**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SIERRA CLUB,<br>    2101 Webster Street, Suite 1300<br>    Oakland, CA 94612,<br><br>UNION OF CONCERNED<br>SCIENTISTS,<br>    2 Brattle Square<br>    Cambridge, MA 02138,<br><br>ENVIRONMENTAL INTEGRITY<br>PROJECT,<br>    888 17th Street NW, Suite 810<br>    Washington, DC 20006,<br><br>and<br><br>CALIFORNIA COMMUNITIES<br>AGAINST TOXICS,<br>    PO Box 2050<br>    Rosamond, CA 93560,<br><br>        Plaintiffs,<br><br>        v.<br><br>ENVIRONMENTAL PROTECTION<br>AGENCY,<br>    1200 Pennsylvania Avenue NW<br>    Washington, DC 20460,<br><br>COUNCIL ON ENVIRONMENTAL<br>QUALITY,<br>    730 Jackson Place NW<br>    Washington, DC 20503,<br><br>DEPARTMENT OF ENERGY,<br>    1000 Independence Avenue SW<br>    Washington, DC 20585, | Civil Action No. 25-1112<br><br>**COMPLAINT** |

DEPARTMENT OF
TRANSPORTATION,
    1200 New Jersey Avenue SE
    Washington, DC 20590,

and

FEDERAL EMERGENCY
MANAGEMENT AGENCY,
    500 C Street SW
    Washington, DC 20472,

        Defendants.

1.    Over the last three months, Defendants the Environmental Protection Agency (EPA), Center for Environmental Quality (CEQ), Department of Energy (DOE), Department of Transportation (DOT), and Federal Emergency Management Agency (FEMA), have removed publicly accessible webpages that served as key sources for information about environmental justice and climate change.

2.    The webpages are essential tools for explaining how communities around the country are harmed or benefited by policy choices regarding the environment, transportation, and energy. The webpages support work examining how the costs of pollution affect disadvantaged communities, provide the means by which community advocates can explain environmental harms, and provide the foundation for public participation in regulatory and legislative processes.

3.    Without these webpages, Plaintiffs are impeded in their ability to understand, explain, or seek to remedy the injustices faced by communities disproportionately affected by climate change, pollution, and other environmental harms, and they must expend additional time, effort, and resources to carry out their work.

4.    Defendants took down the vitally important webpages at issue here without providing required notice of their action, and the removals are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.

## JURISDICTION AND VENUE

5.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, because this action arises under the laws of the United States, namely, the Paperwork Reduction Act of 1995 (PRA), 44 U.S.C. §§ 3501 *et seq.*, and the Administrative Procedure Act (APA), 5 U.S.C. §§ 702, 706.

6.    Venue is proper in this judicial district under 28 U.S.C. § 1391(e)(1) because Defendants are agencies of the United States.

## PARTIES

7.    Plaintiff Sierra Club is a nonprofit membership organization incorporated under the laws of the State of California. Sierra Club has more than 620,000 members nationwide dedicated to exploring, enjoying, and protecting the wild places of the earth. Among other things, Sierra Club informs and educates the public about the activities of the EPA and other federal agencies entrusted with the administration of public-health and environmental laws, with the aim of improving public understanding of, and support for, public health and environmental protection. The Sierra Club has a long history of advocacy and public education about the dangers of climate change-causing and other pollution, as well as the importance of federal enforcement of the Clean Air Act, Clean Water Act, and other bedrock environmental statutes.

8.    Plaintiff Union of Concerned Scientists (UCS) is a nonprofit organization with the mission of conducting scientific analysis and research in the public interest. UCS combines

technical analysis and effective advocacy to create innovative, practical solutions for a healthy, safe, and sustainable future.

9.      Plaintiff Environmental Integrity Project (EIP) is a national nonprofit organization dedicated to advocating for more effective enforcement of environmental laws. EIP (1) conducts research and data analysis that is shared with the public, illustrating how the failure to enforce or implement environmental laws increases pollution and harms public health; (2) engages in legal advocacy to hold federal and state agencies, as well as individual corporations, accountable for failing to enforce or comply with environmental laws; and (3) provides legal and technical resources to organizations and communities that help them obtain the protection of environmental laws. EIP invests substantial time and effort documenting how air and water pollution from industrial operations threatens human health and the environment, particularly in areas that may have higher environmental burdens and vulnerable populations.

10.      Plaintiff California Communities Against Toxics (CCAT) is a nonprofit organization of over 25 organizational members and thousands of individuals across California dedicated to advancing environmental justice and public health.  For the past three decades, CCAT has sought to reduce pollution from industrial sources and to protect members' and local communities' rights to a safe environment. CCAT educates communities, policymakers, and elected officials about the adverse health and environmental impacts of air, water, and soil pollution. Through its work, CCAT has formed strategic partnerships with other environmental justice groups across the country, providing them technical support and working with them to engage in public comment periods on relevant federal and state proceedings and permit applications. CCAT also advances environmental justice and pollution prevention efforts by

advocating in legislative, administrative, educational, and legal arenas on behalf of itself and its membership.

11.     Defendant EPA is a federal agency within the meaning of the PRA, 44 U.S.C. § 3502(1), and the APA, 5 U.S.C. § 551(1).

12.     Defendant CEQ is a federal agency within the meaning of the PRA, 44 U.S.C. § 3502(1), and the APA, 5 U.S.C. § 551(1).

13.     Defendant DOE is a federal agency within the meaning of the PRA, 44 U.S.C. § 3502(1), and the APA, 5 U.S.C. § 551(1).

14.     Defendant DOT is a federal agency within the meaning of the PRA, 44 U.S.C. § 3502(1), and the APA, 5 U.S.C. § 551(1).

15.     Defendant FEMA is a federal agency within the meaning of the PRA, 44 U.S.C. § 3502(1), and the APA, 5 U.S.C. § 551(1).

## STATUTORY AND REGULATORY FRAMEWORK

**The Paperwork Reduction Act**

16.     Congress enacted the PRA to "ensure the greatest possible public benefit from and maximize the utility of information created, collected, maintained, used, shared and disseminated by or for the Federal Government" and "provide for the dissemination of public information on a timely basis, on equitable terms, and in a manner that promotes the utility of the information to the public and makes effective use of information technology." 44 U.S.C. §§ 3501(2), (7).

17.     To accomplish those goals, the PRA mandates that every agency must "ensure that the public has timely and equitable access to the agency's public information" and must "provide adequate notice when initiating, substantially modifying, or terminating significant information dissemination products." 44 U.S.C. §§ 3506(d)(1), (3).

18.     Government-wide guidance issued by the Office of Management and Budget (OMB) states that the term "information dissemination product" includes "any electronic document … or web page" that an agency disseminates to the public. Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of Information Disseminated by Federal Agencies; Republication, 67 Fed. Reg.  8452, 8460 (Feb. 22, 2002).

## FACTS

19.     In late January and February 2025, Defendants took down from their websites numerous tools and pages that provided important information concerning the environment. Defendants provided no notice and no reasoned explanation before removing public access to the tools and webpages.

**EPA – EJScreen**

20.     First released to the public in 2015, EJScreen was an interactive mapping tool that provided critical data on local pollution burdens, demographic indicators, and environmental justice indicators. EJScreen enabled users to conduct analysis for different pollutants and populations on federal, state, and city levels. As part of that analysis, EJScreen provided users with color-coded mapping, the ability to generate a report for a selected area, and comparisons showing differences between a selected area and the surrounding state, EPA region, or the nation.[1]

---

[1] Exhibit 1, Learn to Use EJSCREEN (Jan. 19, 2021), https://19january2021 snapshot.epa.gov/ejscreen/learn-use-ejscreen_.html.



21.     Prior to February 2025, EPA encouraged public use of EJScreen and sought to promote reliance on it. For example, EPA directed grant applicants to use the tool to indicate whether their grants would benefit vulnerable communities. And EPA recognized that EJScreen "may be of interest to community residents or other stakeholders as they search for environmental or demographic information" and "can also support a wide range of research and policy goals."[2]

22.     On February 5, 2025, EPA removed from its website EJScreen and webpages related to EJScreen.

23.     Plaintiff Sierra Club regularly relied on EJScreen in its public education materials, comments and testimony to federal agencies, and conversations with elected officials. For instance, Sierra Club recently released a report that used EJScreen to demonstrate how communities would be harmed by the proposed Southeast Supply Enhancement Project in North Carolina, and it provided recommendations to North Carolina decisionmakers based on the data and analysis. Similarly, in 2022, Sierra Club developed an interactive map of existing and proposed warehouses in the United States that are larger than 100,000 square feet, and it used EJScreen to overlay the

---

[2] Purposes and Uses of EJSCREEN (Jan. 19, 2021), https://19january2021snapshot.epa .gov/ejscreen/purposes-and-uses-ejscreen_.html.

map with demographic information about residents living within a half mile of the warehouses. The map and an accompanying article in Sierra Magazine raised awareness about the impact of the proliferation of warehouses across the country, and the EJScreen data was essential in showing that warehouse development imposes disparate burdens on communities that already bear the burden of a legacy of pollution.

24.    Sierra Club also frequently used EJScreen to create maps and analyses that it used to support its involvement in regulatory proceedings, including comments on important federal Clean Air Act rulemakings that determine the amount of toxic air pollution that can be released into communities. Access to EJScreen was particularly important in that setting because it allowed Sierra Club to produce comments efficiently and meet the constrained timelines that accompany many comment periods.

25.    UCS regularly relied on the EJScreen webpages, including in numerous reports it issued to the public. For example, in its report "Invisible Threat, Inequitable Impact," UCS used EJScreen to assess and explain the environmental justice burden of ethylene oxide emissions in communities across the country and to help identify the case study communities highlighted in the report.

26.    UCS also used EJScreen in technical assistance and education with community partners. For example, in its Community Guide for Cumulative Impacts, which was developed in partnership with community leaders, UCS provided guidance for how to use EJScreen. The community guide also directed users to undertake a practice exercise where they use EJScreen to help understand environmental and health stressors in their communities..

27.    UCS planned to incorporate EJScreen into forthcoming technical analyses. For example, UCS planned to incorporate EJScreen data in a research project that aims to connect

nuclear materials exposure with public health outcomes and highlights the cumulative burdens faced by nuclear frontline communities. Without access to EJScreen, UCS must alter its research methodology and will be unable to include comprehensive cumulative burden data that will help achieve the project's goal of improving health equity in affected communities.

28.    EIP relied on EJScreen weekly to conduct research and prepare public reports, interactive maps, legal filings, and other materials that educate the public and decisionmakers about the impacts of industrial pollution on communities. For example, EIP relied on EJScreen to create published reports on pollution from petroleum coke facilities and on harmful air pollution from new and expanded plastics plants around the country, to identify and report on environmental burdens and vulnerable populations living near these facilities. EIP routinely uses information from these and other EIP reports when engaging in legal advocacy to hold industrial facilities accountable to state and federal laws and when advocating for improvements to existing laws to protect human health and the environment..

29.    EIP operates the website oilandgaswatch.org, which tracks the expansion of oil, gas, and petrochemical infrastructure around the country and alerts the public about opportunities to submit public comments. That website directly incorporated EJScreen data through EJScreen's Application Program Interface (API) tool, enabling EIP automatically to monitor and retrieve demographic and environmental burden data from EJScreen. The API tool was removed from EPA's website at the same time as EJScreen. Without access to the EJScreen API tool and EJScreen mapping tool, EIP can no longer automatically update the oilandgaswatch.org website, and it lacks the resources to do so manually.

30.    EIP also used EJScreen as a consideration in its decisionmaking process to determine how to allocate funds for technical support. To ensure that individuals and communities

can influence environmental decisions that affect their health and quality of life, EIP funds access to high-quality science and engineering expertise. EIP used both EJScreen and CEJST every month to evaluate the demographic, risk characteristics, and other vulnerabilities of communities where it provides technical assistance.

31.     In addition, EIP relied on EJScreen as a consideration in its decisionmaking process to determine when it would expend resources participating in rulemaking or other regulatory proceedings and when deciding whether to spend money and time pursuing litigation.

32.     CCAT regularly relied on EJScreen to explain environmental harms to the public, regulators, and legislators. For example, CCAT has used EJScreen to display and explain the harms caused by lead battery acid facilities and to advocate for improved regulation of the facilities. Exposure to lead pollution can result in severe damage to the brain and nervous system, kidney damage, high blood pressure, infertility and miscarriage, and learning disabilities, and lead battery acid facilities are often located in disadvantaged communities. CCAT has used EJScreen as part of its efforts to inform communities and decisionmakers about the harms these facilities inflict on disadvantaged communities and to advocate for improved monitoring that would alert these communities to dangerous levels of pollution.

33.     After EPA revoked public access to EJScreen, it issued a memorandum stating that "environmental justice considerations shall no longer inform EPA's enforcement and compliance assurance work," and, accordingly, that "EJScreen … has been disabled and may not be used for any enforcement or compliance activity."[3]

---

[3] Jeffrey Hall, Acting Assistant Administrator, Memorandum re: Implementing National Enforcement and Compliance Initiatives Consistently with Executive Orders and Agency Priorities (Mar. 12, 2025), https://www.epa.gov/system/files/documents/2025-03/implementingnecis consistentlywitheosandagencypriorities.pdf.

**CEQ – CEJST**

34.    Prior to January 22, 2025, CEQ maintained webpages making publicly available the Climate and Economic Justice Screening Tool (CEJST). CEJST was an interactive mapping tool that identified and highlighted communities that face disproportionate environmental burdens. The tool expanded on EJScreen and considered burden indicators, including energy burdens, air quality, higher education enrollment, formerly redlined census tracts, expected agricultural loss, and traffic proximity.

35.    CEQ regulations recognized the importance of CEJST and EJScreen and encouraged reliance on those tools. For example, CEQ directed agencies to use CEJST, EJScreen, and similar tools "[t]o assist in identifying communities with environmental justice concerns." 40 C.F.R. § 1508.1(f).

36.    On or about January 22, 2025, CEQ removed from its website CEJST and the webpages related to CEJST.

37.    Sierra Club regularly relied on CEJST to provide targeted advocacy to address the disproportionate impact of environmental crises. For example, after the Maui wildfires in 2023, Sierra Club successfully used EJScreen and CEJST in conjunction with other research to advocate to local health officials to prioritize the evacuation of pregnant native Hawaiian women in the third trimester. From its prior experience with disasters and reviewing post-disaster data, Sierra Club understands that miscarriage and birthweight are tied to pollution. With that knowledge, Sierra Club used the census block-level precision datasets from CEJST and EJScreen to identify the higher acute risk from wildfire pollution to Maui's most vulnerable population and to communicate that information to the Hawaii Department of Health in calls and meetings.

38.    UCS regularly relied on CEJST to conduct technical analyses that it disseminated to the public. For example, UCS relied on CEJST to develop reports on the disadvantaged communities that are particularly vulnerable to impacts from increased coastal flooding and on whether the government was making infrastructure investments in disadvantaged communities. The removal of CEJST greatly impairs UCS's ability to produce national-scale analyses related to climate and environmental justice.

39.    EIP also regularly relied on CEJST, including to conduct research and prepare public reports, interactive maps, and other materials that educate the public and decisionmakers about the impacts of industrial pollution on communities. For example, EIP relied on CEJST to develop and regularly update an interactive map of existing and proposed $CO_2$ pipelines and to publish reports on the harms from petcoke facilities and aluminum manufacturing facilities. EIP also used CEJST several times a month as a consideration when deciding how to allocate funds for technical support.

40.    CCAT regularly relied on CEJST to determine the impact of pollution on disadvantaged communities and to assist those communities in advocating against the environmental and health harms they are suffering. For example, in 2024, a CCAT analysis determined that copper smelters in Arizona were emitting enormous quantities of lead via the air. In regulating that pollution, EPA had ignored the impact on the San Carlos Apache Tribe. Using EJScreen and CEJST, CCAT was able to identify the extent of the disproportionate impact on the San Carlos Apache Tribe, who were then able to use that data to advocate for regulations that would protect the health of their community and the environment.

41.    After removing access to CEJST, CEQ issued a memorandum stating that agencies should not include "an environmental justice analysis" when undertaking environmental impact reviews.[4]

**DOE – LEAD Tool**

42.    Until late January 2025, DOE maintained webpages related to the Low-Income Energy Affordability Data (LEAD) Tool. The LEAD tool was an interactive mapping tool that helped users understand and compare the cost of energy relative to income, for various geographic regions, including census tracts, cities, counties, states, tribal lands, and the entire United States. DOE specifically created the tool to improve knowledge about housing and energy characteristics for low- and moderate-income communities.

43.    Between January 25, 2025, and January 29, 2025, DOE removed from its website the LEAD tool and pages related to it.

44.    The LEAD Tool was central to Sierra Club's work to protect public health, climate, and public lands. For instance, Sierra Club used the LEAD tool to analyze how liquid natural gas build-out increases energy bills and contributes to disproportionate energy burdens on low-income households.

45.    Sierra Club also used the LEAD tool in reports that develop regional recommendations to alleviate the energy burden for vulnerable households. For example, Sierra Club used the LEAD tool to produce its St. Louis Energy Burden Report, which highlights racial and economic disparities in energy burden in the city, and Missouri Energy Burden Explorer, an interactive map that presents energy burden data by census tract, as well as data on income, race,

---

[4] Katherine R. Scarlett, Chief of Staff, Memorandum re: Implementation of the National Environmental Policy Act (Feb. 19, 2025), https://ceq.doe.gov/docs/ceq-regulations-and-guidance/CEQ-Memo-Implementation-of-NEPA-02.19.2025.pdf.

and respiratory illness rates. Those reports have been vital both to Sierra Club's advocacy and to its decisions about how and where to allocate resources.

46.     UCS regularly relied on the LEAD tool. For example, UCS relied on the LEAD tool in its ongoing efforts to produce reports about how decarbonization and a cleaner electric grid may affect energy access and affordability.

**DOE – Community Benefits Plan Map**

47.     DOE created the Community Benefits Plan Map to allow local communities to better understand what DOE projects are being developed in their area so that community members and other advocates can engage more effectively with the projects. The Community Benefits Plan Map provided information about the location of DOE-funded projects and the community benefits expected to derive from those projects.

48.     On January 23, 2025, DOE issued a memorandum "directing a suspension of … diversity, equity, and inclusion (DEI) policies, procedures, programs, activities, and reviews involving or relating to DEI objectives and principles … [and of actions] requiring, using, or enforcing Community Benefits Plans."[5]

49.     Between January 25, 2025, and January 29, 2025, DOE removed from its website the Community Benefits Plan Map and pages related to it.

50.     Sierra Club relied on the Community Benefits Plan Map in its work supporting the necessary transition of the most polluting industries to cleaner, greener technologies while preserving and growing high-paying jobs. For example, Sierra Club recently used the Community

---

[5] Ingrid C. Kolb, Acting Secretary, Memorandum re: Executive Order on Ending Radical and Wasteful Government DEI Programs and Preferencing, and Agency-Wide Policy to Promote Equal Opportunity (Jan. 23, 2025), https://www.energy.gov/sites/default/files/2025-02/Memorandum%20signed%20by%20Acting%20Secretary%20of%20Energy%20Ingrid%20C.%20Kolb%20dated%20January%2023%202025%20%2802%29.pdf

Benefit Plans Map as part of its efforts to ensure that potential DOE-funded projects not only delivered climate benefits but also local air and water quality benefits, and addressed other needs of manufacturing communities. Sierra Club used the webpages to understand the communities impacted by the projects, to reach out to those communities to encourage them to engage in the public process, and to engage in the public process itself.

**DOT – ETC Explorer**

51.    DOT's Equitable Transportation Community (ETC) Explorer was an interactive mapping tool that compiled location data based on transportation insecurity, climate and disaster risk burden, environmental burden, health vulnerability, and social vulnerability. It served as a complement to CEJST and helped explain the cumulative burden that communities experience from underinvestment in transportation.

52.    On its website, DOT recognized that the ETC Explorer was intended to permit users to understand the transportation-related causes of disadvantage.

53.    Between January 26, 2025, and February 1, 2025, DOT removed from its website the ETC Explorer and pages related to it.

54.    The ETC Explorer has been instrumental in Sierra Club's work related to public transportation projects meant to allow all communities to access green spaces and public recreational amenities. Sierra Club used the ETC Explorer and EJScreen to identify public transit routes that connect underserved communities to green spaces like trails, parks, and nature areas; to encourage municipalities to advertise their existing routes as "transit to trails" options; and to promote legislation that would create or improve transportation between underserved communities and public lands.

55. Sierra Club also regularly used the ETC Explorer to identify gaps in public transit availability and, in conjunction with EJScreen, to determine where to allocate its resources for public transportation projects.

**FEMA – Future Risk Index**

56. FEMA's Future Risk Index was an interactive mapping tool that provided projected economic losses due to climate change at the county level, based on different greenhouse gas emission scenarios and environmental hazards (coastal flooding, extreme heat, wildfire, hurricanes, and drought). The Future Risk Index served as a supplement to FEMA's National Risk Index and provided free, one-of-a-kind information about how much climate change is likely to cost communities in the United States.

57. In February 2025, FEMA removed from its website the Future Risk Index and pages related to it.

58. When the pages were posted, UCS used the Future Risk Index webpages for scoping technical analyses, and UCS had been considering integrating the tool into a forthcoming analysis on affordable housing.

**Injury to Plaintiffs**

59. Defendants' decisions to remove the webpages are causing and will cause substantial harm to Plaintiffs. As set forth above, Plaintiffs relied and, absent Defendants' removal, would continue to rely heavily on the removed webpages to explain to communities, decisionmakers, and the media the harms suffered by disadvantaged groups, and how policy choices can exacerbate or ameliorate those harms; to engage with regulatory processes; and to decide how and where to allocate their scarce resources.

60.     Without the information provided by the removed webpages, Plaintiffs have had to halt work on reports intended for public dissemination and are impeded in their ability to identify communities that face disproportionate environmental burdens, to communicate how policies will impact those communities, and to target resources to aid disadvantaged communities.

61.     Defendants' removal of access to the webpages makes it harder for Plaintiffs to disseminate accurate information about the impacts of industrial air and water pollution on human health and the environment to the general public, impacted communities, organizations, decisionmakers, and the media. For example, they cannot publish reports with the same detailed data or must seek out alternative sources of information for their reports that are less convenient and less reliable.

62.     The webpage removals also hamper the ability of Plaintiffs to participate in regulatory processes. Because many public comment periods are only open for 30 days, it is essential for potential commenters to have access to tools that allow them to quickly assess the impact of proposals on the environment and disadvantaged communities. By removing web pages, Defendants have increased the burden on members of the public, including Plaintiffs, that seek to participate in the regulatory process. Plaintiffs must therefore expend additional resources to participate in ostensibly open government proceedings.

63.     Plaintiffs do not have access to alternative sources of information that provide the same level of standardization, reliability, precision, and functionality as the removed webpages. Plaintiffs do not have access to alternatives that offer a consistent, reliable methodology used by partner organizations and state and federal agencies.

64.     Some of the removed webpages compiled information from numerous other sources. For example, EJScreen combined numerous datasets that originated from the Census

Bureau, EPA, the Federal Highway Administration, and other agencies. Collecting that information would require Plaintiffs to invest significant time and resources and could not be done in a timely manner. In addition, if Plaintiffs were able to access the data, combining it would present technical and data management challenges that would also require Plaintiffs to expend additional resources.

65.     Because Defendants have removed the webpages, Plaintiffs must now either expend additional time and resources to determine how to serve their target populations or face a greater risk that their investment of time, money, and resources will go to naught.

### COUNT I
### (By All Plaintiffs Against EPA)

66.     The APA empowers this Court to "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or taken "without observance of procedure required by law," *id.* § 706(2)(D).

67.     The EJScreen webpages that EPA removed are significant information dissemination products. *See* 44 U.S.C. § 3506(d)(3).

68.     Because it provided no advance public notice before removing the webpages, EPA failed to comply with the PRA requirement that an agency must "provide adequate notice when initiating, substantially modifying, or terminating significant information dissemination products." *Id.*

69.     Because it removed all access to the interactive webpages, EPA failed to comply with the PRA requirement that an agency "ensure that the public has timely and equitable access to the agency's public information." *Id.* § 3506(d)(1).

70.     EPA's decision to remove the webpages lacked reasonable explanation.

71.    By removing the webpages, EPA failed to observe procedures required by law, and took agency action that was arbitrary, capricious, an abuse of discretion, or not in accordance with the PRA.

## COUNT II
### (By All Plaintiffs Against CEQ)

72.    The APA empowers this Court to "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or taken "without observance of procedure required by law," *id.* § 706(2)(D).

73.    The CEJST webpages that CEQ removed are significant information dissemination products. *See* 44 U.S.C. § 3506(d)(3).

74.    Because it provided no advance public notice before removing the webpages, CEQ failed to comply with the PRA requirement that an agency must "provide adequate notice when initiating, substantially modifying, or terminating significant information dissemination products." *Id*.

75.    Because it removed all access to the interactive webpages, CEQ failed to comply with the PRA requirement that an agency "ensure that the public has timely and equitable access to the agency's public information." *Id*. § 3506(d)(1).

76.    CEQ's decision to remove the webpages lacked reasonable explanation.

77.    By removing the webpages, CEQ failed to observe procedures required by law, and took agency action that was arbitrary, capricious, an abuse of discretion, or not in accordance with the PRA.

## COUNT III
### (By Sierra Club and UCS Against DOE)

78.     The APA empowers this Court to "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or taken "without observance of procedure required by law," *id.* § 706(2)(D).

79.     The LEAD and Community Benefits Plan Map webpages that DOE removed are significant information dissemination products. *See* 44 U.S.C. § 3506(d)(3).

80.     Because it provided no advance public notice before removing the webpages, DOE failed to comply with the PRA requirement that an agency must "provide adequate notice when initiating, substantially modifying, or terminating significant information dissemination products." *Id*.

81.     Because it removed all access to the interactive webpages, DOE failed to comply with the PRA requirement that an agency "ensure that the public has timely and equitable access to the agency's public information." *Id*.

82.     DOE's decision to remove the webpages lacked reasonable explanation.

83.     By removing the webpages, DOE failed to observe procedures required by law, and took agency action that was arbitrary, capricious, an abuse of discretion, or not in accordance with the PRA.

## COUNT IV
### (By Sierra Club Against DOT)

84.     The APA empowers this Court to "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or taken "without observance of procedure required by law," *id.* § 706(2)(D).

85.    The ETC webpages that DOT removed are significant information dissemination products. *See* 44 U.S.C. § 3506(d)(3).

86.    Because it provided no advance public notice before removing the webpages, DOT failed to comply with the PRA requirement that an agency must "provide adequate notice when initiating, substantially modifying, or terminating significant information dissemination products." *Id*.

87.    Because it removed all access to the interactive webpages, DOT failed to comply with the PRA requirement that an agency "ensure that the public has timely and equitable access to the agency's public information." *Id*.

88.    DOT's decision to remove the webpages lacked reasonable explanation.

89.    By removing the webpages, DOT failed to observe procedures required by law, and took agency action that was arbitrary, capricious, an abuse of discretion, or not in accordance with the PRA.

**COUNT V**
**(By UCS Against FEMA)**

90.    The APA empowers this Court to "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or taken "without observance of procedure required by law," *id.* § 706(2)(D).

91.    The Future Risk Index webpages that FEMA removed are significant information dissemination products. *See* 44 U.S.C. § 3506(d)(3).

92.    Because it provided no advance public notice before removing the webpages, FEMA failed to comply with the PRA requirement that an agency must "provide adequate notice when initiating, substantially modifying, or terminating significant information dissemination products." *Id*.

93.     Because it removed all access to the interactive webpages, FEMA failed to comply with the PRA requirement that an agency "ensure that the public has timely and equitable access to the agency's public information." *Id*.

94.     FEMA's decision to remove the webpages lacked reasonable explanation.

95.     By removing the webpages, FEMA failed to observe procedures required by law, and took agency action that was arbitrary, capricious, an abuse of discretion, or not in accordance with the PRA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

(1)  Declare that Defendants' removal of webpages related to EJScreen, CEJST, the LEAD tool, the Community Benefits Plan Map, the ETC Explorer, and the Future Risk Index violates the PRA and the APA;

(2)  Order Defendants to restore the removed webpages related to EJScreen, CEJST, the LEAD tool, the Community Benefits Plan Map, the ETC Explorer, and the Future Risk Index;

(3)  Award Plaintiffs their costs, attorneys' fees, and other disbursements for this action; and

(4)  Grant any other relief this Court deems appropriate.

Dated: April 14, 2025                    Respectfully submitted,

                                         /s/ Zachary R. Shelley
                                         Zachary R. Shelley (DC Bar No. 90021549)
                                         Adina H. Rosenbaum (DC Bar No. 490928)
                                         Allison M. Zieve (DC Bar No. 424786)
                                         Public Citizen Litigation Group
                                         1600 20th Street NW
                                         Washington, DC 20009
                                         (202) 588-1000
                                         zshelley@citizen.org

                                         *Counsel for All Plaintiffs*

                                         Andrea Issod* (CA Bar No. 230920)
                                         Joya Manjur* (CA Bar No. 348160)
                                         Sierra Club
                                         2101 Webster Street, Suite 1300
                                         Oakland, CA 94612
                                         (415) 977-5544

                                         *Counsel for Sierra Club*

                                         *\* Motion to appear pro hac vice forthcoming*