## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SIERRA CLUB, et al. | |
| Plaintiffs, | |
| v. | Civil Action No. 25-cv-1112-RC |
| ENVIRONMENTAL PROTECTION AGENCY, et al. | |
| Defendants. | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Andrea Issod (CA Bar No. 230920)
Joya Manjur (CA Bar No. 348160)
Sierra Club
2101 Webster Street, Suite 1300
Oakland, CA 94612
(415) 977-5544

*Counsel for Sierra Club*

Zachary R. Shelley (DC Bar No. 90021549)
Adina H. Rosenbaum (DC Bar No. 490928)
Allison M. Zieve (DC Bar No. 424786)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
zshelley@citizen.org

*Counsel for All Plaintiffs*

# CONTENTS

Introduction........................................................................................................................ 1

Background ......................................................................................................................... 2

    Removal of data and webpages.......................................................................................... 2

    This lawsuit ..................................................................................................................... 7

Legal Standard ................................................................................................................... 7

Argument ........................................................................................................................... 8

I.      Plaintiffs are likely to succeed on the merits. .................................................... 8

    A.  Removal of the webpages and datasets violated the Paperwork Reduction Act. ......... 8

    B.  Removal of the interactive tools and datasets was arbitrary and capricious.............. 14

II.    Plaintiffs are suffering and will suffer irreparable injury absent a preliminary injunction. .
    ........................................................................................................................................ 16

III.   The balance of the equities and the public interest favor Plaintiffs. ................................ 23

Conclusion ....................................................................................................................... 24

# TABLE OF AUTHORITIES

**Cases**

*American Immigration Council v. DHS*,
   470 F. Supp. 3d 32 (D.D.C. 2020) ........................................................................... 22

*C.G.B. v. Wolf*,
   464 F. Supp. 3d 174 (D.D.C. 2020) ......................................................................... 23

*Chaplaincy of Full Gospel Churches v. England*,
   454 F.3d 290 (D.C. Cir. 2006) .................................................................................... 8

*D.A.M. v. Barr*,
   474 F. Supp. 3d 45 (D.D.C. 2020) ............................................................................. 8

*DHS v. Regents of the University of California*,
   591 U.S. 1 (2020) ............................................................................................... 14, 15

*Fertilizer Instute v. EPA*,
   935 F.2d 1303 (D.C. Cir. 1991) ............................................................................... 12

*League of Women Voters of the United States v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016) ...................................................................................... 22

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 5
   67 U.S. 209 (2012) ...................................................................................................... 8

*Motor Vehicle Manufacturers Ass'n of the United States v. State Farm Mutual Automobile Insurance Co.*,
   463 U.S. 29 (1983) .................................................................................................... 14

*Open Communities Alliance v. Carson*,
   286 F. Supp. 3d 148 (D.D.C. 2017) ......................................................................... 23

*Perez v. Mortgage Bankers Ass'n*,
   575 U.S. 92 (2015) .................................................................................................... 15

*SEC v. Chenery Corp.*,
   332 U.S. 194 (1947) .................................................................................................. 14

*United Steel, Paper & Forestry, Rubber, Manufacturing, Energy, Allied Industrial & Service Workers International Union v. Federal Highway Administration*,
   151 F. Supp. 3d 76 (D.D.C. 2015) ........................................................................... 12

**Statutes**

44 U.S.C. § 3501 ............................................................................................................... 9

44 U.S.C. § 3501(7) ............................................................................................................ 9

44 U.S.C. § 3502(12) .......................................................................................................... 9

44 U.S.C. § 3506(d)(1) ........................................................................................................ 9

44 U.S.C. § 3506(d)(2) ...................................................................................................... 13

5 U.S.C. § 706(2)(A) ...................................................................................................... 1, 8

5 U.S.C. § 706(2)(D) ........................................................................................................... 1

**Regulations**

40 C.F.R. § 1508.1(f) ........................................................................................................ 12

**Other Authorities**

Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of
Information Disseminated by Federal Agencies; Republication, 67 Fed. Reg. 8452 (Feb. 22,
2002). ............................................................................................................................ 12

H.R. Rep. No. 104-37 ........................................................................................................ 13

OMB Circular A-130, 1993 WL 357572 (June 28, 1993) ................................................ 13

**INTRODUCTION**

In January and February 2025, the Environmental Protection Agency (EPA), Council on Environmental Quality (CEQ), Department of Energy (DOE), Department of Transportation (DOT), and Federal Emergency Management Agency (FEMA) (collectively, Defendants) revoked public access to a number of webpages that provided important information concerning the environment and public health. Defendants provided no public warning that the webpages would disappear, and they provided no reasoned explanation for halting public access to the information.

When they developed these tools for public dissemination, Defendants recognized that the tools are singularly useful and actively encouraged the public to rely on them. For Plaintiffs, the webpages were essential to their ability to understand environmental harms, climate change, and socioeconomic stressors; to educate communities about the harms they face; and to engage with government officials to mitigate those harms. Defendants' sudden take-down of the webpages has hindered—and in some cases halted—Plaintiffs' work and forced them to expend additional resources searching for alternative sources of information that either do not exist at all, do not provide the same quality, or take more time to access. Without the tools that Defendants have removed, Plaintiffs must expend additional time, effort, and resources to carry out their work, and they cannot engage with policymakers as efficiently or effectively.

Defendants' removal of the webpages was arbitrary, capricious, and not in accordance with law, including the Paperwork Reduction Act of 1995 (PRA)—a statute enacted to ensure that agencies do not abruptly and arbitrarily revoke access to important resources and to ensure that the public has timely and equitable access to reliable, useful information. *See* 5 U.S.C. § 706(2)(A). The removal was also undertaken without observance of required procedures. *See id*. § 706(2)(D). Given the harm to Plaintiffs' ability to engage in ongoing public debates about changes to

1

transportation, energy, health, and environmental policies, and that Defendants would suffer no cognizable harm if required to restore the webpages and data, this Court should enter a preliminary injunction requiring Defendants to restore the webpages that they removed.

## BACKGROUND

### Removal of data and webpages

Until recently, Defendants ensured public access to interactive webpages that provided information about the environment and public health, including EPA's EJScreen, CEQ's Climate and Economic Justice Screening Tool (CEJST), DOE's Low-Income Energy Affordability Data (LEAD) Tool and Community Benefits Map, DOT's Equitable Transportation Community (ETC) Explorer, and FEMA's Future Risk Index. Beginning in January 2025, Defendants removed each of these interactive webpages, as well as the behind-the-scenes webpages and datasets necessary for the interactive pages to function.

### EPA – EJScreen

On February 5, 2025, EPA removed from its website EJScreen, webpages that supported EJScreen's functionality, and the EJScreen Application Program Interface (API) tool, which allowed the public to automatically collect data from EJScreen using computer code. Grenter Decl. ¶ 7; Duggan Decl. ¶ 10. Developed over the course of several years and first released to the public in 2015, EJScreen was an interactive mapping tool that provided critical data on local pollution burdens, demographic indicators, and environmental justice indicators. *See* EPA, How was EJSCREEN Developed? (Jan. 19, 2021), https://19january2021snapshot.epa.gov/ejscreen/how-was-ejscreen-developed_.html.[1] EJScreen presented over a dozen environmental and demographic

---

[1] The Court may take "judicial notice of information posted on official public websites of government agencies." *Pharm. Rsch. & Manufacturers of Am. v. DHS*, 43 F. Supp. 3d 28, 33 (D.D.C. 2014).

indicators by standardizing and compiling information from other public datasets and also generated EPA's own indices. This solved the technical problems of developing a "nationally consistent dataset and approach for combining environmental and demographic indicators." EPA, What is EJSCREEN? (Jan. 19, 2021), https://19january2021snapshot.epa.gov/ejscreen/what-ejscreen_.html. It also presented that data in a more useful interactive format and used the underlying data to create environmental justice indicators that identified communities that face unique burdens from pollution. *Id.*

By providing all this data in one place, EJScreen enabled users to analyze the demographic characteristics and environmental burdens of communities at a granular level. As part of that analysis, EJScreen provided users with color-coded mapping, the ability to generate a report for a selected area, and comparisons showing differences between a selected area and the surrounding state, EPA region, or the nation. *See* EPA, Learn to Use EJSCREEN (Jan. 19, 2021), https://19january2021snapshot.epa.gov/ejscreen/learn-use-ejscreen_.html.

EPA promoted public use of EJScreen, recognizing that it "may be of interest to community residents or other stakeholders as they search for environmental or demographic information" and "can also support a wide range of research and policy goals." EPA, Purposes and Uses of EJSCREEN (Jan. 19, 2021), https://19january2021snapshot.epa.gov/ejscreen/purposes-and-uses-ejscreen_.html. EPA also recognized that because EJScreen provided a consistent nationwide methodology for understanding environmental burdens, it "create[d] a common starting point between the agency and the public when looking at issues related to environmental justice." *Id.* After removing EJScreen, EPA posted at least some of the data from EJScreen to a public repository. *See* USEPA/EJAMM-open, https://github.com/USEPA/EJAM-open. However, those datasets are not nearly as functional or useful as the EJScreen webpage, and using that data has

proved time-intensive and costly because it requires overcoming steep technical challenges the agencies had solved when they originally created the interactive tools. *See* Williams Decl. ¶ 22; Duggan Decl. ¶ 31; Grenter Decl. ¶ 37.

**CEQ – CEJST**

On January 22, 2025, CEQ removed CJEST and its supporting webpages and datasets. Grenter Decl. ¶ 7. Like EJScreen, CEJST was an interactive mapping tool that identified and highlighted communities that face disproportionate environmental burdens using a consistent nationwide methodology. *See* CEQ, Methodology (Jan. 17, 2025), https://web.archive.org/web/20250117221651/https://screeningtool.geoplatform.gov/en/methodo logy#3/33.47/-97.5.[2] The tool included different environmental and demographic indicators than did EJScreen, combining dozens of datasets on climate change, energy, health, housing, pollution, transportation, water and wastewater, and workforce development. *Id.* Before it removed CEJST, CEQ encouraged public use of and feedback on the tool. *See* CEQ, About (Jan. 17, 2025), https://web.archive.org/web/20250117222055/https://screeningtool.geoplatform.gov/en/about#3/ 33.47/-97.5.

---

[2] "The Internet Archive Wayback Machine is a service that allows people to visit archived versions of Web sites. Visitors to the Wayback Machine can type in a URL, select a date range, and then begin surfing on an archived version of the Web." Wayback Machine General Information, Internet Archive, https://help.archive.org/help/wayback-machine-general-information. As the D.C. Circuit has recognized, "[t]he contents of webpages available through the Wayback Machine constitute facts that can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *New York v. Meta Platforms, Inc.*, 66 F.4th 288, 303 (D.C. Cir. 2023) (internal quotation marks omitted). Although the Wayback Machine preserves some of Defendants' descriptions of the removed webpages, the contents of the interactive mapping tools are not functional through archived Wayback Machine pages.

**DOE – LEAD Tool**

At some point between January 25, 2025, and January 29, 2025, DOE removed from its website the LEAD tool and its supporting webpages and datasets. Grenter Decl. ¶ 7. The LEAD Tool was an interactive mapping tool that helped users understand and compare the cost of energy relative to income for various geographic regions, including census tracts, cities, counties, states, tribal lands, and the entire United States. *See* DOE, LEAD Tool Methodology (Dec. 2024), https://www.energy.gov/sites/default/files/2024-12/lead-methodology_122024.pdf. DOE created the tool specifically to allow users to "make data-driven decisions on energy goal setting and program planning by providing them information on low-to-moderate-income household populations and associated energy use." *Id.* (recognizing that the LEAD Tool helps "fill knowledge gaps, conduct strategic energy planning, inform the development of low-income energy programs and goals, improve energy program targeting, and increase public awareness of low-income household issues").

**DOE – Community Benefits Map**

At some point between January 25, 2025, and January 29, 2025, DOE removed from its website the Community Benefits Map and its supporting webpages and datasets. Grenter Decl. ¶ 7. The Community Benefits Map was an interactive mapping tool that provided information about the location of DOE-funded projects and the community benefits expected to derive from those projects. *See* DOE, Community Benefits Map for Demonstration and Deployment Projects (Nov. 22, 2024), https://web.archive.org/web/20241122145403/https://www.energy.gov/infrastructure/community-benefits-map-demonstration-and-deployment-projects. DOE created the Community Benefits Map to allow local communities to better understand what DOE projects are being

5

developed in their area so that community members and other advocates could engage more effectively with the projects. *Id.*

**DOT – ETC Explorer**

At some point between January 26, 2025, and February 1, 2025, DOT removed from its website the ETC Explorer and its supporting webpages and datasets. Grenter Decl. ¶ 7. The ETC Explorer was an interactive mapping tool that compiled location data based on transportation insecurity, climate and disaster risk burden, environmental burden, health vulnerability, and social vulnerability. *See* DOT, ETC Explorer (Jan. 26, 2025), https://web.archive.org/web/20250126215618/https://www.transportation.gov/priorities/equity/justice40/etc-explorer. The ETC Explorer was "designed to complement [CEJST] by providing users deeper insight into the Transportation disadvantage component of CEJST, and the ETC Explorer's Transportation Insecurity component, which will help ensure the benefits of DOT's investments are addressing the transportation related causes of disadvantage." *Id.* DOT encouraged the public's use of the ETC Explorer, explaining that the tool would allow "every community in the country to understand how it is experiencing burden that transportation investments can mitigate or reverse." *Id.*

**FEMA – Future Risk Index**

In February 2025, FEMA removed from its website the Future Risk Index and its supporting webpages and datasets. Phartiyal Decl. ¶ 5. The Future Risk Index was an interactive mapping tool that provided projected economic losses due to climate change at the county level, based on different climate scenarios and environmental hazards, including coastal flooding, extreme heat, wildfire, hurricanes, and drought. *See* FEMA, Frequently Asked Questions (Jan. 19, 2025), https://web.archive.org/web/20250119104326/https://hazards.fema.gov/nri/frequently-asked-questions#is-future-risk-incorporated-into-the-national-risk-index. The Future Risk Index

provided one-of-a-kind information about how much climate change is likely to cost communities in the United States. *See id.*; Phartiyal Decl. ¶ 12.

**This lawsuit**

Plaintiffs Sierra Club, Union of Concerned Scientists (UCS), Environmental Integrity Project (EIP), and California Communities Against Toxics (CCAT) are nonprofit organizations that regularly relied on the removed webpages. *See* Grenter Decl. ¶ 3; Phartiyal Decl. ¶ 2; Duggan Decl. ¶ 2; Williams Decl. ¶ 2. Plaintiffs used the webpages to investigate environmental harms and educate the public, to guide where they directed their technical expertise and funding, and to engage with public officials. *See, e.g.*, Grenter Decl. ¶¶ 9–33; Phartiyal Decl. ¶¶ 7–12; Duggan Decl. ¶¶ 7–27; Williams Decl. ¶¶ 5–16. For example, the webpages allowed EIP to draft a report exposing that petroleum refineries that release pollution in waterways are disproportionately located in communities where the majority of residents are people of color or are considered low-income. Duggan Decl. ¶ 13. And the webpages formed the basis for comments that prompted the EPA to strengthen its Major-Minor Source Reclassification Rule, and reduce toxic air pollution in communities that CCAT works to protect. *See* Williams Decl. ¶¶ 6–9. Defendants' removal of these tools has disrupted Plaintiffs' work and forced them to expend additional resources in search of replacement data. *See* Grenter Decl. ¶ 13; Phartiyal Decl. ¶ 14; Duggan Decl. ¶ 36; Williams Decl. ¶ 14; *see also infra* II.

## LEGAL STANDARD

"To warrant preliminary injunctive relief, the moving party must show (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction." *Chaplaincy of Full Gospel Churches*

7

*v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (citations omitted). "When the movant seeks to enjoin the government, the final two … factors—balancing the equities and the public interest—merge." *D.A.M. v. Barr*, 474 F. Supp. 3d 45, 67 (D.D.C. 2020) (citing *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016)).

## ARGUMENT

Each factor favors granting Plaintiffs' motion for a preliminary injunction. Because Defendants have violated the requirements of the PRA and failed to engage in reasoned decisionmaking, Plaintiffs are likely to succeed on the merits. They are currently suffering irreparable harm from the substantial disruptions Defendants' actions have caused to their work explaining environmental harms, advocating for policies that will protect public health and the environment, and engaging with policymakers. And the balance of the equities and public interest weigh decidedly in Plaintiffs' favor because there is no public interest in the perpetuation of Defendants' unlawful actions and the interest in promoting public understanding and engagement with policies that impact the environment and public health is served by public access to the removed webpages.

## I.    Plaintiffs are likely to succeed on the merits.

### A.    Removal of the webpages and datasets violated the Paperwork Reduction Act.

The Administrative Procedures Act (APA) provides that a reviewing court "shall" hold unlawful and set aside agency actions "not in accordance with law." 5 U.S.C. § 706(2)(A); *see Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 220 (2012) (referring to a claim that an agency has "violate[d] a federal statute" as "a garden-variety APA claim"). Here, Defendants' removal of the webpages at issue failed to comply with two distinct requirements of the PRA.

8

**1.  Defendants violated the Paperwork Reduction Act's requirement to provide timely and equitable access to public information.**

Congress enacted the PRA to "ensure the greatest possible public benefit from and maximize the utility of information created, collected, maintained, used, shared and disseminated by or for the Federal Government" and to "provide for the dissemination of public information on a timely basis, on equitable terms, and in a manner that promotes the utility of the information to the public and makes effective use of information technology." 44 U.S.C. §§ 3501(2), (7). To accomplish these goals, Congress mandated that every agency "ensure that the public has timely and equitable access to the agency's public information." *Id.* § 3506(d)(1).

The PRA defines "public information" as "any information, regardless of form or format, that an agency discloses, disseminates, or makes available to the public." *Id.* § 3502(12). When an agency first "discloses, disseminates, or makes [information] available to the public," that information becomes "public information." *Id.* § 3502(12); *see* H.R. Rep. No. 104-37, at 109 (contrasting the PRA with the Freedom of Information Act and explaining that "'[p]ublic information' is information that an agency has in fact made public"). Because Defendants maintained the removed webpages on their publicly accessible websites, the contents of those webpages are public information, and the requirement to provide timely and equitable access attaches to them.

Here, Defendants' removal of the interactive webpages denies "timely" access to "public information" for two reasons. First, some of the information on the pages was available only through those webpages. For example, the Future Risk Index provided a novel assessment of the costs of climate change that is not available elsewhere, Phartiyal Decl. ¶ 12, and EJScreen included unique environmental burden indices and percentiles. *See* EPA, Environmental Justice Indexes in EJSCREEN, (Jan. 19, 2021), https://19january2021snapshot.epa.gov/ejscreen/environmental-

justice-indexes-ejscreen_.html. By removing access to the webpages, Defendants effectively revoked access to that information. And, to state the obvious, access to information cannot be timely if there is no access at all.

Second, the agencies have recognized that the interactive webpages enabled the public to understand the environmental burdens they face and how government policies impact those burdens. *See supra* pp. 3–6. When Defendants created the webpages, they consolidated information from numerous other data sources and solved the difficult technical problems inherent in creating a consistent and user-friendly nationwide approach for combining that data. *Id.* By presenting that information in an interactive format and, in the case of EJScreen, with the ability to instantly generate PDF summary reports, Defendants ensured that the public had easy access to the information whenever they needed it. *See* Williams Decl. ¶ 26; Grenter Decl. ¶ 38; Duggan Decl. ¶ 24. Attempting to collect the information from the disparate sources that Defendants consolidated with their interactive tools and to display it in a comprehensible format would require "[a] significant investment of time and resources" and "would present technical and data management challenges." Duggan Decl. ¶ 31; *see* Grenter Decl. ¶ 37. By denying access to the interactive webpages, Defendants have therefore effectively denied access to all the information for a substantial portion of the public. *See* Phartiyal Decl. ¶ 15; Grenter Decl. ¶ 37; Duggan Decl. ¶¶ 29, 31, 35; Williams Decl. ¶¶ 25–27.

Moreover, even well-resourced and technically-savvy members of the public are now denied timely access to the information because, in situations with limited timeframes, they are required to engage in a time- and labor-intensive process to retrieve the data that was previously accessible through the interactive webpages. The removed webpages are particularly important because they allow members of the public to quickly conduct analyses that can be submitted in

support of comments in administrative proceedings. *See* Williams Decl. ¶¶ 5–13; Grenter Decl. ¶¶ 32–33; Duggan Decl. ¶ 27. Many public comment periods "are a maximum of 30 days," so the delays in accessing public information that Defendants have imposed by removing the interactive webpages will frequently prevent Plaintiffs "from meaningfully participating under these constrained timelines." Williams Decl. ¶ 26; *see, e.g.*, U.S. Army Corp of Engineers, Public Notice of Application for Permit (Apr. 28, 2025) (seven-day comment period);[3] U.S. Army Corp of Engineers, Public Notice (Apr. 21, 2025) (thirteen-day comment period).[4] Defendants' action has thus undermined a key use of the data and denied timely access to Plaintiffs.

Defendants' removal of webpages is also not "equitable." In enacting the PRA's information dissemination requirements, Congress "require[d] agencies not only to refrain from enhancing the position of some members of the public over that of others, but to refrain from enhancing the Federal Government's position over that of others as well." H.R. Rep. No. 104-37, at 45. Removing access to the interactive tools, however, disadvantages the public, which now must spend substantial resources to attempt to access other, insufficient sources of information that the government possesses and previously made readily available. And again, only well-resourced members of the public with technical expertise can even attempt to do so. *See* Phartiyal Decl. ¶ 15; Duggan Decl. ¶ 35; Grenter Decl. ¶ 37; Williams Decl. ¶ 25. Those barriers violate the duty to provide equitable access to public information.

---

3    https://www.nws.usace.army.mil/Portals/27/docs/regulatory2/Public%20Notices/2025/NWS-2024-23-PN.pdf?ver=WLa0grFTKFw6z-ltO_jT8g%3d%3d.

4    https://www.swg.usace.army.mil/Portals/26/docs/regulatory/PN%20APRIL/SWG-2025-00115%20TXCPL%20PN%20(Energy%20EO).pdf?ver=x-583fPypUiD0pJ6EvCq3g%3d%3d.

### 2. Defendants failed to observe procedures required by the PRA.

Through the PRA, Congress required agencies to "provide adequate notice when initiating, substantially modifying, or terminating significant information dissemination products." 44 U.S.C. § 3506(d)(3). When Congress has set out a procedural requirement, such as a requirement to provide notice or an opportunity to comment prior to agency action, and the agency fails to satisfy that requirement, this Court has found the action to be both "not in accordance with law and without observance of procedure required by law, in violation of Section 706 of the APA."[5] *United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union v. Fed. Highway Admin.*, 151 F. Supp. 3d 76, 93–94 (D.D.C. 2015) (internal quotation marks omitted). Here, before removing the webpages, Defendants failed to observe the PRA's notice requirement.

Government-wide guidance issued by the Office of Management and Budget explains that the term "information dissemination product" includes "any electronic document … or web page" that an agency disseminates to the public. 67 Fed. Reg. 8452, 8460 (Feb. 22, 2002). Here, the webpages that Defendants removed are all "electronic document[s]" or "web page[s]" that the agencies had disseminated to the public, *id.*, and, therefore, are all information dissemination products.

Each of the datasets and webpages is also a "significant information dissemination product." The information they provided was key to the public's understanding of how pollution, climate change, and policy choices about energy and transportation impact public health and the environment. *See, e.g.*, Grenter Decl. ¶¶ 6, 8–33; Phartiyal Decl. ¶¶ 4, 7–13; Duggan Decl. ¶¶ 5,

---

[5] The D.C. Circuit has occasionally permitted agency action to stand while an agency corrects procedural flaws if "equity demands." *Fertilizer Inst. v. EPA*, 935 F.2d 1303, 1312 (D.C. Cir. 1991). As discussed below, the equities here do not weigh in favor of allowing Defendants' unlawful actions to stand while they undertake required procedures.

7–30; Williams Decl. ¶¶ 5–19. Government agencies have frequently relied on the information when making decisions. *See, e.g.*, Williams Decl. ¶¶ 6–9 (explaining that comments supported by EJScreen data led EPA to strengthen its Major-Minor Source Reclassification Rule); 40 C.F.R. § 1508.1(f) (directing agencies to use CEJST, EJScreen, and similar tools "[t]o assist in identifying communities with environmental justice concerns").[6] Defendants themselves have recognized the singular usefulness of the information that the removed webpages provided, and they invested substantial resources and years of time to develop the tools. *See supra* pp. 3–6; *cf.* OMB Circular A-130, 1993 WL 357572, at *40 (June 28, 1993) (including as examples of "significant" information dissemination products those that "by reason of the nature of the information, are matters of continuing public interest," "by reason of the time value of the information, command public interest," or "involve expenditure of substantial funds").

Because the removed pages have a substantial impact on the public's understanding of environmental harms, affect how the public engages with policymakers, and involved substantial expenditure of funds, they qualify as significant information dissemination products. Accordingly, Defendants were required to provide "adequate notice" before removing them. 44 U.S.C. § 3506(d)(3). Defendants, however, failed to provide *any* notice at all. Without notice, Plaintiffs' work was thrown into disarray. *See* Phartiyal Decl. ¶ 14 (discussing disruptions caused by the removals); Williams Decl. ¶¶ 22, 26 (same); Duggan Decl. ¶¶ 33–34, 36 (same); Grenter Decl. ¶ 30 (same). Further, Defendants' failure to provide notice undermined "[t]he purpose of the notice," which "is to maximize the ability of the public to influence agency information plans at

---

[6] CEQ recently issued an interim final rule rescinding this regulation. 90 Fed. Reg. 10610 (Feb. 25, 2025). The recently rescinded regulation nonetheless shows the importance of the removed webpages.

an early stage." H.R. Rep. No. 104-37, at 46; *c.f.* 44 U.S.C. § 3506(d)(2) (requiring agencies to "solicit and consider public input on the agency's information dissemination activities").

Defendants thus acted in violation of the PRA.

**B.      Removal of the interactive tools and datasets was arbitrary and capricious.**

Agency action is arbitrary and capricious when it is not the product of "reasoned decisionmaking." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020) (quoting *Michigan v. EPA*, 576 U.S. 743, 750 (2015)). "[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). And it must consider each "important aspect of the problem." *Id.*

Here, Defendants failed to offer a reasoned explanation for their actions. Indeed, with one exception, Defendants failed to offer *any* contemporaneous public justification for removing the interactive tools. *See SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) (holding that a "reviewing court … must judge the propriety of [agency] action solely by the grounds invoked by the agency" at the time of the action).

The one exception was DOE's explanation regarding the Community Benefits Map, but its explanation was patently deficient. On January 23, 2025, DOE issued a memorandum "directing a suspension of … diversity, equity, and inclusion (DEI) policies, procedures, programs, activities, and reviews involving or relating to DEI objectives and principles … [and of actions] requiring, using, or enforcing Community Benefits Plans."[7] However, that memorandum neither explained

---

[7] Ingrid C. Kolb, Acting Secretary, Memorandum re: Executive Order on Ending Radical and Wasteful Government DEI Programs and Preferencing, and Agency-Wide Policy to Promote

how the removals complied with DOE's information dissemination duties nor accounted for reliance interests upset by the removal. DOE developed the Community Benefits Map to improve public knowledge and to encourage members of the public, like Plaintiffs, to engage with DOE projects. *See supra* p. 5. Plaintiffs and other members of the public regularly relied on the removed webpages to analyze environmental burdens, to educate their communities, and to engage with government officials whose decisions would impact their communities. *See infra* II. Where an agency's actions have "engendered serious reliance interests," the agency must provide a "more substantial justification" than usual. *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 106 (2015) (internal quotation marks and citation omitted); *see Regents of the Univ. of California*, 591 U.S. at 33 (holding that where an agency is "not writing on a blank slate, it [is] required to assess whether there [are] reliance interests, determine whether they [are] significant, and weigh any such interests against competing policy concerns" (internal quotation marks and citation omitted)). DOE's lack of consideration of the public's reliance on the webpages further demonstrates that its action—like that of the other Defendants—was arbitrary and capricious.

In two instances, well after removing the webpages, agency leadership issued memoranda referring to the removals. First, in a memorandum five weeks after EPA took down EJScreen, Jeffrey Hall, Acting Assistant Administrator at EPA, issued a memorandum "to provide initial guidance on implementing" EPA's enforcement and compliance initiatives consistently with three executive orders and an initiative set out by EPA's Administrator. Hall, Memorandum re: Implementing National Enforcement and Compliance Initiatives Consistently with Executive

---

Equal Opportunity (Jan. 23, 2025), https://www.energy.gov/sites/default/files/2025-02/Memorandum%20signed%20by%20Acting%20Secretary%20of%20Energy%20Ingrid%20C.%20Kolb%20dated%20January%2023%202025%20%28002%29.pdf.

Orders and Agency Priorities, at 1 (Mar. 12, 2025) (Hall Memo).[8] The memorandum stated that "environmental justice considerations shall no longer inform EPA's enforcement and compliance assurance work," and, accordingly, that "EJScreen … has been disabled and may not be used for any enforcement or compliance activity." Hall Memo, at 1. And in a memorandum issued a week after CEQ removed CEJST, CEQ Chief of Staff Katherine Scarlett stated that, because the President rescinded two executive orders that addressed environmental justice, agencies "should not include an environmental justice analysis" when undertaking environmental impact reviews. Scarlett, Memorandum re: Implementation of the National Environmental Policy Act, at 5 (Feb. 19, 2025) (Scarlett Memo).[9] Neither memorandum provides a reasoned explanation for the webpage removals. The Hall memo does not identify which executive order supposedly required EPA to remove EJScreen, much less what language in the executive order required the removal. The Scarlett memo, for its part, does not explain why the revocation of executive orders that mandated consideration of environmental justice barred their consideration. More importantly, while the memoranda state that *the agencies* are not going to rely on the removed tools, their statements do not illuminate why the agencies denied *the public* access to the webpages.

## II.    Plaintiffs are suffering and will suffer irreparable injury absent a preliminary injunction.

The loss of access to webpages that provided uniquely useful information about the environment and public health imposes irreparable harm on Plaintiffs. Defendants have

---

[8]    https://www.epa.gov/system/files/documents/2025-03/implementingnecisconsistently witheosandagencypriorities.pdf.

[9]    https://ceq.doe.gov/docs/ceq-regulations-and-guidance/CEQ-Memo-Implementation-of-NEPA-02.19.2025.pdf.

hindered—and, in some instances, completely halted—the ability of Plaintiffs to carry out key portions of their work and to participate in public decisionmaking processes.

Plaintiffs frequently used the removed webpages to understand environmental harms, educate the public about those harms, and engage with government officials whose actions would mitigate or exacerbate those harms. To start, Plaintiffs relied on the removed webpages to assess where to allocate their limited resources to alleviate the greatest environmental burdens. EIP, for instance, provides funding to "ensure that local communities and environmental advocates have access to high-quality science and engineering expertise." Duggan Decl. ¶ 22. EIP took information from EJScreen and CEJST into account as a factor in making its funding decisions, since a goal of the funding is to "support[] communities most affected by pollution and historically left out of environmental decision-making." *Id.* ¶ 23; *see id.* 24–25 (describing additional ways in which EIP uses EJScreen and CEJST to evaluate candidate communities for technical assistance). Sierra Club similarly used the Community Benefits Map to "identify the communities impacted by decarbonization demonstration projects" so it could "provide those communities with information on the projects and other nearby DOE funded projects … and address other needs of [those] communities." Grenter Decl. ¶ 29. Sierra Club also used the LEAD Tool to make decisions about the communities to which it offered assistance in seeking relief from high energy burdens, *id.* ¶ 27, and used the ETC explorer "to identify existing community needs and calculate the benefits of developing particular transit routes," *id.* ¶ 20; *see id.* ¶¶ 21–22.

Once Plaintiffs had decided where to focus their limited resources, they relied on the removed webpages to educate the public, provide technical assistance to communities experiencing environmental burdens, and engage with government officials. Sierra Club, UCS, and EIP each expend substantial resources developing reports to understand and explain

environmental harms and had relied on EJScreen as a key part of those reports. *See* Grenter Decl. ¶¶ 11, 13, 32; Phartiyal Decl. ¶¶ 7, 9; Duggan Decl. ¶¶ 11–14. For example, UCS's report "Invisible Threat, Inequitable Impact" relied on EJScreen to explain how ethylene oxide emissions disproportionately burden disadvantaged communities across the country. Phartiyal Decl. ¶ 7. UCS, EIP, and Sierra Club also frequently relied on CEJST, the LEAD tool, and the Future Risk Index to produce novel reports that provided them and the public with a better understanding of how environmental harms impact issues ranging from public health to affordable housing to energy costs. *See* Phartiyal Decl. ¶ 7 (UCS reports using CEJST); *id.* ¶ 11 (UCS reports using the LEAD tool); *id.* ¶ 12 (UCS reports using the Future Risk Index); Grenter Decl. ¶ 32 (Sierra Club reports using CEJST); *id.* ¶¶ 23–26 (Sierra Club reports using the LEAD tool); Duggan Decl. ¶ 17 (EIP reports using CEJST).

Plaintiffs also relied on EJScreen and CEJST to develop interactive webpages of their own. For example, EIP relied on EJScreen's Application Program Interface (API) tool to automatically collect information for routine updates to its Oil & Gas Watch website, which monitors the expansion of petrochemical facilities and informs the public about opportunities to submit public comments on federal and state permits issued to those facilities. *See* Duggan Decl. ¶¶ 17–20; *see also* Grenter Decl. ¶¶ 12, 16 (discussing Sierra Club's use of EJScreen for its interactive Liquefied Natural Gas Export Tracker and interactive maps of large warehouses). EIP likewise incorporated information from CEJST into its interactive maps, including its interactive map of existing and proposed $CO_2$ pipelines. *See* Duggan Decl. ¶ 17. And Sierra Club used the LEAD tool "to create the Missouri Energy Burden Explorer, an interactive map that presents energy burden data by census tract, as well as data on income, race, and respiratory illness rates." Grenter Decl. ¶ 25.

The reports and interactive webpages that Plaintiffs created using the removed pages were essential to their work educating the public about environmental harms. *See, e.g.*, Grenter Decl. ¶¶ 14–15, 25; Duggan Decl. ¶ 8. Plaintiffs also relied on the removed webpages to conduct public education without formal reports, and to provide training services to community partners that were seeking to understand and address environmental burdens where they live. For example, Sierra Club used "DOE's Community Benefits Map to help educate and organize communities about industrial decarbonization demonstration projects." Grenter Decl. ¶ 29; *see id.* ¶ 32; Phartiyal Decl. ¶ 10 (describing how UCS used EJScreen and CEJST as training tools so its local partners could "understand environmental and health stressors in their communities"); *id.* ¶ 13 (explaining that UCS used the removed webpages "to provide technical assistance to communities that seek to understand and advocate about the environmental burdens they face"; Duggan Decl. ¶¶ 24–25 (describing how EIP "relies on EJScreen and CEJST for quick, reliable identification of certain risk levels" when providing technical assistance to communities); Williams Decl. ¶ 5 (explaining that CCAT relied on EJScreen and CEJST "to create maps and analyses for education … to protect public health and communities").

Finally, Plaintiffs relied on the removed webpages when engaging with public officials. Plaintiffs used the removed webpages to educate public officials just as they used the webpages to educate other members of the public. *E.g.*, Grenter Decl. ¶ 11. And Plaintiffs relied on the removed webpages particularly heavily when submitting comments on proposed rulemakings or permits. *See, e.g.*, Grenter Decl. ¶¶ 32–33; Duggan Decl. ¶ 27; Williams Decl. ¶¶ 5–13. For example, "CCAT, in cooperation with other organizations, used EJScreen and CEJST data to support comments on the EPA's Major-Minor Source Reclassification Rule." Williams Decl. ¶ 6. "As a result of CCAT's efforts, the EPA strengthened the proposed rule," ensuring that "large polluters

maintain the pollution controls that limit emissions of toxic air pollution." *Id.* ¶ 9. The removed webpages were particularly valuable in that setting because they provided a "common starting point between the agency and the public," EPA, Purposes and Uses of EJSCREEN, *supra*, which eliminated the need to spend time disputing the reliability of data sources, *see id.* ¶ 21, 24 (explaining that EJScreen and CEJST are uniquely "recognized and accepted by … federal agencies" and "eliminated the need for expert testimony in litigation and regulatory proceedings to validate … data collection"); Duggan Decl. ¶ 29 (recognizing that EJScreen and CEJST are "authoritative"). The interactive webpages were also particularly valuable because they decreased the time needed to put together comments on permitting and regulatory processes. *See* Williams Decl. ¶¶ 21, 26; Grenter Decl. ¶ 38; Duggan Decl. ¶ 27. Because most regulatory processes provide only a short window in which the public may make their voices heard, the time-savings the removed webpages provided compared to other sources of information were essential for ensuring the public could "meaningfully participat[e]" in the regulatory process. Williams Decl. ¶ 26. Indeed, the removed webpages allowed the public to undertake analysis quickly enough that they could engage with public officials to improve responses to ongoing emergencies: after the Maui wildfires in 2023, Sierra Club successfully used EJScreen and CEJST in conjunction with other research to advocate to local health officials to prioritize the evacuation of vulnerable populations. Grenter Decl. ¶ 33.

Without the interactive webpages, all the work described above will either be halted or will require additional time and resources. Simply put, "[t]here are no adequate substitutes available for the eliminated federal tools." Grenter Decl. ¶ 36. Plaintiffs relied on the removed webpages because of their unique combination of "standardization, reliability, precision, and functionality," Duggan Decl. ¶ 30, and because they provided "one-of-a-kind information," Phartiyal Decl. ¶ 12.

20

No other data sources offer the same characteristics that made the removed webpages useful, and attempting to create a replacement from existing data source would require "[a] significant investment of time and resources" and "would present technical and data management challenges." Duggan Decl. ¶ 31; *see* Grenter Decl. ¶ 37 ("It is extremely time-consuming to try to recreate the same analyses and reports that are available by using the federal tools.").

Plaintiffs have already experienced disruptions due to the removals. Plaintiffs have halted or delayed work on their analysis of environmental burdens. Phartiyal Decl. ¶ 14 (observing that "UCS has already had to halt work on some of its projects," including those on housing affordability, the health impacts of nuclear materials exposure, and energy affordability); Williams Decl. ¶ 22 ("CCAT has already felt these impacts, including when it had to stop work on its project to inventory landfill pollution impacts across several states[.]"); Duggan Decl. ¶ 36 (stating that "EIP has already had to invest additional resources to gather and analyze data without access to EJScreen," including "develop[ing] and run[ning] a new computer code" and "spend[ing] additional time reconciling inconsistencies in [the replacement data]"). They have lost some of the functionality of their own interactive webpages. *See* Duggan Decl. ¶ 33 ("Without access to EPA's EJScreen and the API tool, EIP is not capable of manually collecting, disseminating and evaluating the information [required by its Oil & Gas Watch] at the same pace and scale."). They have had to stop education and organizing efforts with their community partners. *See* Grenter Decl. ¶ 30 ("The removal of the Community Benefits Map has prevented the Sierra Club from continuing its work to educate, organize, and mobilize communities around … opportunities to secure additional community benefits as part of clean manufacturing projects."). They have been unable to consider information from the removed websites when deciding where to allocate their scarce resources.

*See* Duggan Decl. ¶ 34. And they have been hindered in their ability to engage with public officials. Williams Decl. ¶ 26.

Because "[t]here are no adequate substitutes available for the eliminated federal tools," Grenter Decl. ¶ 36, these harms will persist going forward. Without access to the removed webpages, where they can, Plaintiffs will need to "[p]ursue other means to individually gather demographic and environmental burden information and establish a standardized and authoritative method to analyze, calculate, and evaluate demographic data at scale." Duggan Decl. ¶ 35. But that will require them to "invest considerably more of [their] limited time, money, and effort" to obtain the same information. *Id.*; *see* Phartiyal Decl. ¶ 15; Grenter Decl. ¶¶ 35, 37; Williams Decl. ¶ 25. Even when Plaintiffs have the time and resources necessary to obtain the same information that they readily could have obtained from the removed webpages, that added expense means they will "be forced to abandon some of [their] other work." Grenter Decl. ¶ 37; *see* Phartiyal Decl. ¶ 15 ("UCS will be forced to abandon some projects due to resource limitations."). Further, because finding alternative sources of information is time-intensive, "the removals may deny [them] the ability to timely participate in the rulemaking process" even when they would otherwise invest the time and resources to seek out alternative data sources. Williams Decl. ¶ 26.

These harms undermine Plaintiffs' core organizational functions in ways that cannot be fully remedied at the end of the case. *See League of Women Voters of the United States v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016) (observing that an organization suffers irreparable harm "if the actions taken by [the defendant] have perceptibly impaired the [organization's] programs" (internal quotation marks omitted; alterations in original)). Plaintiffs' work is time-sensitive, and every day the webpages are down they lose out on the opportunity to engage in ongoing public debate about transportation, energy, public health, and environmental policies. *See Am. Immigr.*

*Council v. DHS*, 470 F. Supp. 3d 32, 38 (D.D.C. 2020) (recognizing that agencies inflict irreparable harm by "den[ying] access to information that is highly relevant to an ongoing public debate"). Absent an injunction from this Court, Plaintiffs will continue to lose out on opportunities to participate in the marketplace of ideas and to engage directly with public officials.

## III.    The balance of the equities and the public interest favor Plaintiffs.

As against the certain and irreparable injury that Plaintiffs are presently experiencing due to Defendants' unlawful actions, Defendants would suffer no cognizable harm if required to restore the webpages and datasets. To begin with, "[i]t is well established that the Government 'cannot suffer harm from an injunction that merely ends an unlawful practice.'" *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (quoting *Open Communities Alliance v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017)). Likewise, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Open Communities Alliance*, 286 F. Supp. 3d at 179 (citation omitted). "To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws." *Id.* (citation omitted).

Moreover, communities around the country are harmed by Defendants' actions, and both the health of the country and principles of public participation in government are put at risk. By removing resources from their websites, Defendants have made it harder for communities to understand the environmental burdens they face and to advocate for policies that will improve their health and well-being. *See* Grenter Decl. ¶¶ 38–39 (discussing harms to communities); Duggan Decl. ¶¶ 23, 32 (discussing harms to EIP's ability to "support[] communities most affected by pollution and historically left out of environmental decision-making"). The removals impose substantial costs on Plaintiffs' access to information and participation in public decisionmaking processes, but "they are even more harmful to other organizations and members of the public who

rely on the user-friendly interface [the removed webpages] provide and who wholly lack time, resources, and expertise to seek out or make use of (still-insufficient) alternative data sources." Williams Decl. ¶ 27. Without ready access to user-friendly tools for understanding environmental harms and how changes in policy may impact their lives, people around the country will be left in the dark about decisions that impact their lives and will be unable to ensure their voices are heard when the government implements new transportation, energy, health, and environmental policies.

On the other side of the ledger, Defendants would suffer no injury from being required to host on their websites the same information that they hosted until recently. The balance of equities thus weighs decisively in favor of granting a preliminary injunction.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion and enter a preliminary injunction ordering restoration of EJScreen, CEJST, the LEAD tool, the Community Benefits Map, the ETC Explorer, and the Future Risk Index and the webpages necessary for those pages to operate.

Dated: May 16, 2025                    Respectfully submitted,

                                       /s/ Zachary R. Shelley
                                       Zachary R. Shelley (DC Bar No. 90021549)
                                       Adina H. Rosenbaum (DC Bar No. 490928)
                                       Allison M. Zieve (DC Bar No. 424786)
                                       Public Citizen Litigation Group
                                       1600 20th Street NW
                                       Washington, DC 20009
                                       (202) 588-1000
                                       zshelley@citizen.org

                                       *Counsel for All Plaintiffs*

                                       Andrea Issod* (CA Bar No. 230920)
                                       Joya Manjur* (CA Bar No. 348160)
                                       Sierra Club
                                       2101 Webster Street, Suite 1300

Oakland, CA 94612
(415) 977-5544

*Counsel for Sierra Club*

*\* Motion to appear pro hac vice filed*