**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| SIERRA CLUB, et al.<br><br>      Plaintiffs,<br><br>      v.<br><br>ENVIRONMENTAL PROTECTION<br>AGENCY, et al.<br><br>      Defendants. | Civil Action No. 25-cv-1112-RC |

**DECLARATION OF JANE WILLIAMS**

I, Jane Williams, declare as follows:

1.     I serve as the Executive Director of California Communities Against Toxics (CCAT), a position I have held since 1997.

2.     CCAT is a nonprofit organization that uses public education, advocacy, and community organizing to: (a) educate communities, policymakers, journalists, and elected officials about the adverse health and environmental impacts of air, water, and soil pollution; and (b) advance environmental justice and pollution prevention efforts by advocating in legislative, administrative, educational, and legal arenas. CCAT coordinates more than 25 organizational members and many individual members across California. CCAT also partners with environmental justice groups and Tribes across the country to engage in federal and state rulemakings whose results may impact environmental justice and pollution prevention efforts in California.

3.     For years, CCAT has worked to reduce toxic air pollution from industrial sources across the country to protect local communities' health, recreational opportunities, and other interests. CCAT has invested substantial resources in advocating for the Environmental Protection

Agency (EPA) to strengthen Clean Air Act emissions and performance standards and to remove unlawful exemptions, like exemptions during periods of startup, shutdown, and malfunction. These efforts include filing public comments on EPA proposals, educating members about EPA rules and the dangers posed by toxic air pollution, and, where necessary, litigation. CCAT also carries out extensive public education campaigns regarding toxic air pollution and its impacts, including circulating sign-on letters and organizing and participating in teach-ins.

4.      In my role at CCAT, I have participated in dozens (if not hundreds) of rulemakings and legislative proceedings at the local, state, and federal level to address toxic pollution, particularly toxic air pollution under the Clean Air Act. I routinely direct and participate in the drafting of comments on Clean Air Act rulemakings, and I meet regularly with elected officials, career EPA staff, affected community members, and political appointees at EPA on Clean Air Act issues.

5.      CCAT has relied on the EPA's Environmental Justice Screening and Mapping tool ("EJScreen") and the Council on Environmental Quality's Climate and Economic Justice Screening Tool ("CEJST") as fundamental tools to create maps and analyses for education, advocacy and public comments to protect public health and communities. In recent years, CCAT has used these two tools for numerous projects, including EPA's Major-Minor Source Reclassification Rule, Lead Acid Battery Manufacturing Rule, and Copper Smelter Regulations.

**CCAT's Use of EJScreen and CEJST**

Major-Minor Source Reclassification Rule

6.      In 2023, CCAT, in cooperation with other organizations, used EJScreen and CEJST data to support comments on the EPA's Major-Minor Source Reclassification Rule. The 2020 Reclassification Rule allowed certain industrial sources to increase their emissions of Hazardous

Air Pollutants ("HAPs"), which are carcinogenic, reproductive toxins, neurotoxic, or otherwise dangerous substances that are often harmful even in exceedingly small quantities. The 2023 draft rule proposed to allow 1800 sources of persistent, bioaccumulative, hazardous air pollutants to increase their emissions by reclassifying the sources as minor sources. As minor sources, many of these facilities would no longer be subject to the Clean Air Act's Maximum Achievable Control Technology ("MACT") standard for controlling HAPs. Relaxing MACT standards would allow these sources to emit up to 10 tons per year of any one air toxic or 25 tons per year of combined toxics.

7.    By using EJScreen and CEJST to map polluting facilities, CCAT determined that EPA's proposal would allow more pollution in disadvantaged communities. Notably, of the approximately 200 facilities that were already reclassified, nearly 80 facilities were in census tracts designated as disadvantaged and another nearly 70 facilities were adjacent to tracts designated as disadvantaged.

8.    Using CCAT's research, other environmental organizations filed detailed comments urging EPA to strengthen the final rule to protect the surrounding communities from toxic pollution and to comply with the Clean Air Act's requirements.

9.    As a result of CCAT's efforts, the EPA strengthened the proposed rule. EPA amended the proposed rule to include a requirement that sources already subject to MACT emission standards remain subject to those same standards. Ensuring that these large polluters maintain the pollution controls that limit emissions of toxic air pollution means less of this pollution will be released into the communities CCAT works to protect.

Lead Battery Acid Manufacturing Facilities

10. Exposure to lead pollution can result in severe damage to the brain and nervous system, kidney damage, high blood pressure, infertility and miscarriage, and learning disabilities.

11. In 2017, CCAT advocated on behalf of communities in South Central Los Angeles for more stringent controls on point source lead emissions. CCAT participated in the process to strengthen regulation of sources emitting more than 1,000 pounds of lead in the South Coast Air Quality Management District, resulting in an updated rule, Rule 1420. CCAT focused its efforts on several provisions in the rule including permanent total enclosure, enhanced fenceline monitoring, and earlier timelines for corrective measures. (Fenceline monitoring requirements are a pollution control strategy since the monitoring is linked to corrective measures and root cause analysis which directly identify leaks and equipment malfunctions and identify measures to repair the equipment.)  CCAT also eventually sued Trojan Battery for its noncompliance with the new rule.

12. CCAT expanded this advocacy in response to federal rule updates to the National Emissions Standards for Hazardous Air Pollutants (NESHAPS). In February 2022, the EPA proposed updates to the National Emission Standards for Hazardous Air Pollutants for lead battery manufacturers. By using EJScreen, CCAT identified that lead battery acid manufacturing facilities are highly concentrated in disadvantaged communities in Georgia and Los Angeles County in California. CCAT worked with other organizations to submit comments that advocated for lead battery facilities to use permanent total enclosures and fenceline monitoring systems, and other improvements, that would help reduce pollution and alert community members about dangerous levels of pollution. Using EJScreen demographic map layers, CCAT showed that most lead battery

manufacturing facilities are located in disadvantaged communities, and relied on that information in deciding to challenge the weak rule EPA ultimately issued.

Copper Smelter Facilities

13.     In 2024, CCAT used data from EJScreen to support public comments to EPA on behalf of the San Carlos Apache Tribe. To support the comments, CCAT analyzed the impact of two copper smelters in Arizona, the Asarco-Hayden and Freeport-McMoran Miami Inc. smelters. Both smelters were found to be emitting enormous amounts of lead and arsenic via air, but EPA had disregarded their impacts on the San Carlos Apache Tribe. CCAT's project identified and assessed the risk of lead pollution for communities within a fifty-kilometer radius of the two smelters and determined that a vast majority of the tracts within that radius were classified as disadvantaged. Using EJScreen and CEJST, CCAT was able to identify the extent of the disproportionate impact on the San Carlos Apache Tribe, as the reservation is within the fifty-kilometer radius of both facilities. After CCAT provided that information to the Tribe and their advocates, the Tribe was then able to use that analysis to advocate for stronger regulations and intervene in efforts by industry to weaken provisions in the rule that would strengthen protections for the health of their community and the environment.

Landfill Impacts Mapping

14.     In January 2025, CCAT began to map the impacts of HAPs emissions from landfills in California, Oregon, Washington, and Colorado, but it has had to delay the project because of EJScreen and CEJST's removal. In Colorado, for example, CCAT was working with its partner Green Latinos to address asthma-related issues near landfills that were caused by HAPs emissions. Now, CCAT cannot provide up-to-date demographic and impact data because it cannot access updated versions of EJScreen or CEJST. CCAT looked to backup data sources that it had

downloaded, but that data is not as current or user friendly. Because CCAT lacks access to a source of this information that is as readily usable and authoritative, the lack of access to EJScreen and CEJST has already added months onto CCAT's efforts for this project and will continue to delay or halt its progress.

15.     While CalEnviroScreen is an alternative mapping tool for California-specific work on the landfill impact mapping project, no comparable tool exists for the other states involved in the landfill project.

16.     Without access to the latest versions of these tools, CCAT has not able to respond to requests from its partners to analyze impacts to communities hosting landfills in other states and its mission to provide critical informational resources to environmental justice groups has been thwarted.

Injuries Resulting from EJScreen's Removal

17.     EJScreen and CEJST's removal has imposed costs on CCAT, undermined its mission, and will undoubtedly negatively impact numerous people in vulnerable communities that CCAT seeks to protect. CCAT has been unable to carry out the daily work it performed prior to the mapping tools' removal, resulting in missed opportunities for advocacy and public education. The projects CCAT has managed to continue to work on require significantly more time and resources to accomplish.

18.     No other tool offers EJScreen and CEJST's combination of nationwide scope, up-to-date information, census block-level precision, acceptability by federal agencies, and mapping and report functions.

19.     EJScreen and CEJST could delineate the impacted area to a proximity to the point source because they use census block data. Census block data, like that used in EJScreen and

CEJST, is the smallest available unit of measurement, meaning that it provides the most precise information and is especially crucial when identifying the characteristics of populations living around polluting facilities.

20.    In EJScreen and CEJST's absence, CCAT has sought alternative tools, but none are sufficient substitutes. For example, CalEnviroScreen, while useful for California statewide analyses, does not have all the same functionalities as EJScreen and CEJST, and cannot be used for the projects on which CCAT works in other states.

21.    Lacking official data that, like EJScreen and CEJST, is reliable, well-standardized, precise, user-friendly, recognized and accepted by other federal agencies, and able to be seamlessly integrated with other federal databases has frustrated CCAT's public education campaigns. Specifically, it has undermined CCAT's ability to provide federal agency staff, elected officials, the public, and journalists with accurate information about the impacts that these large industrial facilities are having in their host communities, has slowed down the campaigns CCAT can carry out, and has required CCAT to expend additional resources to perform its work.

22.    As mentioned above, CCAT has already felt these impacts, including when it had to stop work on its project to inventory landfill pollution impacts across several states. Though CCAT has expended significant staff time on utilizing the backup data sources, including some previously downloaded EJScreen data for the landfill project, it has still been unable to complete the project due to the poor quality and limited functionality of these backup sources.

23.    In its efforts to find alternative data sources, CCAT has had to reach out to other data analysts and map-making experts to discern the viability of fixing the bugs in the older versions of EJScreen data. This has entailed CCAT using expert staff time—a precious resource in the nonprofit sector—to coordinate, collaborate, and identify the coding missing in the older

version of EJScreen. So, not only has this taken up expert time from CCAT, but also from CCAT's partner organizations.

24.    EJScreen has served as a universally recognized and respected dataset. This eliminated the need for expert testimony in litigation and regulatory proceedings to validate the data collection. Instead, testimony could focus on the methodology and findings. Without EJScreen, CCAT will be forced to dedicate additional resources just to establish data reliability, and it will likely face challenges to the data it uses in litigation and regulatory proceedings.

25.    In addition to imposing time and costs on the projects CCAT continues to work on, the removals will also take resources and time away from CCAT's other work, limiting the number of regulatory proceedings and public communications campaigns in which it can engage. As a result of the additional costs of participating in regulatory and legislative processes and of engaging in advocacy, CCAT will not be able to learn about the impacts that pollution is having on the communities with which it works, it will not be able to inform the public and policymakers about the impact of the pollution those communities face, and those communities will likely suffer from additional pollution.

26.    Even when CCAT engages in rulemakings and advocacy efforts, despite the now-higher costs of doing so, the removals may deny it the ability to timely participate in the rulemaking process. EJScreen and CEJST enabled CCAT to respond quickly to urgent issues. Most public comment periods in which CCAT and its partners participate are a maximum of 30 days. Removing EJScreen and CEJST prevents CCAT and its partners from meaningfully participating under these constrained timelines. EJScreen and CEJST's removal forces CCAT to dedicate additional time to research data sources and assess their usability and credibility, typically delaying project timelines by 15-25%. This can manifest in a range from 3 hours to 4 days, or even far longer, depending on

the size of the project and the availability of alternative data. Given the tight timeline for participating in public comment periods, those delays will mean that CCAT is unable to timely or fully participate in some workshops, public meetings, hearings, and rulemakings even when it could absorb the expense of that added research. Indeed, CCAT has already faced this problem. In February 2025, I had the opportunity to provide public comment on measures the Oregon legislature was considering to reduce landfill pollution. In the past, when providing these types of comments, I would use EJScreen and CEJST to quickly generate statistical information about communities that would be impacted by the policy changes, and I would use the report-generating feature in EJScreen to automatically generate a PDF report that I could include as a supplement to my comments. Because EJScreen and CEJST were removed, I could no longer include that information when submitting comments to the Oregon legislature. Given the short window during which I could comment on the proposed legislation, I had no opportunity to undertake the time-intensive (if not impossible) task of gathering the information about demographics, environmental burdens, and the disadvantaged status of communities that would typically inform my comments. So, while I was able to provide comments with a description of the general dangers of landfill pollution and with anecdotes about how communities in California have suffered from landfill pollution, I was denied the opportunity to provide the full analysis that I would otherwise have contributed. Moreover, the Oregon legislature was denied the benefit of that information.

27.    As harmful as these costs are to CCAT itself, they are even more harmful to other organizations and members of the public who rely on the user-friendly interface EJScreen and CEJST provide and who wholly lack time, resources, and expertise to seek out or make use of (still-insufficient) alternative data sources.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 15th, 2025.

Jane Williams
Jane Williams