UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SIERRA CLUB, et al.,<br><br>                 Plaintiffs,<br><br>                 v.<br><br>ENVIRONMENTAL PROTECTION<br>AGENCY, et al.,<br><br>                 Defendants. | Civil Action No. 25-1112 (RC) |

**DEFENDANTS' OPPOSITION TO**
**<u>PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION</u>**

# TABLE OF CONTENTS

Table of Contents ................................................................................................ ii

Table of Authorities ........................................................................................... iv

Background ........................................................................................................... 1

    I.      EJScreen ............................................................................................... 1

    II.    Climate and Economic Justice Screening Tool ................................ 4

    III.   Low-Income Energy Affordability Data Tool .................................. 10

    IV.   Community Benefits Plan Map ......................................................... 11

    V.     Equitable Transportation Community Explorer ............................. 13

    VI.   Future Risk Index ............................................................................. 15

Standard of Review ............................................................................................ 17

    I.      Preliminary Injunctive Relief .......................................................... 17

    II.    Administrative Procedure Act .......................................................... 17

Argument ............................................................................................................ 18

    I.      LEAD Tool Claim Is Moot ................................................................ 18

    II.    Plaintiffs Will Not Suffer Imminent Irreparable Harm In The Absence Of Injunctive Relief ........................................................... 19

          A.    Inexcusable Delay ................................................................ 20

          B.    Plaintiffs Have Not Demonstrated That They Will Experience Imminent Irreparable Injury In The Absence Of Injunctive Relief ......................... 22

    III.   Plaintiffs' Motion Does Not Demonstrate That They Will Succeed on the Merits ......................................................................................... 27

          A.    The Agencies' Respective Web Tools Were Not "Significant Information Dissemination Products" ................. 28

          B.    Certain Tools Did Not Involve The "Agency's Public Information" ....... 34

    IV.   The Public Interest and the Equities Strongly Favor Defendants ......................... 36

V.    Plaintiffs Should Be Ordered to Post Security In Connection With Any Temporary Injunctive Relief............................................................................. 37

Conclusion .......................................................................................................................... 39

# TABLE OF AUTHORITIES

**Cases**

*Abdullah v. Obama*,
   753 F.3d 193 (D.C. Cir. 2014) ........................................................... 19

*Already, LLC v. Nike, Inc.*,
   568 U.S. 85 (2013) ........................................................... 18

*Arizonans for Officials English v. Arizona*,
   520 U.S. 43 (1997) ........................................................... 19

*AT&T Corp. v. FCC*,
   220 F.3d 607 (D.C. Cir. 2000) ........................................................... 18

*Biovail Corp. v. FDA*,
   448 F. Supp. 2d 154 (D.D.C. 2006) ........................................................... 21, 22

*Chafin v. Chafin*,
   568 U.S. 165 (2013) ........................................................... 18

*Chaplaincy of Full Gospel Churches v. England*,
   454 F.3d 290 (D.C. Cir. 2006) ........................................................... 17, 20

*Church of Scientology of Cal. v. United States*,
   506 U.S. 9 (1992) ........................................................... 18

*Church v. Biden*,
   573 F. Supp. 3d 118 (D.D.C. 2021) ........................................................... 27

*CityFed Fin. Corp. v. Off. of Thrift Supervision*,
   58 F.3d 738 (D.C. Cir. 1995) ........................................................... 19

*Colo. Wild Horse v. Jewell*,
   130 F. Supp. 3d 205 (D.D.C. 2015) ........................................................... 36

*Damus v. Nielsen*,
   Civ. A. No. 18-0578 (JEB), 2018 WL 3232515 (D.D.C. July 2, 2018) ........................................................... 17

*Davis v. Pension Benefit Guar. Corp.*,
   571 F.3d 1288 (D.C. Cir. 2009) ........................................................... 17

*Doctors for America v. Office of Personnel Management*,
   766 F. Supp. 3d 39 (D.D.C. 2025) ........................................................... 30, 35

*Doe v. Mattis*,
   889 F.3d 745 (D.C. Cir. 2018) ........................................................... 20

*DSE, Inc. v. United States*,
   169 F.3d 21 (D.C. Cir. 1999) ........................................................... 38

*Fisheries Survival Fund v. Jewell,*
    236 F. Supp. 3d 332 (D.D.C. 2017) ........................................................... 19

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*,
    528 U.S. 167 (2000) ................................................................................ 19

*Fund for Animals v. Frizzell,*
    530 F.2d 982 (D.C. Cir. 1975) ................................................................. 21

*Hi-Tech Pharmacal Co. v. FDA,*
    587 F. Supp. 2d 13 (D.D.C. 2008) ........................................................... 18

*Hubbard v. United States,*
    496 F. Supp.2d 194 (D.D.C. 2007) .......................................................... 37

*Kansas v. United States,*
    124 F.4th 529 (8th Cir. 2024) .................................................................. 27

*League of Women Voters v. Newby,*
    838 F.3d 1 (D.C. Cir. 2016) ..................................................................... 17

*Mills v. Green*,
    159 U.S. 651 (1895) ................................................................................ 18

*Motor Vehicle Mfgr's Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) .................................................................................. 17

*Murphy v. Hunt*,
    455 U.S. 478 (1982) (per curiam) ............................................................ 18

*Mylan Pharms., Inc. v. Shalala,*
    81 F. Supp. 2d 30 (D.D.C. 2000) ............................................................. 21

*N.Y. State Rifle & Pistol Ass'n, Inc. v. City of New York*,
    140 S. Ct. 1525 (2020) (per curiam) ........................................................ 18

*Nat'l Parks Conservation Ass'n v. U.S. Forest Serv.,*
    Civ. A. No. 15-1582 (APM), 2016 WL 420470 (D.D.C. Jan. 22, 2016) .............................. 20

*New York Times Co. v. Def. Health Agency,*
    Civ. A. No. 21-0566 (BAH), 2021 WL 1614817 (D.D.C. Apr. 25, 2021) ...................... 25, 26

*Newdow v. Bush,*
    355 F. Supp. 2d 265 (D.D.C. 2005) ......................................................... 21

*Nken v. Holder*,
    556 U.S. 418 (2009) ................................................................................ 36

*Open Top Sightseeing USA v. Mr. Sightseeing, LCC,*
    48 F. Supp. 3d 87 (D.D.C. 2014) ............................................................. 21

*Pursuing Am.'s Greatness v. Fed. Election Comm'n,*
    831 F.3d 500 (D.C. Cir. 2016) ............................................... 36

*Sampson v. Murray,*
    415 U.S. 61 (1974) ............................................... 36-37

*Serono Labs., Inc. v. Shalala,*
    158 F.3d 1313 (D.C. Cir. 1998) ............................................... 37

*Sherley v. Sebelius,*
    644 F.3d 388 (D.C. Cir. 2011) ............................................... 17

*U.S. Bancorp Mortgage Co. v. Bonner Mall P'ship,*
    513 U.S. 18 (1994) ............................................... 18

*Va. Petroleum Jobbers Ass'n v. FPC,*
    259 F.2d 921 (D.C. Cir. 1958) ............................................... 22-23, 23

*Weinberger v. Romero-Barcelo,*
    456 U.S. 305 (1982) ............................................... 37

*Winter v. Nat. Res. Def. Council,*
    555 U.S. 7 (2008) ............................................... 17, 19, 37

*Wis. Gas Co. v. FERC,*
    758 F.2d 669 (D.C. Cir. 1985) (per curiam) ............................................... 19, 20, 21, 22, 23, 25

## Statutes & Regulations

5 U.S.C. § 706 ............................................... 17

44 U.S.C. § 3502 ............................................... 28

44 U.S.C. § 3504 ............................................... 28

44 U.S.C. § 3506 ............................................... 27, 28, 34, 35

67 Fed. Reg. 8452 (Feb. 22. 2002) ............................................... 28, 29

Defendants Environmental Protection Agency ("EPA"), Council on Environmental Quality, Department of Energy ("Energy"), Department of Transportation ("Transportation"), and Federal Emergency Management Agency ("FEMA") (collectively, "Defendants"), by and through undersigned counsel, respectfully oppose the motion for preliminary injunction filed by Plaintiffs Sierra Club, Union of Concerned Scientists ("Scientists"), Environmental Integrity Project ("Project"), and California Communities Against Toxics ("California Communities") (collectively, "Plaintiffs").[1]  As explained below, Plaintiffs have not demonstrated that they are at imminent risk of irreparable harm, that they are likely to succeed on the merits, or that the balance of the equities is in their favor.  As a result, their request for a preliminary injunction should be denied.

## BACKGROUND[2]

### I.  <u>EJScreen</u>

EJScreen was an interactive mapping tool created by EPA that provided data on local pollution burdens, demographic indicators, and environmental justice indicators.  Compl. (ECF No. 1) ¶ 20. EJScreen enabled users to conduct screening and initial analysis for different pollutants and populations on federal, state, and city levels.  *Id.* To facilitate that analysis, EJScreen provided users with color-coded mapping, the ability to generate a report for a selected area, and comparisons showing differences between a selected area and the surrounding state, EPA region, or the nation.  *Id.*

---

[1]     Defendants also respectfully submit herewith the Declarations of Christina Motilall ("Motilall Decl."), David Smith ("Smith Decl."), Amy Kidd ("Kidd Decl."), Jocelyn D'Ambrosio ("D'Ambrosio Decl."), Juli Huynh ("Huynh Decl."); and Kristin Leahy Fontenot ("Fontenot Decl.") in support of their Opposition.

[2]     Unless otherwise noted, the following alleged facts drawn from the Complaint are accepted as true solely for the purposes of this motion.

EJScreen aggregated data from a variety of different sources, including the U.S. Census Bureau, National Aeronautics and Space Administration ("NASA"), the National Association for Public Health Statistics and Information Systems, the Robert Wood Johnson Foundation, the Centers for Disease Control and Prevention ("CDC"), National Oceanic and Atmospheric Administration ("NOAA"), the Department of Agriculture ("USDA"), the EPA itself, and others. U.S. Environmental Protection Agency (EPA), 2024. EJScreen Technical Documentation, *available at* https://www.epa.gov/system/files/documents/2024-07/ejscreen-tech-doc-version-2-3.pdf; *see also* Motilall Decl. ¶ 6. On February 5, 2025, EPA removed the EJScreen tool and supporting documentation from public access. Motilall Decl. ¶ 5. The public can access the snapshot of EPA's website as of January 19, 2025, via https://19january2025snapshot.epa.gov/. Motilall Decl. ¶ 7. As of April 9, 2025, the EJScreen code is available as a public archive and are available online. *Id.* ¶ 8. There are also unofficial versions of EJScreen available on the internet. *See* https://pedp-ejscreen.azurewebsites.net/ (last visited Jun. 10, 2025).

Plaintiff Sierra Club alleges that it was harmed by the removal of EJScreen because it "regularly relied on EJScreen in its public education materials, comments and testimony to federal agencies, and conversations with elected officials." Compl. (ECF No. 1) ¶ 23. In support of its allegations regarding harm, Sierra Club cites prior uses of the tool, but no current projects or other specific tasks that it cannot perform because it no longer has access to EJScreen. Compl. (ECF No. 1) ¶¶ 23-24.

Plaintiff Scientists alleges that it was harmed by the removal of EJScreen because it "relied on the EJScreen webpages, including in numerous reports it issued to the public[,]" and it "used EJScreen in technical assistance and education with community partners." Compl. (ECF No. 1) ¶¶ 25-26; Pls.' Br. (ECF No. 20-1) at 19. As part of these efforts, Scientists alleges that it instructed

users of its community guides to use EJScreen to understand environmental and health issues in their communities. Compl. (ECF No. 1) ¶ 26. Scientists also alleges that it "planned to incorporate EJScreen into forthcoming technical analyses" and, without EJScreen, it "must alter its research methodology and will be unable to include comprehensive cumulative burden data that will help achieve the project's goal of improving health equity in affected communities." *Id.* ¶ 27. Scientists claims that, because of the removal of EJScreen, it "has had to pause and reorganize its work on a project involving the impact of nuclear materials on communities." Phartiyal Decl. (ECF No. 20-4) ¶ 14.

Plaintiff Project alleges that it was harmed by the removal of EJScreen because it "relied on EJScreen weekly to conduct research and prepare public reports, interactive maps, legal filings, and other materials that educate the public and decisionmakers about the impacts of industrial pollution on communities." Compl. (ECF No. 1) ¶ 28. Project alleges that it has created reports using EJScreen in its legal advocacy. *Id.* Project alleges further that it operates a website called oilandgaswatch.org that directly incorporated EJScreen data through EJScreen's Application Program Interface tool ("Interface Tool"), which was also removed from EPA's website. *Id.* ¶ 29. Project alleges that, without access to the Interface Tool and EJScreen mapping tool, Project "can no longer automatically update the oilandgaswatch.org website, and it lacks the resources to do so manually." *Id.*; Duggan Decl. (ECF No. 20-5) ¶ 33 ("Without access to EPA's EJScreen and the API tool, [Project] is not capable of manually collecting, disseminating and evaluating the information [required by its Oil & Gas Watch] at the same pace and scale.").

Project also alleges that it used EJScreen "every month to evaluate the demographic, risk characteristics, and other vulnerabilities of communities where it provides technical assistance," and that it used EJScreen "as a consideration in its decisionmaking process to determine when it

would expend resources participating in rulemaking or other regulatory proceedings and when deciding whether to spend money and time pursuing litigation."  Compl. (ECF No. 1) ¶¶ 30-31; *see also* Pls.' Br. (ECF No. 20-1) at 17 ("[Project] took information from EJScreen and CEJST into account as a factor in making its funding decisions, since a goal of the funding is to 'support[] communities most affected by pollution and historically left out of environmental decision-making.'").  Project alleges that its work has been impeded because of the removal of EJScreen. Compl. (ECF No. 1) ¶¶ 60-64.  Project claims that it "has already had to invest additional resources to gather and analyze data without access to EJScreen," including "develop[ing] and run[ning] a new computer code" and "spend[ing] additional time reconciling inconsistencies in [the replacement data]."  Duggan Decl. (ECF No. 20-5) ¶ 36.

California Communities alleges that it was harmed by the removal of EJScreen because it "regularly relied on EJScreen to explain environmental harms to the public, regulators, and legislators."  Compl. (ECF No. 1) ¶ 32; Pls.' Br. (ECF No. 20-1) at 19 (claiming that California Communities used EJScreen to "create maps and analyses for education . . . to protect public health and communities.").  California Communities also claims that it "had to stop work on its project to inventory landfill pollution impacts across several states" because of the "poor quality and limited functionality" of the alternatives it found after the removal of EJScreen.  Williams Decl. (ECF No. 20-6) ¶ 22.

## II.    Climate and Economic Justice Screening Tool

Climate and Economic Justice Screening Tool ("Screening Tool") was created by the Council on Environmental Quality with support from the U.S. Digital Service and in collaboration with other federal agencies and departments and made available at https://screeningtool.geoplatform.gov. D'Ambrosio Decl. Ex. 1. at 4. The Screening Tool was an interactive mapping tool that allowed agencies to identify communities deemed "disadvantaged"

for the purpose of complying with Biden Administration policies, including the Justice40 Initiative.        Biden        White        House        Archives,        Justice40, https://bidenwhitehouse.archives.gov/environmentaljustice/justice40/        ("The Climate        and Economic Justice Screening Tool (CEJST) is an interactive mapping tool to identify disadvantaged communities that are marginalized by underinvestment and overburdened by pollution. . . . By helping Federal agencies identify disadvantaged communities, the CEJST seeks to fulfill the promise of the Justice40 Initiative. The CEJST was developed with Federal resource allocation purposes in mind."); M-23-09 Memorandum for the Heads of Executive Departments and Agencies, Addendum to the Interim Implementation Guidance for the Justice40 Initiative, M-21-28, on using the Climate and Economic Justice Screening Tool (CEJST), Jan. 27, 2023, https://www.whitehouse.gov/wp-content/uploads/2023/01/M-23-09_Signed_CEQ_CPO.pdf; (directing Federal agencies to use Version 1.0 of the Screening Tool "as expeditiously as possible" "to identify geographically defined disadvantaged communities" for Justice40 covered programs and any statutory programs directing resources to disadvantaged communities, to the maximum extent possible and permitted by law, with allowance for certain exceptions); Compl. (ECF No. 1) ¶ 34.

Executive Order 14008 created the Justice40 Initiative and made it a policy goal of the Biden Administration[3] that 40 percent of certain Federal investments flow to "disadvantaged" communities. E.O. 14008, Section 223, 86 Fed. Reg. 7619, 7631-32 (Jan. 27, 2021). However, the Executive Order creating the Justice40 Initiative did not define "disadvantaged" communities. *Id.* Instead, it directed the Council on Environmental Quality to "create a geospatial Climate and

---

[3] President Trump rescinded Executive Order 14008 via Executive Order 14148 of January 20, 2025, published in the Federal Register at 90 Fed. Reg. 8237 (Jan. 28, 2025).

Economic Justice Screening Tool and . . . annually publish interactive maps highlighting disadvantaged communities." E.O. 14008, Section 222(a), 86 Fed. Reg. 7619, 7631 (Jan. 27, 2021).

The Screening Tool identified communities by census tract as "disadvantaged" based on subjective criteria and external data inputs on various climate, environmental, socioeconomic and other burdens. D'Ambrosio Decl. Ex. 1, Section II (Methodology). For example, one of the categories of disadvantaged communities identified in Version 2.0 of the Screening Tool is communities located in census tracts that meet the threshold for at least one of the tool's environmental, climate, or other burdens and the threshold for the associated socioeconomic burden. D'Ambrosio Decl. Ex. 1, Section II.A. Each of the broad burden categories—climate change, energy, health, housing, legacy pollution, transportation, water and wastewater, and workforce development—reflects a subjective choice, as does the threshold above which the community could be deemed "disadvantaged" based on that burden category. For example, the Screening Tool would identify a community as "disadvantaged" for experiencing "climate change burdens" where, among other factors, the "expected agriculture loss rate" within the associated census tract was greater than or equal to the 90th percentile, and the associated census tract met the socioeconomic burden threshold, i.e., was "low income," which was further defined. D'Ambrosio Decl. Ex. 1, Section II.A, Table 1. Information used to establish the expected agriculture loss rate, and other data inputs into the Screening Tool's decision matrix, were obtained from other agency information and other publicly available information. D'Ambrosio Decl. Ex. 1, at 8-10; *see also id.* Section III (Data); *id.* at 4 ("The tool uses publicly available, nationally-consistent datasets to identify disadvantaged communities."). For example, the Technical Support Document for Version 2.0 of the Screening Tool explains that data about the climate change burden

come from the Federal Emergency Management Agency's (FEMA) National Risk Index, the First Street Foundation's Climate Risk dataset, and the U.S. Census Bureau's American Community Survey. *Id.* at 8.

The methodology outlined in the Technical Support Document does not identify the Council on Environmental Quality as the source of any of the data inputs, and it explains that the datasets—which come from at least a half dozen agencies and other public sources—were chosen after receiving hundreds of dataset recommendations from federal agencies, environmental justice data experts, the White House Environmental Justice Advisory Council (WHEJAC), the National Academies of Sciences, Engineering, and Medicine (NASEM), and the public. *Id.* at 16, 17-19 (Table showing datasets).

All of the programming code for building a version of the Screening Tool is open source and was made available through a Federal government-maintained GitHub repository[4] at https://github.com/usds/justice40-tool,[5] and that repository is still available.. At least two organizations have websites providing links to the same "re-created Version 2.0" of the Screening Tool, described also as an "unchanged" copy of the Screening Tool. *See* Public Environmental Data Partners, Data + Screening Tools, https://screening-tools.com/climate-economic-justice-screening-tool; NDC Partnership, Climate and Economic Justice Screening Tool (CEJST), https://ndcpartnership.org/knowledge-portal/climate-toolbox/climate-and-economic-justice-

---

[4]     GitHub is a "collaborative platform" that, among other things, "enables seamless code sharing and feedback" for government agencies and external partners. *See* GitHub, Government Solutions, Empowering government agencies with secure, collaborative software development, https://github.com/solutions/industry/government.

[5] *See also* D'Ambrosio Decl. Ex. 1 at 30 ("[A]ll of the programming code for building the CEJST is open source and available at https://github.com/usds/justice40-tool. It is mostly written in Python and JavaScript (TypeScript). Documentation for working with the codebase is currently available in both English and Spanish.").

screening-tool-cejst. These websites direct users to the same tool, available at https://edgi-govdata-archiving.github.io/j40-cejst-2/en/#3/33.47/-97.5, which may have been available to the public as early as January 24, 2025. *See* Public Environmental Data Partners, Data + Screening Tools, https://screening-tools.com/ (stating that "[a]ccess to Climate and Economic Justice Screening Tool was made publicly available" on January 24, 2025).

In addition, the Screening Tool made its determinations regarding whether a community was "disadvantaged" publicly available for download in searchable spreadsheets and via a "Shapefile" that could be loaded into alternative mapping software for individual use. D'Ambrosio Decl. Ex. 1 at 30. These files allow users to access the Screening Tool's conclusions as to whether a community is "disadvantaged" and create their own searchable maps even if the Screening Tool's map interface is no longer available on a government website. *See id.*

Members of the public could have downloaded these files and at least one website appears to host such downloaded information. *See* Rollback: CEQ's Climate & Economic Justice Screening Toll (CEJST) Removed," https://eelp.law.harvard.edu/tracker/ceqs-climate-economic-justice-screening-tool-removed/ (providing a link to download files from Version 2.0 of the Screening Tool); Harvard Dataverse, Harvard Environment and Law Data (HELD) Collection, Climate and Economic Justice Screening Tool (CEJST), https://dataverse.harvard.edu/dataset.xhtml?persistentId=doi:10.7910/DVN/B6ULET (providing Screening Tool files "downloaded . . . on December 5, 2024"). In addition, the reconstituted third-party screening tool discussed above[6] provides a link to allow users to download the third-party tool's outputs, including the community list spreadsheets and shapefile. *See* Unofficial Climate and Economic Justice Screening Tool, Downloads,    https://edgi-govdata-archiving.github.io/j40-cejst-2/en/downloads#3/33.47/-97.5.

---

[6]    Available at https://edgi-govdata-archiving.github.io/j40-cejst-2/en/#3/33.47/-97.5

The third-party tool also provides a link to a GitHub repository with underlying source code. *See* GitHub, EDGI Gov Data Archiving, https://github.com/edgi-govdata-archiving/j40-cejst-2.[7]

Sierra Club alleges that it was harmed by removal of the Screening Tool because it "relied on [the Screening Tool] to provide targeted advocacy to address the disproportionate impact of environmental crises." Compl. (ECF No. 1) ¶ 37. In support of its allegations regarding harm, Sierra Club cites a prior use of the tool, but no current projects or other specific tasks that it cannot perform because it no longer has access to the Screening Tool. *Id.*

Scientists alleges that it was harmed by removal of the Screening Tool because it "regularly relied on [the Screening Tool] to conduct technical analyses that it disseminated to the public." Compl. (ECF No. 1) ¶ 38. Scientists further alleges that "removal of [the Screening Tool] greatly impairs [its] ability to produce national-scale analyses related to climate and environmental justice." *Id.* Scientists also claims that, because of the removal of the Screening Tool, it "has had to pause and reorganize its work on a project involving the impact of nuclear materials on communities." Phartiyal Decl. (ECF No. 20-4) ¶ 14.

Project alleges that it was harmed by removal of the Screening Tool because it "regularly relied on [the Screening Tool], including to conduct research and prepare public reports, interactive maps, and other materials that educate the public and decisionmakers about the impacts of industrial pollution on communities." Compl. (ECF No. 1) ¶ 39. Project further alleges that it "used [the Screening Tool] several times a month as a consideration when deciding how to allocate funds for technical support." *Id.* Other than its allegation regarding ongoing use of the Screening

---

[7]    EDGI is likely the Environmental Data & Governance Initiative. See EDGI, Environmental Data & Governance Initiative, Trump Removes Access to CEJST, Our New Coalition Restores It, https://envirodatagov.org/trump-removes-access-to-cejst-our-new-coalition-restores-it/  (Jan. 31, 2025).

Tool as part of fund allocation decisions, Project does not cite any current projects or other specific tasks that it cannot perform because it no longer has access to the Screening Tool. *Id.*

California Communities alleges that it was harmed by removal of the Screening Tool because it "regularly relied on [the Screening Tool] to determine the impact of pollution on disadvantaged communities and to assist those communities in advocating against the environmental and health harms they are suffering." Compl. (ECF No. 1) ¶ 40. In support of its allegations regarding harm, California Communities cites a prior use of the tool, but no current projects or other specific tasks that it cannot perform because it no longer has access to the Screening Tool. *Id.*

## III.     <u>Low-Income Energy Affordability Data Tool</u>

The Low-Income Energy Affordability Data Tool ("LEAD Tool") was an interactive mapping tool created by Energy that helped users understand and compare the cost of energy relative to income, for various geographic regions, including census tracts, cities, counties, states, tribal lands, and the entire United States. Compl. (ECF No. 1) ¶ 42. Between January 25, 2025, and January 29, 2025, Energy removed from its website the LEAD Tool and pages related to it. *Id.* ¶ 43. As of June 3, 2025, the LEAD Tool is again available on Energy's website at https://www.energy.gov/scep/slsc/lead-tool. Kidd Decl. ¶ 5. Energy does not currently expect to remove the LEAD Tool again at this time but plans to provide prior notice on its website should such a decision be made in the future. Kidd Decl. ¶ 6. Moreover, even prior to June 3, 2025, the LEAD Tool remained available and continues to be available on https://lead.openei.org/, and the underlying data continued to be for download at https://data.openei.org/submissions/6219. Kidd Decl. ¶ 7.

Sierra Club alleges that it was harmed by removal of the LEAD Tool because it "was central to Sierra Club's work to protect public health, climate, and public lands." Compl. (ECF

No. 1) ¶ 44.  Sierra Club further alleges that it "used the LEAD [T]ool in reports that develop regional recommendations to alleviate the energy burden for vulnerable households."  *Id.* ¶ 45. Sierra Club also claims that it "used the LEAD Tool to make decisions about the communities to which it offered assistance in seeking relief from high energy burdens."  Pls.' Br. (ECF No. 20-1) at 17.  In support of its allegations regarding harm, Sierra Club cites a prior use of the tool, but no current projects or other specific tasks that it cannot perform because it no longer had access to the LEAD Tool.  Compl. (ECF No. 1) ¶¶ 44-45; Pls.' Br. (ECF No. 20-1) at 18.

Scientists alleges that it was harmed by removal of the LEAD Tool because it "relied on the LEAD tool in its ongoing efforts to produce reports about how decarbonization and a cleaner electric grid may affect energy access and affordability."  Compl. (ECF No. 1) ¶ 46.  Scientists claims that it "also had to pause work on two separate research projects that would use . . . the LEAD tool in analyses related to affordable housing and energy affordability." Phartiyal Decl. (ECF No. 20-4) ¶ 14.

## IV.    <u>Community Benefits Plan Map</u>

The Community Benefits Plan Map ("Community Map") was created by Energy and provided information about the location of Energy-funded projects and the community benefits expected to derive from those projects.  Compl. (ECF No. 1) ¶ 47.  At the time it was launched in August 2024, Energy stated that the "mapped projects" were "being funded by President Biden's Bipartisan Infrastructure Law and Inflation Reduction Act [("Inflation Reduction Act")] and that "[p]rojects on the . . . map represent a subset of the publicly announced Investing in America agenda  selected  and  awarded  projects."    DOE Launches Map Highlighting Benefits to Communities  Selected  for  Biden-Harris  Clean  Energy  Projects,  *available  at* https://www.energy.gov/infrastructure/articles/doe-launches-map-highlighting-benefits-communities-selected-biden-harris (last visited Jun. 9, 2025).  The map was limited to projects

meeting certain criteria, including that they were Inflation Reduction Act "demonstration or deployment projects or will inform future demonstration or deployment projects," "[h]ave a specific location that is publicly available and identified at the county, city, or Tribal level" and "[h]ave provided community benefits plans with their funding applications." *Id.*

Between January 25, 2025, and January 29, 2025, Energy removed from its website the Community Map and pages related to it. Compl. (ECF No. 1) ¶ 49. However, other websites have posted recreated versions of the map, or significant portions thereof, and made it publicly available. A free platform called Tableau Public offers a map depicting "Department of Energy awarded projects and community commitments" "based on the Demonstrations and Deployments map put together by the Energy in 2024." DOE BIL/IRA-Funded Projects Community Benefit Commitments, *available at* https://public.tableau.com/app/profile/nikki.luke/viz/DOEBILIRA-FundedProjectsCommunityBenefitCommitments/Sheet1. The Tableau Public map page provides additional information and links for the mapped projects. *Id.* The University of California, Berkeley School of Law also has a reproduction of what appears to be a slightly earlier version of the map. Mapping DOE Community Benefits Plans, *available at* https://www.law.berkeley.edu/research/clee/research/other-research-initiatives/doe-community-benefits/ (last visited Jun. 9, 2025). The map on this site is interactive, and the map data can also be viewed as a table. *Id.*

Sierra Club alleges that it was harmed by removal of the Community Map because it "relied on the [Community Map] in its work supporting the necessary transition of the most polluting industries to cleaner, greener technologies while preserving and growing high-paying jobs." Compl. (ECF No. 1) ¶ 50. Sierra Club also claims that it "used the Community Benefits Map to "identify the communities impacted by decarbonization demonstration projects" so it could

- 12 -

"provide those communities with information on the projects and other nearby DOE funded projects … and address other needs of [those] communities." Pls.' Br. (ECF No. 20-1) at 17. Sierra Club further claims that it used the Community Map to educate and organize communities in connection with "industrial decarbonization demonstration projects." Pls.' Br. (ECF No. 20-1) at 19. Sierra Club claims that "removal of the Community Benefits Map has prevented the Sierra Club from continuing its work to educate, organize, and mobilize communities around … opportunities to secure additional community benefits as part of clean manufacturing projects." Grenter Decl. (ECF No. 20-3) ¶ 30.

## V.    Equitable Transportation Community Explorer

Equitable Transportation Community Explorer ("Community Explorer") was an interactive mapping tool created by Transportation that compiled location data based on transportation insecurity, climate and disaster risk burden, environmental burden, health vulnerability, and social vulnerability. Compl. (ECF No. 1) ¶ 51. Transportation developed the Community Explorer in 2022 to support the agency's implementation of the Justice40 Initiative established under Executive Order (E.O.) 14008. Huynh Decl. ¶ 3. The initial version of the Community Explorer was replaced in early January 2025 with an updated tool that included updated- methodology, data, display, display layers and an updated Transportation Insecurity Analysis Tool component. Huynh Decl. ¶ 3. Both versions of the Community Explorer were interactive web applications that used different variables and data to assist communities in understanding the cumulative impacts that result from the lack of transportation options. Huynh Decl. ¶ 4. Data sources used included (but were not limited to)- the American Census Survey, Center for Disease Control's (CDC) CDC Places 2024, Environmental Protection Agency's (EPA) EJ Screen, and various data sets developed and managed by USDOT's Bureau of Transportation Statistics (BTS) based on Household Travel Survey data. Huynh Decl. ¶ 4.

For both versions of the Community Explorer, Transportation developed component scores that represented a specific aspect of the overall definition of "disadvantage" in the context of transportation. Huynh Decl. ¶ 5.  The original Community Explorer's five indices (Transportation Insecurity Index; Environmental Burden Index; Health Vulnerability Index; Climate and Disaster Risk Index; and Social Vulnerability Index) were consolidated into three indices for the January 2025 version (Transportation Insecurity Index; Place-Based Burden Index; and Population-Based Vulnerability Index).  Huynh Decl. ¶ 5.  In both tools, the components were combined to form an overall index. Huynh Decl. ¶ 5. In the updated Community Explorer tool released in early January 2025, USDOT also included an updated Transportation Insecurity Analysis Tool component. Huynh Decl. ¶ 5.

Transportation did not collect any data for the sole purpose of the Community Explorer but relied on information from the Census and other existing datasets. Huynh Decl. ¶ 6.  In both versions of the Community Explorer, Transportation combined individual variables and datasets to create a score for each component of the overall definition of disadvantage.  Huynh Decl. ¶ 6. The indices in both versions of the Community Explorer were compilations of data from multiple publicly available government data sources that included variables such as the percent of households with no car, average commute time, walkability, traffic fatalities, and air quality indicators like diesel particulates concentration. Huynh Decl. ¶ 7. The Explorer included modeling of household transportation costs completed by the Bureau of Transportation Statistics, which was based on survey response data that is not available to the public and was not published with the Community Explorer, however, no limitation exists on sharing the modeled transportation costs results publicly. Huynh Decl. ¶ 7.

Between January 26, 2025, and February 1, 2025, Transportation removed from its website the Community Explorer and pages related to it. Compl. (ECF No. 1) ¶ 53. However, the indices, methods and formula, as described in the Community Explorer technical guide, are all currently available on DOT's website. USDOT, Equitable Transportation Community Explorer (ETCE), ETCE Technical Documentation (Feb. 2023), available at: https://www.transportation.gov/sites/dot.gov/files/2023-02/ETCE-Technical-Documentation.pdf.

Sierra Club alleges that it was harmed by removal of the Community Explorer because it used "the [Community] Explorer and EJScreen to identify public transit routes that connect underserved communities to green spaces like trails, parks, and nature areas; to encourage municipalities to advertise their existing routes as 'transit to trails' options; and to promote legislation that would create or improve transportation between underserved communities and public lands." Compl. (ECF No. 1) ¶ 54. Sierra Club alleges further that it "regularly used the [Community] Explorer to identify gaps in public transit availability and, in conjunction with EJScreen, to determine where to allocate its resources for public transportation projects." *Id.* ¶ 55. Sierra Club also claims that it uses the Community Explorer "to identify existing community needs and calculate the benefits of developing particular transit routes," Pls.' Br. (ECF No. 20-1) at 17. In support of its allegations regarding harm, Sierra Club cites no current projects or other specific tasks that it cannot perform because it no longer has access to the Community Map. Compl. (ECF No. 1) ¶¶ 54-55.

## VI.    **Future Risk Index**

FEMA's Future Risk Index was an interactive mapping tool that provided projected economic losses due to climate change at the county level, based on different greenhouse gas emission scenarios and environmental hazards (coastal flooding, extreme heat, wildfire, hurricanes, and drought). Compl. (ECF No. 1) ¶ 56. The Future Risk Index served as a supplement

to FEMA's National Risk Index and provided estimates of how much climate change is likely to cost communities in the United States.  *Id.*  The Future Risk Index was a prototype tool FEMA developed to estimate potential future natural hazard risk on communities in the United States. Fontenot Decl. ¶ 4. The Future Risk Index projected potential risks based on current data available for five natural hazards: wildfire, hurricane, extreme heat, drought, and coastal flooding.  *Id.*  The data that FEMA utilized to create the index included publicly available information from the Department of Defense, the Environmental Protection Agency, the National Aeronautics and Space Administration, the Jet Propulsion Laboratory, the National Oceanic and Atmospheric Administration, the U.S. Army Corps of Engineers, the U.S. Census Bureau, the U.S. Geological Survey and FEMA.  *Id.* FEMA developed the FRI prototype tool with contract support from Applied Research Associates, Inc., Compass PTS, and FACTOR, Inc.  *Id.*

In February 2025, FEMA removed from its website the Future Risk Index and pages related to it.  Compl. (ECF No. 1) ¶ 57; Fontenot Decl. ¶ 13 (the index was removed from FEMA's website on February 19, 2025).  Because the Future Risk Index tool was publicly available, it was replicated and is available on other websites such as https://screening-tools.com/fema-future-risk and  https://fulton-ring.github.io/nri-future-risk/.  Fontenot Decl. ¶ 4.  A recent article confirms the  Future  Risk  Index  tool  remains  accessible  on  other  websites (https://geographical.co.uk/news/the-online-climate-tool-that-trump-removed-but-data-scientists-have-now-rebuilt).  Fontenot Decl. ¶ 4.

Scientists alleges that it was harmed by removal of the National Risk Index because it had previously "used the Future Risk Index webpages for scoping technical analyses" and "had been considering integrating the tool into a forthcoming analysis on affordable housing."  Compl. (ECF No. 1) ¶ 58.

**STANDARD OF REVIEW**

**I.     Preliminary Injunctive Relief**

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008). A party seeking preliminary relief must make a "clear showing that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest." *League of Women Voters v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016). The movant bears the burden of persuasion to show that the requested relief is due. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).

Before the Supreme Court's decision in *Winter*, courts weighed these factors on a "sliding scale," allowing "an unusually strong showing on one of the factors" to overcome a weaker showing on another. *Damus v. Nielsen*, Civ. A. No. 18-0578 (JEB), 2018 WL 3232515, at *4 (D.D.C. July 2, 2018) (quoting *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291-92 (D.C. Cir. 2009)). This Circuit has hinted, though not held, that *Winter*—which overturned the Ninth Circuit's "possibility of irreparable harm" standard—establishes that "likelihood of irreparable harm" and "likelihood of success" are "independent, free-standing requirement[s]." *Sherley v. Sebelius*, 644 F.3d 388, 392-93 (D.C. Cir. 2011); *see also League of Women Voters*, 838 F.3d at 7 (declining to address whether "sliding scale" approach is valid after *Winter*).

**II.     Administrative Procedure Act**

The Administrative Procedure Act ("APA") directs courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, [] otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  The scope of review is "narrow," and "the court is not to substitute its judgment for that of the agency."  *Motor Vehicle Mfgr's Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  The arbitrary and capricious standard is "[h]ighly

- 17 -

deferential," and "presumes the validity of agency decisions." *AT&T Corp. v. FCC*, 220 F.3d 607, 616 (D.C. Cir. 2000); *see also Hi-Tech Pharmacal Co. v. FDA*, 587 F. Supp. 2d 13, 18 (D.D.C. 2008) ("[I]t is not enough for the agency decision to be incorrect—as long as the agency decision has some rational basis, the court is bound to uphold it.").

## ARGUMENT

Plaintiffs' motion for injunctive relief should be denied. Plaintiffs have not demonstrated that they risk imminent irreparable harm or that they are likely to succeed on the merits of their claim. Moreover, the balance of interests, which considered the broader public interest in making the determinations that Plaintiffs seek to challenge, is firmly in favor of Defendants.

## I.    LEAD Tool Claim Is Moot

A federal court may not "decide the merits of a legal question not posed in an Article III case or controversy." *U.S. Bancorp Mortgage Co. v. Bonner Mall P'ship*, 513 U.S. 18, 21 (1994). In particular, a federal court has no authority "to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it." *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992) (quoting *Mills v. Green*, 159 U.S. 651, 653 (1895)). There is "no case or controversy, and a suit becomes moot, 'when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome.'" *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (quoting *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013)) (in turn quoting *Murphy v. Hunt*, 455 U.S. 478, 481 (1982) (*per curiam*)); *see N.Y. State Rifle & Pistol Ass'n, Inc. v. City of New York*, 140 S. Ct. 1525, 1526 (2020) (*per curiam*) (claim for declaratory and injunctive relief against "old" municipal firearms transport rule "is . . . moot" where municipality amended rule and state amended underlying statute after Supreme Court granted review). "To qualify as a case fit for federal-court adjudication, an actual controversy must be extant *at all stages* of review, not merely at the time the complaint is filed."

*Arizonans for Officials English v. Arizona*, 520 U.S. 43, 67 (1997) (citation omitted; emphasis added).

Here, Energy reposted the LEAD Tool on June 3, 2025, Kidd Decl. ¶ 5, thus, removing any controversy regarding whether Plaintiffs can access it. Moreover, Energy's declarant states that the agency does not currently expect to remove the LEAD Tool again and, if it does, it will provide notice, Kidd Decl. ¶ 6, thus demonstrating that there is no reasonable expectation that the allegedly unlawful conduct will recur. Therefore, the claim may be moot. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 189 (2000) ("A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur."). Because the LEAD Tool claim is moot, Plaintiffs lack standing for Count III as it relates to the LEAD Tool and will not succeed on the merits of that claim.

## II.    Plaintiffs Will Not Suffer Imminent Irreparable Harm In The Absence Of Injunctive Relief

Movants for a preliminary injunction must show that they are "likely to suffer irreparable harm in the absence of preliminary relief." *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014); *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam) ("The basis for injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies") (cleaned up). A preliminary injunction may not issue "based only on a possibility of irreparable harm . . . [since] injunctive relief [i]s an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

The "standard for irreparable harm is particularly high in the D.C. Circuit." *Fisheries Survival Fund v. Jewell*, 236 F. Supp. 3d 332, 336 (D.D.C. 2017). If a party makes no irreparable injury showing, a court may deny a motion for injunctive relief without considering the other factors. *CityFed Fin. Corp. v. Off. of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995); *Wis.*

*Gas*, 758 F.2d at 674, 676 (because movants could not establish irreparable harm, the court need not address any of the other factors). The injury "must be both certain and great; it must be actual and not theoretical [and] . . . of such imminence that there is a 'clear and present' need for equitable relief." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (citation omitted); *Doe v. Mattis*, 889 F.3d 745, 782 (D.C. Cir. 2018) (injury must be "certain," "great" and "actual").

A movant must substantiate that the irreparable injury is "likely" to occur in the absence of relief. *See, e.g.*, *Nat'l Parks Conservation Ass'n v. U.S. Forest Serv.*, Civ. A. No. 15-1582 (APM), 2016 WL 420470, at *8 (D.D.C. Jan. 22, 2016) ("The movant bears the burden of substantiating, with evidence, that the injury is certain, imminent, great, and beyond remediation"). The Local Civil Rules underscore the need for the movant to present such proof, requiring that "[a]n application for a preliminary injunction . . . be supported by all affidavits on which the plaintiff intends to rely" and prohibiting the filing of "[s]upplemental affidavits" without "permission of the Court." *See id.* (citing LCvR 65.1(c)). The vague allegations about *possible* future harms contained in Plaintiffs' Complaint fall far short of showing the D.C. Circuit requires of an applicant for a preliminary injunctive relief. *See, e.g.*, *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (noting the Circuit's "high standard for irreparable injury"). "Bare allegations of what is likely to occur are of no value" because the district court must make the determination of "whether the harm will *in fact* occur." *Wis. Gas*, 758 F.2d at 674 (emphasis in original).

## A.    Inexcusable Delay

As a threshold matter, the fact that Plaintiffs waited between six and eleven weeks after the websites were removed to even file suit in this case—and then waited another month to move for a preliminary injunction—dooms their request for this extraordinary relief.

As alleged in the Complaint and explained by Plaintiffs' declarants, EJScreen was removed on February 5, 2025 (Compl. (ECF No. 1) ¶ 22); the Screening Tool was removed on or about

January 22, 2025 (*id.* ¶ 36); the LEAD Tool was removed between January 25, 2025, and January 29, 2025 (*id.* ¶ 43); the Community Map was removed between January 25, 2025, and January 29, 2025 (*id.* ¶ 49); the Community Explorer was removed between January 26, 2025, and February 1, 2025 (*id.* ¶ 53); and the Future Risk Index was removed "in February 2025" (*id.* ¶ 57). Plaintiffs filed their complaint on April 14, 2025, Compl. (ECF No. 1), and they did not move for a preliminary injunction until May 16, 2025, Pls.' Prelim. Inj. Mot. (ECF No. 20). "An unexcused delay in seeking extraordinary injunctive relief may be grounds for denial because such delay implies a lack of urgency and irreparable harm." *Newdow v. Bush*, 355 F. Supp. 2d 265, 292 (D.D.C. 2005). "The D.C. Circuit has found that a delay of forty-four days before bringing action for injunctive relief was 'inexcusable,' and 'bolstered' the 'conclusion that an injunction should not issue,' particularly where the party seeking an injunction had knowledge of the pending nature of the alleged irreparable harm." *Open Top Sightseeing USA v. Mr. Sightseeing, LCC*, 48 F. Supp. 3d 87, 90 (D.D.C. 2014) (quoting *Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975)); *see also Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 44 (D.D.C. 2000) (delay of two months in bringing action "militates against a finding of irreparable harm"); *Biovail Corp. v. FDA*, 448 F. Supp. 2d 154, 165 (D.D.C. 2006) ("The delay in filing this suit further undermines any showing of irreparable injury").

Plaintiffs' delay here clearly indicates that no imminent or irreparable harm was caused (or is being caused) by the removal of the websites at issue in this matter. Plaintiffs' motion for preliminary injunction should be denied and this case should proceed according to a standard schedule for APA matters.

**B.    Plaintiffs Have Not Demonstrated That They Will Experience Imminent Irreparable Injury In The Absence Of Injunctive Relief**

Even if the Court does not deny Plaintiffs' Motion solely on the basis of unreasonable delay, the harms cited by Plaintiffs in their Complaint and declarations are neither imminent nor irreparable.

1.    Economic Loss

Plaintiffs each allege that, because they no longer have access to the web tools at issue in this litigation, they have had to spend money (or expect to spend money) to seek out alternate data and computing tools.  *See* Grenter Decl. (ECF No. 20-3) ¶ 37 (explaining that Sierra Club will need to expend additional resources to pursue its mission if it has to recreate the web tools' analysis); Phartiyal Decl. (ECF No. 20-4) ¶ 15 ("Without these tools, [Scientists] will need to devote additional expertise and resources to gather data about environmental and health hazards and the communities they impact. That means some of [Scientists'] work will now be more expensive and time-consuming, and that [Scientists] will be forced to abandon some projects due to resource limitations."); Duggan Decl. (ECF No. 20-5) ¶ 16 ("Replacing that information would require [Project] to access datasets with the same information, to upload those datasets, and to pay additional money for online storage of the datasets."); *id.* ¶ 35 ("If EJScreen and CEJST are not restored, [Project] will be required to invest considerably more of its limited time, money, and effort to [conduct analysis]."); Williams Decl. (ECF No. 20-6) ¶ 21 (explaining that the removal of EJScreen and the Screening Tool "has required [California Communities] to expend additional resources to perform its work.").

It is "well settled that economic loss does not, in and of itself, constitute irreparable harm." *Wis. Gas Co*., 758 F.2d at 674.  "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough." *Va. Petroleum Jobbers Ass'n*

*v. FPC*, 259 F.2d 921, 925 (D.C. Cir. 1958). "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation weighs heavily against a claim of irreparable harm." *Id.* Recoverable monetary loss may constitute irreparable harm "only where the loss threatens the very existence of the movant's business." *Wis. Gas Co*., 758 F.2d at 674 (citing *Washington Metropolitan Area Transit Comm'n v. Holiday Tours, Inc.,* 559 F.2d 841, 843 n. 2 (D.C. Cir. 1977)).

Here, Plaintiffs' papers argue that they will suffer "certain, great and actual" economic losses as a result of having to find alternate data sources and computing tools. Pls.' PI Br. (ECF No. 20-1) at 16-23. Even if Plaintiffs' declarations supported that statement, which they do not, economic injuries short of insolvency, are insufficient to meet the irreparable harm standard for a preliminary injunction. *Wis. Gas Co*., 758 F.2d at 674. Moreover, Plaintiffs' declarations do not come anywhere close to demonstrating the magnitude of the plaintiff organizations' economic damages (incurred or expected), let alone that the losses would imperil the very existence of the organization. *See generally*, Grenter Decl. (ECF No. 20-3); Phartiyal Decl. (ECF No. 20-4); Duggan Decl. (ECF No. 20-5); Williams Decl. (ECF No. 20-6). Rather, Plaintiffs' declarants make vague assertions regarding the need to shift resources from certain aspects of their programs to data analysis. *See*, *e.g.*, Phartiyal Decl. (ECF No. 20-4) ¶ 15 ("Without these tools, [Scientists] will need to devote additional expertise and resources to gather data about environmental and health hazards and the communities they impact. That means some of [Scientists'] work will now be more expensive and time-consuming"). Moreover, several of the tools at issue in this case have been reconstituted by other organizations or preserved in their historical state at the time they were removed, undercutting Plaintiffs' assertions of economic losses due to the unavailability of the affected websites and tools. *See* https://pedp-ejscreen.azurewebsites.net/; Motilall Decl. ¶ 8 ("As

of April 9, 2025, the EJScreen code is available as a public archive."); Unofficial Copy of the Climate and Economic Justice Screening Tool, Explore the Map, https://edgi-govdata-archiving.github.io/j40-cejst-2/en/#3/33.47/-97.5; *see also* Harvard Dataverse, Harvard Environment and Law Data (HELD) Collection, Climate and Economic Justice Screening Tool (CEJST), https://dataverse.harvard.edu/dataset.xhtml?persistentId=doi:10.7910/DVN/B6ULET (providing files downloaded from the Screening Tool on December 5, 2024, including a spreadsheet list identifying disadvantaged communities); Background, *supra*. Plaintiffs make general allegations about alternate sources being unreliable or insufficient, but do not categorically state that they are unusable such that Plaintiffs would need to wholly divert "great and actual" resources toward reconstituting data or information from the affected websites and tools.

Put simply, Plaintiffs have failed to demonstrate that their purported economic damages meet the burden for warranting injunctive relief in this Circuit.

### 2.    No Other Imminent, Irreparable Harm

Large portions of the harm allegations and argument in Plaintiffs' paper and supporting declarations address prior uses of the web tools at issue in this case, with the suggestion that Plaintiffs will not be able to engage in similar work in the future. *See*, *e.g.*, Compl. (ECF No. 1) ¶ 28 (Plaintiff Project "relied on EJScreen weekly to conduct research and prepare public reports, interactive maps, legal filings, and other materials that educate the public and decisionmakers about the impacts of industrial pollution on communities."); *id.* ¶ 38 (Plaintiff Scientists "regularly relied on [the Screening Tool] to conduct technical analyses that it disseminated to the public."); *id.* ¶ 44 (alleging that the LEAD Tool because it "was central to Sierra Club's work to protect public health, climate, and public lands."); *id.* ¶ 50 (alleging that Plaintiff Sierra Club "relied on the [Community Map] in its work supporting the necessary transition of the most polluting industries to cleaner, greener technologies while preserving and growing high-paying jobs."); *id.*

¶ 55 (alleging that Plaintiff Sierra Club used "the [Community] Explorer and EJScreen to identify public transit routes that connect underserved communities to green spaces like trails, parks, and nature areas; to encourage municipalities to advertise their existing routes as 'transit to trails' options; and to promote legislation that would create or improve transportation between underserved communities and public lands."); *id.* ¶ 58 (alleging that Plaintiff Scientists was harmed by removal of the Future Risk Index because it had previously "used the Future Risk Index webpages for scoping technical analyses"). As a threshold matter, the fact that Plaintiffs relied on these tools and resources in the past does not demonstrate that they face an imminent threat of irreparable harm as a result of the tools' removal. Moreover, the speculative suggestion that their organization and clients will be harmed by Plaintiffs' prospective inability to use the web tools at issue in this case does not satisfy their burden to show an imminent threat of irreparable harm. Such "bare allegations of what is likely to occur are of no value since the court must decide whether the harm will *in fact* occur," *Wis. Gas Co.*, 758 F.2d at 674 (emphasis in original), and whether "the alleged harm will directly" flow from the occurrence movant seeks to compel or enjoin, *id.*; *see also New York Times Co. v. Def. Health Agency,* No. 21-CV-566 (BAH), 2021 WL 1614817, at *8 (D.D.C. Apr. 25, 2021) (denying motion for preliminary injunction in Freedom of Information Act where plaintiff sought expedited processing of request for data regarding the federal government's nationwide effort to distribute coronavirus vaccines).

Even where Plaintiffs allege that they have had to halt projects or look for other resources because they had intended to use tools that are no longer available from the Defendants' websites, their allegations are vague, conclusory, and do not demonstrate that irreparable harm will befall their organizations in the absence of injunctive relief. For example, Plaintiff Scientists alleges that, without EJScreen, it "must alter its research methodology and will be unable to include

comprehensive cumulative burden data that will help achieve the project's goal of improving health equity in affected communities." *Id*. ¶ 27.   Scientists claims that, because of the removal of EJScreen, it "has had to pause and reorganize its work on a project involving the impact of nuclear materials on communities." Phartiyal Decl. (ECF No. 20-4) ¶ 14.   Other than the conclusory assertion that it has no options other than EJScreen, Plaintiff Scientists does not explain why the removal of EJScreen forecloses their previously planned work, nor does it explain how imminent, irreparable harm will flow from the cessation of this work.   Similarly, Plaintiff Project alleges that it cannot update its oil and gas website without EJScreen and makes the conclusory assertion that it has no replacement for the tool.   Compl. (ECF No. 1) ¶ 29; Duggan Decl. (ECF No. 20-5) ¶ 33.   But neither Plaintiff Project nor its declarant demonstrates that there are no other tools that will allow them to update the website or that imminent, irreparable harm will ensue.

Finally, the implication in much of Plaintiffs' harm discussion is that the clients they serve and the American people writ large are being harmed as a result of Plaintiffs not having access to the web tools at issue in this litigation and not being able to use those tools for education and advocacy. *See*, *e.g.*, Grenter Decl. (ECF No. 20-3) ¶ 38 ("Especially under constrained timelines, the elimination of the tools prevents Sierra Club from responding to disasters, meaningfully participating in proceedings, and educating communities impacted by such events."); Phartiyal Decl. (ECF No. 20-4) ¶ 10 (explaining that the organization had instructed members of the public how to use the web tools and now those individuals will not be able to use them); Duggan Decl. (ECF No. 20-5) ¶ 32 ("The lack of accurate and reliable information on demographic and other indicators from EJScreen and CEJST reduces EIP's ability to disseminate—to the general public, impacted communities, organizations, decisionmakers, and the media—accurate information about the impacts of industrial air and water pollution on human health and the environment.").

But such implications carry no weight for the purposes of the *irreparable harm* analysis because "harm that might befall unnamed third parties does not satisfy the irreparable harm requirement in the context of emergency injunctive relief, which must instead be connected specifically to the parties before the Court." *State v. Musk*. --- F. Supp. 3d ---, 2025 WL 520583, at *4 (D.D.C. Feb. 18, 2025) (quoting *Church v. Biden*, 573 F. Supp. 3d 118, 146 (D.D.C. 2021)); *see also Kansas v. United States*, 124 F.4th 529, 534 (8th Cir. 2024) ("The irreparable-harm analysis focuses on the moving party, not the nonmoving party or some third party.") (citation omitted).

*   *   *

Having failed to demonstrate that they will be subject to an imminent threat of irreparable harm without injunctive relief, Plaintiffs have failed to meet their burden of establishing that they are entitled to a preliminary injunction.

## III.    <u>Plaintiffs' Motion Does Not Demonstrate That They Will Succeed on the Merits</u>

Plaintiffs' Motion for Preliminary Injunction does not demonstrate that Plaintiffs will succeed on the merits.  For each Defendant, Plaintiffs allege that the agency's removal of its respective web tool violated the APA because the removal was "arbitrary, capricious, an abuse of discretion, or not in accordance with the [Paperwork Reduction Act]" because: (1) the web tool(s) qualified as "significant information dissemination products" and was removed without "adequate notice" and (2) removal of the web tool(s) caused a failure of the agency's obligation to "ensure that the public has timely and equitable access to the agency's public information."  Compl. (ECF No. 1) ¶¶ 66-95 (citing 44 U.S.C. § 3506(d)(1), (d)(3)).  As explained below, Plaintiffs are not likely to succeed on the merits because the tools at issue were not "significant information dissemination products," were not "agency's public information," or both.

A.      The Agencies' Respective Web Tools Were Not "Significant Information Dissemination Products"

The Paperwork Reduction Act states that, "[w]ith respect to information dissemination, each agency shall . . . provide adequate notice when initiating, substantially modifying, or terminating significant information dissemination products." 44 U.S.C. § 3506(d)(3). The Paperwork Reduction Act itself does not define "information" or "dissemination products." *See* 44 U.S.C. § 3502 (definitions); *but see id.* (defining "information system" as "a discrete set of information resources organized for the collection, processing, maintenance, use, sharing, dissemination, or disposition of information" and "public information" as "any information, regardless of form or format, that an agency discloses, disseminates, or makes available to the public"). The relevant terms are defined, however, by guidance issued by the Office of Management and Budget ("OMB"). The Paperwork Reduction Act requires OMB to develop "guidelines" that "apply to Federal agency dissemination of public information. Id. § 3504(d)(1). Congress subsequently passed the Data Quality Act, also known as the Information Quality Act, which elaborated on the requirement to issue guidelines. See Consolidated Appropriations Act, 2001, Pub. L. No. 106-554, Appx. C, § 515.

The Office of Management and Budget guidelines, published as interim final on September 28, 2001, and finalized on February 22, 2002, define "information," "dissemination," and "information dissemination product." Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of Information Disseminated by Federal Agencies; Republication, 67 Fed. Reg. 8452 (Feb. 22. 2002). "Information" is defined as "any communication or representation of knowledge such as facts or data, and does not include opinions." *Id.* at 8453-54, 8460. "Dissemination" is defined as "agency initiated or sponsored distribution of information to the public." *Id.* at 8460. "Information dissemination product" is

defined as "any books, paper, map, machine-readable material, audiovisual production, or other documentary material, regardless of physical form or characteristic, an agency disseminates to the public." *Id.* The guidelines do not define "significant."

   1. <u>Screening Tool</u>

  The Screening Tool created by the Council on Environmental Quality with support from other government entities was not a "information dissemination product." The Council on Environmental Quality's best understanding of the data inputs used to determine whether an area was "disadvantaged" for the Screening Tool is that they were not prepared by or at the direction of the Council on Environmental Quality. *See* D'Ambrosio Decl. Ex. 1 at 5-27 (explaining methodology and listing third party data sets). The Screening Tool allowed users to view the Council on Environmental Quality's subjective determination about whether a geographically defined community was "disadvantaged" based on aggregated information in data sets originating with and disseminated by entities such as the Census Bureau, the EPA, Transportation, the Department of Housing and Urban Development, the CDC, Energy, and FEMA. *See id.* at 16; *id.* at 32 (showing the Screening Tool's output—a map of a census tract showing a disadvantaged community and providing the reasons support that opinion, namely that "[t]his tract is considered disadvantaged because it meets more than 1 burden threshold AND the associated socioeconomic threshold"). Thus, the Screening Tool and its content do not fall within the applicable definition of "dissemination," which is defined as "agency *initiated or sponsored* distribution of information to the public." 67 Fed. Reg. 8452, 8460 (emphasis added). The Council on Environmental Quality, at most, was making available information disseminated by other agencies and other entities and providing the Council on Environmental Quality's opinions about the status of communities (i.e., disadvantaged or not) based on that third-party information.

Moreover, much of what the Screening Tool did does not fall within the definition of "information" because it applied subjective criteria to determine whether an area was "disadvantaged" and applied these subjective determinations to the maps that users could generate. Merriam Webster Dictionary defines "opinion" as "a view, judgment, or appraisal formed in the mind about a particular matter."    Merriam Webster, Opinion Definition, *available at* https://www.merriam-webster.com/dictionary/opinion.    As is clear from the Methodology for Version 2.0 of the Screening Tool, the Screening Tool was not displaying data, it created a map that incorporated judgments and appraisals of "disadvantage."  *See generally* D'Ambrosio Decl. Ex. 1, Section II (Methodology).  This is clearly outside the definition of "information" applicable to Plaintiffs' claims.

The decision in *Doctors for America v. Office of Personnel Management*, 766 F. Supp. 3d 39, 51 (D.D.C. 2025), does not instruct differently.  *Doctors for America* involved the removal of webpages and data sets by the Center for Disease Control and the Food and Drug Administration that included raw data, treatment guidance, and other information used in public health.  *Id.* at 46. The parties in that matter do not appear to have litigated whether the content constituted "information" within the meaning of the Paperwork Reduction Act and it appears to have been uncontested that the content did meet the Department of Health And Human Services' internal guidelines—which are not appliable here—for "information dissemination products." *See id.* at 52 (explaining that defendants "do not really disagree" that the removed webpages met the agency guideline definition).  Moreover, *Doctors for America* involved actual raw data and agency guidance regarding disease testing and prevention, not maps and indices generated by agency processing of non-agency data sets.  *See id.* at 48 (discussion of how defendants used the information at issue).

Looking beyond the definitions themselves, any agency action associated with the Screening Tool (*see supra*) is arguably outside the scope of the Paperwork Reduction Act. As Plaintiffs note, the Paperwork Reduction Act was enacted to "ensure the greatest possible benefit from and maximize the utility of information created, collected, maintained, used, shared and disseminated by or for the Federal Government," and "provide for the dissemination of public information on a timely basis, on equitable terms, and in a manner that promoted the utility of the information to the public and makes effective use of information technology." Compl. (ECF No. 1) ¶ 16 (quoting 44 U.S.C. 3501(2), (7)); *see also* Pls.' Br. (ECF No. 20-1) at 9. The Council on Environmental Quality was not sharing or disseminating information that it created, collected, maintained, or used; rather, it created the Screening Tool to display conclusions about whether a geographically defined community was "disadvantaged" based on aggregated information that other agencies or entities created, collected, maintain, used, shared, or disseminated. That the Council on Environmental Quality was not the entity "disseminating" information through the Screening Tool is further demonstrated by the fact that third parties appear to have been able to reconstitute the tool based on datasets and other specifications available online. *See* Unofficial Climate and Economic Justice Screening Tool, Explore the Map, https://edgi-govdata-archiving.github.io/j40-cejst-2/en/#3/33.47/-97.5. Put simply, Plaintiffs are trying to stretch the Paperwork Reduction Act further than it was intended in this case and will fail on the merits in its claim that the Council on Environmental Quality violated the APA because Plaintiffs lacked access to the Tool.

### 2.    Community Explorer

Much like the Council on Environmental Quality's Screening Tool, Transportation's Community Explorer did not disseminate "information" initiated or sponsored by the defendant agency—here, Transportation. Instead, the Community Explorer used existing data, much of

which was collected by other agencies, to allow users to compare different datasets geographically to understand the "disadvantage" communities experience through the cumulative impacts that result from the lack of affordable, safe, multimodal transportation options.  Huynh Decl. ¶¶ 4-9. The Community Explorer also showed an overall disadvantage score, which was based on the agency's own analysis of the interrelationship of the different existing datasets.  *Id.*  This does not fall within the applicable definitions of "information" or of "dissemination," the latter of which is defined as "agency *initiated or sponsored* distribution of information to the public."  67 Fed. Reg. 8452, 8460 (emphasis added).

As with the Screening Tool, the Community Explorer's displays relied on indices that were functions of subjective assessments of data.  Huynh Decl. ¶¶ 4-9.  In other words, the tool displayed opinions in the form of index calculations, not "information."  Also, because much of the data originated with other agencies, it cannot be said that Transportation was "disseminating" it.

### 3.    Future Risk Index

Similarly, the Future Risk Index did not disseminate "information" initiated or sponsored by the defendant agency.  Rather, the Future Risk Index incorporated data from FEMA and other agencies and used that data to make a projection or estimate of future climate risk by making calculations that generated an index.  Fontenot Decl. ¶ 4.  Though the index did incorporate data from FEMA, its core function involved a subjective assessment of risk that was communicated as an index calculation.  *See generally*, https://fulton-ring.github.io/nri-future-risk/ (displaying map color-coded according to the risk assessed by the index).  This falls within the opinion exclusion to the definition of "information" applicable to the Paperwork Reduction Act.  67 Fed. Reg. 8452, 8460.  Also, to the extent that the Future Risk Index included FEMA data, it was also not primarily a means of distributing that information to the public.  Rather, the FEMA data was incorporated into the index, which, as noted, was not itself "information."  Moreover, FEMA's Future Risk

Index and its associated data were meant for planning purposes only.  Fontenot Decl. ¶ 4.  FEMA also reiterated in the technical documentation supporting the Future Risk Index that the tool was a prototype.  *Id.* ¶¶ 4, 6.

        4.    <u>EJScreen</u>

EJScreen similarly aggregated data from a variety of different sources, including the U.S. Census Bureau, NASA, the National Association for Public Health Statistics and Information Systems, the Robert Wood Johnson Foundation, the CDC, NOAA, the Department of Agriculture ("USDA"), the EPA itself, and others.  U.S. Environmental Protection Agency (EPA), 2024. EJScreen Technical Documentation, available at https://www.epa.gov/system/files/documents/2024-07/ejscreen-tech-doc-version-2-3.pdf; *see also* Motilall Decl. ¶ 6.  As such, EJScreen is not a significant information dissemination product because it was using a web application to synthesize data from various sources for viewing in a map form.

        5.    <u>Community Benefits Plan Map</u>

The Community Map was a pictorial representation of various projects that were being funded by the Inflation Reduction Act.  *See* DOE BIL/IRA-Funded Projects Community Benefit Commitments, *available at* <u>https://public.tableau.com/app/profile/nikki.luke/viz/DOEBILIRA-FundedProjectsCommunityBenefitCommitments/Sheet1</u>.  There is no indication that the map was a method for Energy to disseminate its information to the public when it merely represented already "publicly announced Investing in America agenda selected and awarded projects." DOE Launches Map Highlighting Benefits to Communities Selected for Biden-Harris Clean Energy Projects, *available at* <u>https://www.energy.gov/infrastructure/articles/doe-launches-map-highlighting-benefits-communities-selected-biden-harris</u>.

### B.    Certain Tools Did Not Involve The "Agency's Public Information"

As discussed above, the Office of Management and Budget guidance that supplies definitions relevant to the Paperwork Reduction Act's requirements regarding agency information dissemination, defines "information" as "any communication or representation of knowledge such as facts or data, and *does not include opinions*."  67 Fed. Reg. 8452, 8453-54, 8460 (emphasis added).  Because many of the web tools were displaying the subjective judgments (i.e. opinions) of the agencies rather than unadulterated facts and data, they do not meet the relevant definition of "information" and Plaintiffs cannot state a claim for violation of the Paperwork Reduction Act provision requiring "timely and equitable access to the agency's public information."

### 1.    Screening Tool

Plaintiffs are also unlikely to succeed on the merits of its claims that "[b]ecause it removed all access to the interactive webpages, [the Council on Environmental Quality] failed to comply with the [Paperwork Reduction Act] requirement that an agency 'ensure that the public has timely and equitable access to *the agency's* public information.'" Compl. (ECF No. 1) ¶ 75 (quoting 44 U.S.C. 3506(d)(1)) (emphasis added); *see also* Pls.' Br. (ECF No. 20-1) at 9.

The Office of Management and Budget guidance defines "information" as "any communication or representation of knowledge such as facts or data, and *does not include opinions*."  67 Fed. Reg. 8452, 8453-54, 8460 (emphasis added).  The Screening Tool, however, does not communicate or represent "knowledge."  The Screening Tool aggregates other agency and third-party information and provides a means to view those information inputs and the Council on Environmental Quality's conclusions based on them—i.e., the Council on Environmental Quality's subjective opinion about whether a particular geographically defined community is "disadvantaged"—on a map, to support now-rescinded Biden Administration policies to direct 40 percent of the benefits of certain federal investments to disadvantaged communities. Thus,

although the Screening Tool relies on aggregated information, including information that other agencies may have disseminated, the Screening Tool is not information, facts, or data itself. Moreover, the public still has timely and equitable access to source code for a version of the Screening Tool and many of the underlying data sources.  Unofficial Copy of the Climate and Economic Justice Screening Tool, Explore the Map, https://edgi-govdata-archiving.github.io/j40-cejst-2/en/#3/33.47/-97.5; D'Ambrosio Decl. Ex. 1, Section III (Data).  And, to the extent that the underlying data is not available, it is not because of the actions of the Council on Environmental Quality, which has no control over the underlying data disseminated by other agencies and third parties.

Plaintiffs' Motion attempts to cast the web tools at issue in this matter as "information" themselves.  Pls.' Br. (ECF No. 20-1) at 9 (the "contents of the webpages are public information.").  But such assertions misunderstand the nature of applications like the Screening Tool, which is more akin to a calculator or computer that processes data by using formulas, and as discussed above, *Doctors for America* did not decide the issue of whether a website itself is *per se* agency "information."  *See generally*, 766 F. Supp. 3d 39.  The fallacy of Plaintiffs' attempts to cast the Screening Tool itself as "information" is also undercut by the fact that third parties appear to have been able to reconstitute it.  *See supra*.

Because the Screening Tool itself is not "agency's public information," any removal of the Screening Tool does not violate 44 U.S.C. 3506(d)(1), and is not, therefore, "not in accordance with law" under section 706(2) of the APA.

### 2.    Community Explorer

Much like the Council on Environmental Quality's Screening Tool, Transportation's Community Explorer is not the "agency's public information" within the meaning of the Paperwork Reduction Act.  *See* 67 Fed. Reg. 8452, 8453-54, 8460 (definition of "information").

The Community Explorer aggregates and provides a means to view spatially information disseminated by other agencies and third parties.  Huynh Decl. ¶¶ 4-9.  Moreover, as discussed above, the Community Explorer relied on indices that were functions of subjective calculations, not "information."

### 3.   Future Risk Index

Similarly, as discussed above, the Future Risk Index incorporated data from a variety of sources to develop subjective predictions regarding climate risk.  This was not agency "information" within the meaning of the definitions applicable to the Paperwork Reduction Act.

### 4.   EJScreen

Additionally, the public still has timely and equitable access to the source code and many of the underlying data sources for EJScreen. Motilall Decl. ¶8; *see also* U.S. Environmental Protection Agency (EPA), 2024. EJScreen Technical Documentation. To the extent that the underlying data is not available, it is not because of the actions of EPA, which has no control over the underlying data disseminated by other agencies and third parties.

\* \* \*

Because Plaintiffs have not demonstrated that they will succeed on the merits of their claims against any defendant, their motion for preliminary injunction should be denied.

## IV.   **The Public Interest and the Equities Strongly Favor Defendants**

The final two factors required for preliminary injunctive relief—a balancing of the harm to the opposing party and the public interest—merge when the Government is the opposing party. *See, e.g.*, *Nken v. Holder*, 556 U.S. 418, 435 (2009); *Colo. Wild Horse v. Jewell*, 130 F. Supp. 3d 205, 220-21 (D.D.C. 2015); *Pursuing Am.'s Greatness v. Fed. Election Comm'n,* 831 F.3d 500, 511 (D.C. Cir. 2016) ("[T]he government's interest is the public interest."). Courts are to give the government "the widest possible latitude in the dispatch of its own affairs." *Sampson v. Murray*,

415 U.S. 61, 83 (1974). Courts must "pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312-13 (1982).

Here, Plaintiffs argue that they will suffer irreparable harm by not having access to the various web tools but, as demonstrated above, there is no evidence that Plaintiffs are at imminent risk of becoming insolvent and the web tools do not even fall within the ambit of the Paperwork Reduction Act provisions upon which Plaintiffs rely. On the other hand, Defendants have the discretion to decide what technological tools they sponsor on government-owned websites. Also, "it is in the public interest to deny injunctive relief when the relief is not likely deserved under law." *Hubbard v. United States,* 496 F. Supp.2d 194, 203 (D.D.C. 2007) (quoting *Qualls v. Rumsfeld,* 357 F. Supp.2d 274, 287 (D.D.C. 2005)); *see also Serono Labs., Inc. v. Shalala,* 158 F.3d 1313, 1326 (D.C. Cir. 1998) ("The final preliminary injunction factor, the public interest, . . . is inextricably linked with the merits of the case."). As demonstrated above, Plaintiffs are not likely to succeed on the merits.

Accordingly, Plaintiffs have not met their burden of establishing "that the balance of equities tips in [their] favor, and that an injunction is in the public interest" and therefore, Plaintiffs' motion should be denied. *See Winter*, 555 U.S. at 20.

## V.    Plaintiffs Should Be Ordered to Post Security In Connection With Any Temporary Injunctive Relief.

For the reasons stated above, Defendants submit that the Court can and should deny Plaintiffs' motion in its entirety. However, should the Court be inclined to order any injunctive relief, the Court should also order Plaintiffs to post security. Under Federal Rule of Civil Procedure 65(c), the Court may issue a preliminary injunction "only if the movant gives security" for "costs and damages sustained" by Defendants if they are later found to "have been wrongfully enjoined."

Fed. R. Civ. P. 65(c). In the event the Court issues an injunction here, the Court should require Plaintiffs to post an appropriate bond commensurate with the scope of any injunction. *See DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999) (stating that Rule 65(c) places "broad discretion in the district court to determine the appropriate amount of an injunction bond").

Here, Plaintiffs ask the Court to restore each of the web tools at issue in this matter. Pls.' Proposed Order (ECF No. 20-2). Defendants' declarants estimate that restoring the web tools will cost at least $194,000 up front, plus $14,000 per month to maintain for the duration of any injunction. Specifically:

- EPA estimates that it would cost the agency between $10,000 and $15,000 to restore and test the EJScreen application, and an additional $3,000 per month for data refreshes, patches, hosting, and operations and maintenance. Smith Decl. ¶ 5.
- The Council on Environmental Quality estimates that reconstituting the Screening Tool would require the Council on Environmental Quality to expend $160,000 to $165,000 over a period of five to six weeks, followed by an ongoing expense of $11,000 per month in hosting fees. D'Ambrosio Decl. ¶¶ 7-10.
- Transportation estimates that it would require approximately 10 hours and two Full-Time Employees to restore the Community Explorer. Huynh Decl. ¶ 11.
- FEMA estimates that returning the Future Risk Index to www.fema.gov would cost the agency approximately $24,000, including contractor support. Fontenot Decl. ¶ 14.

The Court should consider these estimated expenditures in determining the amount of bond to require from Plaintiff.

**CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiffs'

Motion.

Dated: June 11, 2025                          Respectfully submitted,
         Washington, DC

                                              JEANINE FERRIS PIRRO
                                              United States Attorney


                                              By:        /s/ Sian Jones
                                                 SIAN JONES, D.C. Bar # 1024062
                                                 Assistant United States Attorney
                                                 601 D Street, NW
                                                 Washington, D.C., 20530
                                                 (202) 252-2578

                                              *Attorneys for the United States of America*