**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

SIERRA CLUB, et al.,

      Plaintiffs,

      v.

ENVIRONMENTAL PROTECTION
AGENCY, et al.,

      Defendants.

Civil Action No. 25-cv-1112-RC

**REPLY MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A
PRELIMINARY INJUNCTION**

Andrea Issod (pro hac vice)
Joya Manjur (pro hac vice)
Sierra Club
2101 Webster Street, Suite 1300
Oakland, CA 94612
(415) 977-5544

*Counsel for Sierra Club*

Zachary R. Shelley (DC Bar No. 90021549)
Adina H. Rosenbaum (DC Bar No. 490928)
Allison M. Zieve (DC Bar No. 424786)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
zshelley@citizen.org

*Counsel for All Plaintiffs*

**CONTENTS**

INTRODUCTION ............................................................................................................. 1

ARGUMENT ................................................................................................................... 2

I.    Plaintiffs are currently suffering irreparable harm. ............................................. 2

II.   Plaintiffs are likely to succeed on the merits. .................................................... 9

      A.  Defendants violated the Paperwork Reduction Act's timely and equitable access
          requirement. ............................................................................................... 10

      B.  Defendants failed to follow procedures required by the Paperwork Reduction Act. . 16

III.  The public interest and equities weigh strongly in favor of a preliminary injunction. ...... 18

IV.   A bond is not warranted. .................................................................................. 18

CONCLUSION ............................................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**

*American Immigration Council v. DHS*,
470 F. Supp. 3d 32 (D.D.C. 2020)..........................................................................2

*DSE, Inc. v. United States*,
169 F.3d 21 (D.C. Cir. 1999).................................................................................18

*Electronic Privacy Information Center v. DOJ*,
416 F. Supp. 2d 30 (D.D.C. 2006).......................................................................2, 3

*J.G.G. v. Trump*,
No. 25-cv-766, 2025 WL 1577811 (D.D.C. June 4, 2025) ....................................19

*League of Women Voters of the United States v. Newby*,
838 F.3d 1 (D.C. Cir. 2016)...............................................................................2, 3

*Maryland v. USDA*,
No. 25-cv-0748, 2025 WL 800216 (D. Md. Mar. 13, 2025).................................19

*National Ass'n of Diversity Officers in Higher Education v. Trump*,
No. 25-cv-333, 2025 WL 573764 (D. Md. Feb. 21, 2025)....................................19

*National Council of Nonprofits v. OMB*,
No. 25-cv-239, 2025 WL 597959 (D.D.C. Feb. 25, 2025)....................................19

*Newdow v. Bush*,
355 F. Supp. 2d 265 (D.D.C. 2005)........................................................................9

*North America's Building Trades Unions v. DoD*,
No. 25-cv-1070-RC, 2025 WL 1423610 (D.D.C. May 16, 2025)..........................19

*Open Communities Alliance v. Carson*,
286 F. Supp. 3d 148 (D.D.C. 2017).......................................................................18

*P.J.E.S. ex rel. Escobar Francisco v. Wolf*,
502 F. Supp. 3d 492 (D.D.C. 2020).......................................................................19

*Pacito v. Trump*,
No. 25-cv-255, 2025 WL 893530 (W.D. Wash. Mar. 24, 2025)............................19

*Simms v. District of Columbia*,
872 F. Supp. 2d 90 (D.D.C. 2012).........................................................................19

*Vaughan v. Capital City Protective Services II*,
No. 20-cv-2932-RC, 2025 WL 275705 (D.D.C. Jan. 23, 2025).............................10

*Washington Post v. DHS*,
   459 F. Supp. 2d 61 (D.D.C. 2006) ........................................................................... 2

**Statutes**

44 U.S.C. § 3502(12) ................................................................................ 11, 14

44 U.S.C. § 3506(d)(1) ................................................................................ 10

44 U.S.C. § 3506(d)(3) ................................................................................ 16

**Other Authorities**

Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of
   Information Disseminated by Federal Agencies; Republication,
   67 Fed. Reg. 8452 (Feb. 22, 2002) ................................................. 14, 15, 16, 17, 18

Websters Dictionary 1828 (2025) ("fact"),
   https://webstersdictionary1828.com/Dictionary/fact ............................................... 14

iii

## INTRODUCTION

Plaintiffs Sierra Club, Union of Concerned Scientists (UCS), Environmental Integrity Project (EIP), and California Communities Against Toxics (CCAT) brought this action to remedy the harm that they are currently suffering from their lack of access to webpages that Defendants abruptly removed from public view. As Plaintiffs have explained, they are likely to succeed on the merits because Defendants' actions violate the Paperwork Reduction Act of 1995 (PRA) and the Administrative Procedure Act (APA). Moreover, Defendants' removal of webpages containing important information about environmental harms, climate change, and socioeconomic stressors irreparably hinders Plaintiffs' ability to conduct their work. The balance of the equities thus strongly favors granting a preliminary injunction because Defendants' actions impose substantial harm on Plaintiffs and the broader public.

Defendants' response confirms that preliminary injunctive relief is warranted. Defendants do not contest that their actions were arbitrary and capricious, and their other merits arguments— that the removed webpages do not contain "information" and that they are not "significant information dissemination products"—ignore both the plain meaning of the relevant terms and common sense. Defendants' opposition also does not counter Plaintiffs' showing of significant irreparable harm and does not materially engage with the harm their actions are imposing on communities around the country. To mitigate the ongoing harm, this Court should grant Plaintiff's motion for a preliminary injunction.[1]

---

[1] After Plaintiffs filed their motion, the Department of Energy (DOE) restored the Low-Income Energy Affordability Data (LEAD) Tool. *See* Defs. Mem. 18–19. Accordingly, Plaintiffs no longer seek a preliminary injunction with respect to that tool.

## ARGUMENT

### I.    Plaintiffs are currently suffering irreparable harm.

Before Defendants removed EJScreen, the Climate and Economic Justice Screening Tool (CEJST), the Equitable Transportation Communities (ETC) Explorer, the Community Benefits Map, and the Future Risk Index from their respective websites, Plaintiffs relied extensively on those interactive tools. Since their removal, Plaintiffs have expended substantial effort seeking alternative resources, but they have been unable to find satisfactory alternatives. Accordingly, the removals have already disrupted and will continue to disrupt their work, and Plaintiffs will be shut out of public debate on ongoing matters of importance until access is restored. *See* Pltfs. Mem. 16–23.

Those injuries are prototypical of cases in which courts in this circuit have found that an organizational plaintiff was suffering irreparable harm. *See League of Women Voters of the United States v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016) ("An organization is harmed if the actions taken by the defendant have perceptibly impaired the organization's programs." (cleaned up)); *Am. Immigr. Council v. DHS*, 470 F. Supp. 3d 32, 38 (D.D.C. 2020) ("[W]here an obligation to disclose exists, a plaintiff may suffer irreparable harm if denied access to information that is highly relevant to an ongoing public debate."); *Elec. Priv. Info. Ctr. v. DOJ*, 416 F. Supp. 2d 30, 41 (D.D.C. 2006) (finding irreparable harm where the plaintiff would be "precluded, absent a preliminary injunction, from obtaining in a timely fashion information vital to the current and ongoing debate"); *Washington Post v. DHS*, 459 F. Supp. 2d 61, 75 (D.D.C. 2006) ("Because the urgency with which the plaintiff makes its FOIA request is predicated on a matter of current national debate, due to the impending election, a likelihood for irreparable harm exists if the plaintiff's FOIA request does not receive expedited treatment.").

In response, Defendants first contend that economic harms that would not put Plaintiffs out of business do not support a preliminary injunction. *See* Defs. Mem. 22–24. That contention misapprehends Plaintiffs' argument. Plaintiffs do not contend that a preliminary injunction is necessary to prevent economic injuries. Rather, they contend that Defendants have 'perceptibly impaired' their operations, *League of Women Voters*, 838 F.3d at 8 (internal quotation marks and citations omitted), by requiring them to expend resources searching for alternative data to use in their work and to allocate resources away from other activities to do so. *See* Pltfs. Mem. 20–23. That impairment is continuing. *See id.* 22; Duggan Decl. ¶ 35; Phartiyal Decl. ¶ 15; Grenter Decl. ¶¶ 35, 37; Williams Decl. ¶ 26.

Second, Defendants argue that some of Plaintiffs' declarations do not provide sufficiently specific allegations of the future harm they will face. *See* Defs. Mem. 25–26. Plaintiffs have explained, however, that they had frequently and extensively relied on the now-removed tools, including by providing examples of specific past projects in which they had used the tools. *See, e.g.*, Pltfs. Mem. 17–20; Grenter Decl. ¶ 12 ("Sierra Club used EJScreen to develop and update an online Liquefied Natural Gas (LNG) Export Tracker that compiles and analyzes information on all existing and proposed LNG export projects in the United States, including data on proposed projects in areas already overburdened by fossil fuel pollution."); *id.* ¶ 22 ("Sierra Club used the ETC tool to identify gaps in public transit availability and EJScreen to gather data about the communities underserved by transit and to determine where to focus Sierra Club's efforts and resources[, including] in the city of Louisville, KY where Sierra Club worked to connect residents with transit access to city parks including the Parklands of Floyd Fork."); *id.* ¶ 29 ("Sierra Club used the DOE's Community Benefits Map to help educate and organize communities about industrial decarbonization demonstration projects funded by the DOE's Industrial Demonstrations

Program …. [and to] identify the communities impacted by the decarbonization demonstration projects, provide those communities with information about the projects and other nearby DOE-funded projects, and encourage them to engage in the public process[.]"); Phartiyal Decl. ¶ 12 ("UCS used the Future Risk Index webpages for scoping technical analyses … [and] to inform science-based policy recommendations to the executive and legislative branches of some states and the federal government."); Duggan Decl. ¶ 17 ("EIP directly relied on CEJST for a September 2023[] report on pollution from aluminum manufacturing facilities, in which EIP found that residents living near U.S. smelters and other aluminum-related facilities are either part of or very close to areas defined as disadvantaged." (internal quotation marks omitted)).

Plaintiffs have also explained that their frequent, extensive reliance would have continued but for Defendants' actions, and they have provided specific examples of how Defendants' actions have already hindered their work and their engagement with public officials. *See, e.g.*, Williams Decl. ¶ 26 (describing an instance in which removal of EJScreen and CEJST hindered CCAT's ability "to provide public comment on measures the Oregon legislature was considering to reduce landfill pollution"); Grenter Decl. ¶ 30 (describing how removal of the Community Benefits Map "has prevented the Sierra Club from continuing its work to educate, organize, and mobilize communities around these opportunities to secure additional community benefits as part of clean manufacturing projects"); *id.* ¶¶ 19, 40 (explaining that EJScreen and the ETC Explorer were "instrumental" to Sierra Club's Transit to Trails program and that their removal means "Sierra Club's work to continue building the Transit to Trails campaign will be much more difficult and time-consuming"); Phartiyal Decl. ¶ 6 ("But for the agencies' recent removals, UCS would continue to rely on these tools in the same manner in which it has in the past."); *id.* ¶ 12 (explaining that "UCS had been considering integrating the [Future Risk Index] into a forthcoming analysis

4

on affordable housing and climate change" but can no longer do so because of FEMA's decision to remove the tool). Plaintiffs' declarations are replete with additional examples of Plaintiffs' past use of the tools, their plans for future use, and the present disruptions they are experiencing from Defendants' actions.

The combination of Plaintiffs' extensive past use of the removed tools and their plans to continue using the tools but for their removal establishes that the removals will hinder or fully halt some of Plaintiffs' work going forward, including their ability to participate in important ongoing public debates. And the specific instances of hindered and halted projects that Plaintiffs identify confirm that the harm is not just imminent but currently ongoing. Those detailed accounts of the harm Plaintiffs are suffering from Defendants' actions far surpass the bar required for obtaining preliminary injunctive relief. *See League of Women Voters*, 838 F.3d at 8.

Third, Defendants suggest that Plaintiffs are not suffering irreparable harm because the Environmental Protection Agency (EPA) and Council on Environmental Quality (CEQ) have made some of the source code and data behind EJScreen and CEJST publicly available, and because third parties have attempted to reconstruct three of the five removed tools. Defs. Mem. 23–24. Plaintiffs have already explained the features that made the removed tools uniquely useful and that no other data source provides the same "standardization, reliability, precision, and functionality," Duggan Decl. ¶ 30, or "one-of-a-kind information," Phartiyal Decl. ¶ 12; *see* Pltfs. Mem. 20–21. That explanation applies to both the limited source code and data that EPA and CEQ have currently made available, as well as to third-party attempts to create unofficial replicas of the removed tools. The limited set of code and data that Defendants have posted online is not an adequate replacement for CEJST and EJScreen. Reconstructing the tools from what source code and data EPA and CEQ have posted "present[s] time-consuming technical challenges," Duggan

Decl. ¶ 30, and provides no guarantee that the end product will replicate the removed tools with the requisite level of reliability.

As for the third-party replicas of CEJST, EJScreen, and the Future Risk Index, Defendants tellingly do not confirm that these alternative websites perfectly replicate the removed tools, nor could they. Because the replicas must necessarily be patched together from a mix of the limited data and code that Defendants have posted and any other data and code necessary to reach the final posted webpage, they do not provide the same guarantee of "standardization, reliability, precision, and functionality," Duggan Decl. ¶ 30, that accompanied Defendants' tools. *See* Explore the map, EDGI (June 16, 2025), https://edgi-govdata-archiving.github.io/j40-cejst-2/en/#3/33.47/-97.5 (recognizing that the tool is "an unofficial copy of the CEJST Tool" and stating that the host is "working on an overhaul" of the webpage); Williams Decl. ¶¶ 20, 23 (explaining that CCAT has contacted "other data analysts and map-making experts to discern the viability of fixing the bugs in the older versions of EJScreen data" but that those efforts have not produced a "sufficient substitute[]"); *id.* at 22 (explaining that "previously downloaded EJScreen data" is not as useful "due to the poor quality and limited functionality of these backup sources"). Indeed, one of the news articles that Defendants cite in support of their argument that the removed tools are available through third parties makes clear that the third-party replicas are not equivalent to the versions the agencies removed. *See* Victoria Heath, *The online climate tool that Trump removed, but data scientists have now rebuilt*, Geographical (Mar. 13, 2025), https://geographical.co.uk/news/the-online-climate-tool-that-trump-removed-but-data-scientists-have-now-rebuilt ("Despite their work, [the individuals that attempted to recreate the Future Risk Index] say that a lot of data has still been lost, including details on methodology."); *id.* ("[S]ome information was even censored as they tried to access it.").

As Plaintiffs have explained, one of the most important functions of the tools was that, because they came from the government and provided a gold-standard for reliability, they "eliminated the need for expert testimony in litigation and regulatory proceedings to validate the data collection." Williams Decl. ¶ 24; *see also* Purposes and Uses of EJSCREEN, EPA (Jan. 19, 2021), https://19january2021snapshot.epa.gov/ejscreen/purposes-and-usesejscreen_.html (recognizing that EJScreen "create[d] a common starting point between the agency and the public when looking at issues related to environmental justice."). Because the replicas do not provide the same guarantee of acceptance by public officials, Plaintiffs would "be forced to dedicate additional resources just to establish data reliability" if they tried to use the replicas and may "likely face challenges to the data [they] use[] in litigation and regulatory proceedings." Williams Decl. ¶ 24.

The replicas also do not have the same functionality as the removed tools. For example, one of the key features of EJScreen was its ability "to automatically generate a PDF report" that Plaintiffs could submit alongside their statements to public officials. *Id.* ¶ 26. Because the replicas appear to lack that functionality, they would not provide an adequate substitute for the removed tools even if Defendants could guarantee that they and other regulators would grant information from the replicas the same deference as information from the original tools, which they cannot.

Finally, Defendants assert that the timing of Plaintiffs' motion undermines their claim of irreparable harm.[2] *See* Defs. Mem. 20–21. But Plaintiffs' timeline confirms, not undermines, the harm they are suffering. When Defendants removed the interactive tools, Plaintiffs, rather than immediately filing suit, sought to ameliorate that harm by searching for alternative data sources.

---

[2] In making their argument, Defendants state that the Court should deny preliminary relief and instead have this case "proceed according to a standard schedule for APA matters." Defs. Mem. 21. That position is inconsistent with Defendants' request for this Court to stay the deadline to file a responsive pleading and thus to handle this case on a schedule slower than an ordinary APA case. *See* Motion to Stay Obligation to File Responsive Pleading, ECF 28 (June 10, 2025).

Unfortunately, Plaintiffs' experience testing out alternative data sources led them to the conclusion that "[t]here are no adequate substitutes available for the eliminated federal tools." Grenter Decl. ¶ 36; *see* Williams Decl. ¶ 36 ("No other tool offers EJScreen and CEJST's combination of nationwide scope, up-to-date information, census block-level precision, acceptability by federal agencies, and mapping and report functions."); Duggan Decl. ¶ 30 ("EIP does not have access to any alternative to EJScreen and CEJST that reflects the same level of standardization, reliability, precision, and functionality, and which does not present time-consuming technical challenges."). That Plaintiffs' attempts to seek out alternatives were ultimately unsuccessful confirms that an injunction is necessary to mitigate the harm they are suffering.

Further, Plaintiffs' timeline in this case was reasonable when viewed against the backdrop of the government's actions in recent months. In some instances, when agencies have revoked access to public information, they have self-corrected shortly thereafter. *See* Apoorva Mandavilli & Roni Caryn Rabin, *C.D.C. Site Restores Some Purged Files After 'Gender Ideology' Ban Outcry*, N.Y. Times (Feb. 3, 2025), https://www.nytimes.com/2025/02/03/health/trump-gender-ideology-research.html (noting voluntary restoration of some removed webpages). In other instances, agencies have changed course after a lawsuit was filed but before a court ruled. *See Northeast Organic Farming Assoc. of N.Y. v. USDA*, No. 25-cv- 1529-MMG, ECF 30 (May 12, 2025) (noting plans for USDA to voluntarily restore webpages it had removed after a complaint was filed but before the court could grant injunctive relief). Indeed, a similar pattern has, in part, played out in this case: After Plaintiffs filed their motion for a preliminary injunction, DOE restored the LEAD Tool. *See* Defs. Mem. 18–19. In light of the government's sporadic actions and the distinct possibility that the government could have mooted this case in its entirety, Plaintiffs' timeline was reasonable.

Furthermore, this case is far afield from *Newdow v. Bush*, 355 F. Supp. 2d 265 (D.D.C. 2005), on which Defendants rely. *See* Defs. Mem. 21. There, the plaintiff's delay seeking injunctive relief "placed defendants and the federal courts in a difficult position," because he sought to enjoin inclusion of prayers at the presidential inauguration set to take place just one week after the hearing on the motion, and "the preliminary relief … would [have] constitute[d] the ultimate relief in the case." *Newdow*, 355 F. Supp. 2d at 292. Here, Defendants do not argue that the timing has caused them prejudice. And none of the fact-specific findings in the other cases cited by Defendants resemble the facts here. *See* Defs. Mem 21.

Because Plaintiffs are suffering irreparable harm that can only be remedied by restoring the removed tools, this Court should grant Plaintiffs' motion.

## II.    Plaintiffs are likely to succeed on the merits.

As Plaintiffs have explained, Defendants' removal of the interactive tools was unlawful because the removals are arbitrary and capricious, Pltfs. Mem. 14–16, and because the removals violate multiple provisions of the PRA, *id.* at 8–14. Defendants offer no response to Plaintiffs' arbitrary and capricious claim. They have therefore forfeited any argument on that claim. *See Vaughan v. Cap. City Protective Servs. II*, No. CV 20-2932-RC, 2025 WL 275705, at *5 (D.D.C. Jan. 23, 2025).

Addressing the PRA claim, Defendants offer two arguments: that four of the removed tools did not contain Defendants' "public information" and that none of the removed tools is a "significant information dissemination product." Those arguments are directly contrary to the plain meaning of those terms.

### A. Defendants violated the Paperwork Reduction Act's timely and equitable access requirement.

Under the PRA, each agency must "ensure that the public has timely and equitable access to the agency's public information." 44 U.S.C. § 3506(d)(1). As Plaintiffs have explained, Defendants' removal of interactive tools violated the timely access requirement by denying all access to some information and by denying access to other information on a timeline necessary for the data to be useful. Pltfs. Mem. 9–11. Defendants also denied equitable access to the information by advantaging access by the government and well-resourced members of the public over others. *Id.* at 11. Yet Defendants contend that the timely-and-equitable access provision does not even apply to EJScreen, CEJST, the ETC Explorer, and the Future Risk Index.[3] Their argument proceeds in two steps, both of which are flawed. First, Defendants argue that most of the information disseminated in each tool is not the Defendant agency's information but rather other agencies' information. Second, they argue that some of the information created by the Defendant agencies constituted "the subjective judgments (i.e. opinions) of the agencies rather than unadulterated facts and data," and thus that the removed tools did not display any of the Defendants' "public information." Defs. Mem. 34; *see id.* at 35–36. The first argument rests on a misunderstanding of what information the tools display, and the second relies on an absurd reading of the PRA and Defendants' blatantly misleading quotation of OMB guidance.

The PRA defines "public information" as "any information, regardless of form or format, that an agency discloses, disseminates, or makes available to the public." 44 U.S.C. § 3502(12). Defendants seem to recognize that some of the information disseminated through the removed

---

[3] Defendants provide no defense against Plaintiffs' timely-and-equitable access claim regarding DOE's Community Benefits Map. They have therefore forfeited any argument that Plaintiffs are not likely to succeed on the merits with respect to that tool. *See Vaughan*, 2025 WL 275705, at *5.

tools qualifies as "information" under the PRA. For example, CEJST both displayed information from the Centers for Disease Control and Prevention (CDC) about the prevalence of asthma and also used the prevalence of asthma to determine whether a community is disadvantaged. *See* CEQ, Methodology (Jan. 17, 2025), https://web.archive.org/web/20250117221651/https://screeningtool.geoplatform.gov/en/methodology#3/33.47/-97.5. And Defendants do not appear to contest that the data CEJST displayed regarding the prevalence of asthma is "information." *See* Defs. Mem. 29 (recognizing that CEJST "aggregated information in data sets originating with and disseminated by entities such as the Census Bureau, the EPA, Transportation, the Department of Housing and Urban Development, the CDC, Energy, and FEMA").

Defendants contend, however, that because most of the "data inputs" used in the removed tools—that is, data that the tools both displayed on their own and used to calculate empirical measures of environmental burden, disadvantage, or costs of climate change—originated with other agencies, the tools do not disseminate each Defendant "agency's public information." Defs. Mem. 34–36. Whether information is an "agency's public information" does not depend on whether the agency originally collected the information. Rather, it depends on whether the agency "discloses" or "disseminates" the information. 44 U.S.C. § 3502(12). Here, all the information disseminated through the removed tools is Defendants' public information.

In addition, Defendants' argument ignores the ways in which Defendants combined information from other sources into their own unique datasets. One of the important features of the removed tools is that they provided a "nationally consistent dataset and approach for combining environmental and demographic indicators." EPA, What is EJSCREEN? (Jan. 19, 2021), https://19january2021snapshot.epa.gov/ejscreen/whatejscreen_.html.; *see* Phartiyal Decl. ¶¶ 7–8; Duggan Decl. ¶ 30; Williams Decl. ¶ 18. When Defendants solved the technical challenges

11

necessary to combine disparate data sources into a single, useful data source, they created a new set of "information" that they—not the agencies from which the underlying raw data derived—possessed and disseminated to the public. So, even if the removed tools did nothing more than combine and display data from other agencies, the information in the tools would still be the Defendant "agenc[ies'] public information," and the timely and equitable access requirement would apply.

Moreover, the removed tools did not merely combine and parrot data from other agencies. Instead, they both displayed that aggregated data and used the aggregated data to calculate their own objective empirical metrics. For example, CEJST used the input data to calculate and display a community's relative prevalence of health problems and other measures of environmental burden (e.g., that a community was in the 92nd percentile for asthma rates) and the relative prevalence of the community's population that was low-income. CEQ, Methodology (Jan. 17, 2025), https://web.archive.org/web/20250117221651/https://screeningtool.geoplatform.gov/en/methodo logy#3/33.47/-97.5. CEQ also incorporated into CEJST numerous other measures of burden, including those related to climate change, energy, housing, legacy pollution, transportation, water and wastewater, and workforce development. *See id.* CEQ, Methodology (Jan. 17, 2025), https://web.archive.org/web/20250117221651/https://screeningtool.geoplatform.gov/en/ methodology#3/33.47/-97.5. For each of those categories, CEQ used the underlying data to determine a community's relative prevalence of the concerned burden indicator and flagged a community as disadvantaged if it was at or above the 90th percentile for the burden indicator and at or above the 65th percentile for low-income population. *See id.* If a community was both at or above the 90th percentile for a burden measure, such as the prevalence of asthma, and was at or above the 65th percentile for low income, CEJST identified the community as disadvantaged.

Defendants incorporated similar objective empirical metrics into EJScreen, the ETC Explorer, and the Future Risk Index. *See* Equitable Transportation Community Explorer (ETCE), ETCE Technical Documentation, DOT (Feb. 2023), https://www.transportation.gov/sites/dot.gov/files/2023-02/ETCE-Technical-Documentation.pdf ("The index computes cumulative disadvantage by normalizing indicators associated with disadvantage, summing the percentile ranks of these indicators into components, and then summing the percentile ranks of the sums of each component to determine an overall score."); Environmental Justice Indexes in EJSCREEN: What the EJ Index Means, EPA (Jan. 19, 2021), https://19january2021snapshot.epa.gov/ejscreen/environmental-justice-indexes-ejscreen_.html (describing how EJScreen indicators were calculated); Phartiyal Decl. ¶ 12 (explaining that the Future Risk Index provided "state-of-the-art public data on future climate change-related risks that include major impacts such as coastal flooding due to sea level rise, drought, extreme heat, hurricanes, and wildfires"); Fontenot Decl. ¶ 4 ("The [Future Risk Index] projected potential risks based on current data available for five natural hazards: wildfire, hurricane, extreme heat, drought, and coastal flooding."); *id.* ¶ 6 ("The [Future Risk Index] utilized climate change data in the estimate analysis.").

Defendants seek to characterize these new empirical variables as "subjective calculations" that amount to nothing more than "opinions" that fall outside the PRA's definition of "information" altogether. Defs. Mem. 36; *see id.* at 34–35. Even setting aside that the phrase "subjective calculations" is an oxymoron, Defendants' reasoning conflicts with any sensical definition of "information" and misunderstands the relevant text. As mentioned above, the PRA defines "public information" as "any information, regardless of form or format, that an agency discloses, disseminates, or makes available to the public." 44 U.S.C. § 3502(12). And OMB's government-wide guidance states:

> "Information" means any communication or representation of knowledge such as
> facts or data, in any medium or form, including textual, numerical, graphic,
> cartographic, narrative, or audiovisual forms. This definition includes information
> that an agency disseminates from a web page…. This definition does not include
> opinions, where the agency's presentation makes it clear that what is being offered
> is someone's opinion rather than fact or the agency's views.

67 Fed. Reg. 8452, 8460 (Feb. 22, 2002). The variables that Defendants calculated and included

in the removed tools are "data" and "fact[s]" under the PRA and OMB's guidance; even if they

were not, they would qualify, at a minimum, as "the agency's views."

    The new variables that Defendants calculated for each of the tools are "data" because, as

mentioned above, they are objective, empirical measures of the state of the world. For the same

reasons, they are also "facts." Whether a community is, for example, at or above the 65th percentile

for the share of its population that is low-income and is at or above the 90th percentile for the share

of its population that suffers from asthma is not Defendants' "opinion." *Cf.* Websters Dictionary

1828 (2025) ("fact"), https://webstersdictionary1828.com/Dictionary/fact ("Reality; truth").

    In any event, Defendants' characterization of the measures as "subjective" does not remove

them from the PRA's definition of "information." Even if Defendants were correct that the

empirical measures are "subjective," the measures would represent "the agency's views." OMB's

guidance distinguishes "the agency's views," which qualify as "information," from "opinions[]"

where the agency's presentation makes it clear that what is being offered is someone's opinion,"

which do not qualify as "information." 67 Fed. Reg. 8452, 8460. Here, Defendants calculated and

disseminated the relevant empirical data. Regardless of what label Defendants now seek to attach

to that data, that process shows the data at least amounts to the agencies' views. Notably,

Defendants quote only the first half of OMB's definition of "information"—omitting that both

facts and the agency's views fall within the definition. *See* Defs. Mem. 34 ("[OMB] guidance

defines 'information' as 'any communication or representation of knowledge such as facts or data,

and does not include opinions.'" (quoting 67 Fed. Reg. 8452, 8460)). Defendants' obfuscation cannot change the underlying nature of the information they created and disseminated.

In addition, even under Defendants' approach, the timely and equitable access requirement would apply to EJScreen, the ETC Explorer, and the Future Risk Index.[4] Defendants acknowledge that EJScreen relied on EPA data that was not originally collected for the purposes of developing EJScreen, that the ETC Explorer relied on data originally collected by the Department of Transportation, and that the Future Risk Index relied on data originally collected by the Federal Emergency Management Agency (FEMA). *See* Overview of Environmental Indicators in EJSCREEN, EPA (Jan. 19, 2021), https://19january2021snapshot.epa.gov/ejscreen/overview-environmental-indicators-ejscreen_.html (listing eight data fields from other EPA datasets); Defs. Mem. 33 ("EJScreen similarly aggregated data from a variety of different sources, including … the EPA itself[.]"); *id.* at 16 ("The data that FEMA utilized to create the [Future Risk Index] included publicly available information from … FEMA."); Huynh Decl. ¶ 4 ("Data sources used [for the ETC Explorer] included … various data sets developed and managed by USDOT's Bureau of Transportation Statistics (BTS) based on Household Travel Survey data."). Ignoring those facts, however, Defendants assert that the timely and equitable access requirement does not apply to EJScreen, the ETC Explorer, and the Future Risk Index on the grounds that those tools did not disseminate those agencies' information. *See* Defs. Mem. 36. Because each tool did in fact incorporate preexisting underlying data sources from the disseminating agency, the timely and equitable access requirement applies even under Defendants' theory.

---

[4] The same can be said of the Community Benefits Map, but Defendants concede that they violated the PRA with respect to the Community Benefits Map. *See supra* n.3.

15

Finally, Defendants assert in a single sentence each that "the public still has timely and equitable access to the source code and many of the underlying data sources" for EJScreen and CEJST. Defs. Mem. 35; *see id.* at 36. But they do not argue that the public has timely access to the information that CEJST and EJScreen displayed as their end product, and their assertions are otherwise flawed for the same reasons as their claims about Plaintiffs' irreparable harm. Defendants do not contest that their actions denied timely and equitable access to the information in the Community Benefits Map, the Future Risk Index, and the ETC Explorer.

**B.  Defendants failed to follow procedures required by the Paperwork Reduction Act.**

In addition to requiring agencies to ensure timely and equitable access to their public information, the PRA also requires agencies to "provide adequate notice when initiating, substantially modifying, or terminating significant information dissemination products." 44 U.S.C. § 3506(d)(3). The removed tools are information dissemination products because they are both "map[s]" and "web page[s]." 67 Fed. Reg. 8452, 8460. As Plaintiffs have explained, the tools are "significant," and Defendants therefore violated the PRA's notice requirement by removing the tools without any advance notice. *See* Pltfs. Mem. 12–14. Defendants do not contest that the tools are "significant" or that they failed to provide notice when they removed the tools. Instead, they argue that the notice requirement does not apply to any of the removed tools because the tools do not qualify as "information dissemination products" at all. That argument lacks merit.

With respect to CEJST, EJScreen, the ETC Explorer, and the Future Risk Index, Defendants contend that the tools are not information dissemination products because they disseminate "opinions" rather than "information" or because they disseminate information from another agency. *See* Defs. Mem. 29–33. Defendants made the same argument with respect to the timely and equitable access requirement, and it is wrong for the reasons described above.

The argument is also wrong with regard to the notice requirement for an additional reason: OMB's guidance defines "dissemination" as "agency initiated or sponsored distribution of information to the public." 67 Fed. Reg. 8452, 8460. Defendants contend that their interactive tools did not disseminate information to the public because other agencies "initiated or sponsored" collection of some of the information that was incorporated into the tools. *See* Defs. Mem. 35. But whether another agency *collected* the information is irrelevant. What matters is whether Defendants "initiated or sponsored *distribution*" of the information. 67 Fed. Reg. 8452, 8460 (emphasis added). Because Defendants each created and hosted their own tools, they undeniably initiated and hosted the distribution of the information contained in the tools, and the notice requirement therefore applies.

With respect to the Community Benefits Map, Defendants contend that "[t]here is no indication that the map was a method for [DOE] to disseminate its information to the public" because the map included information about projects that DOE had publicly announced. Defs. Mem. 33. The Community Benefit Map, however, provided information beyond merely announcing projects. DOE itself described the Map as a tool "that local communities can use to better understand what DOE-supported projects are being developed in their areas." DOE, Community Benefits Map for Demonstration and Deployment Projects (Nov. 22, 2024), https://web.archive.org/web/20241122145403/https://www.energy.gov/infrastructure/community -benefits-map-demonstration-and-deployment-projects. Because the Community Benefits Map was both a webpage and a map that provided the public with information from DOE, it was an information dissemination product. *See* 67 Fed. Reg. 8452, 8460. And because it was a significant information dissemination product, *see* Pltfs. Mem. 12–14, Defendants were required to comply with the PRA's notice requirement.

**III.    The public interest and equities weigh strongly in favor of a preliminary injunction.**

 Defendants do not respond to Plaintiffs' discussion of the consequences that their actions have had on communities around the country. *See* Pltfs. Mem. 23–24. Rather, Defendants' argument on the equities largely reiterates their arguments on the merits and irreparable harm. In addition, they state, without citation, that they "have the discretion to decide what technological tools they sponsor on government-owned websites." Defs. Mem. 37. But that statement ignores the duties imposed on Defendants by both the PRA and APA. Because there is "no public interest in the perpetuation of unlawful agency action," *Open Communities Alliance v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017), and because the harms both to Plaintiffs and other members of the public are substantial and irreparable, the balance of equities weighs heavily in favor of granting a preliminary injunction.

**IV.    A bond is not warranted.**

 Defendants ask that, if the Court grants Plaintiffs' motion, it require Plaintiffs to pay an extraordinarily large injunction bond—a minimum of $194,000—for restoring information to their webpages. Rule 65(c) "vest[s] broad discretion in the district court to determine the appropriate amount of an injunction bond," *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999), "including the discretion to require no bond at all," *P.J.E.S. ex rel. Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492, 520 (D.D.C. 2020) (quoting *Simms v. District of Columbia*, 872 F. Supp. 2d 90, 107 (D.D.C. 2012)). The Court should deny a bond here.

 Because "imposing a bond could unduly burden [p]laintiffs and potentially impair their ability to seek judicial relief," courts have repeatedly exercised their discretion by "declining to require bonds in public interest litigation." *N. Am.'s Bldg. Trades Unions v. DoD*, No. 25-cv-1070-RC, 2025 WL 1423610, at *15 (D.D.C. May 16, 2025); *see, e.g., Maryland v. USDA*, No. 25-cv-

18

0748, 2025 WL 800216, at *26 (D. Md. Mar. 13, 2025) ("District courts have discretion to set the required security at a nominal amount, and this approach has long been followed in public-interest litigation cases." (citation omitted) (collecting cases)); *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 25-cv-333, 2025 WL 573764, at *29 (D. Md. Feb. 21, 2025) (setting a nominal bond of zero dollars because granting the defendants' request "would essentially forestall [the] [p]laintiffs' access to judicial review"); *Pacito v. Trump*, No. 25-cv-255, 2025 WL 893530, at *14 (W.D. Wash. Mar. 24, 2025) (denying injunction bond in a case involving expenditure of money); *Nat'l Council of Nonprofits v. OMB*, No. 25-cv-239, 2025 WL 597959, at *19 (D.D.C. Feb. 25, 2025) (denying request for injunction bond); *J.G.G. v. Trump*, No. 25-cv-766, 2025 WL 1577811, at *31 (D.D.C. June 4, 2025) (setting nominal bond of $1). These considerations apply fully here. For those reasons, as well as because Plaintiffs' claims are about access to information, not the expenditure of money or monetary damages, a bond is unwarranted.

Moreover, Defendants' asserted costs do not justify an injunction bond, much less the extraordinarily large one they request. For one, most of the "costs" that Defendants assert arise from employee time restoring the removed webpages. *See, e.g.*, D'Ambrosio Decl. ¶¶ 6–7; Smith Decl. ¶ 5. Defendants, however, would pay those employees regardless of whether they spend time reposting the webpages. Moreover, the time that Defendants claim is unreasonable. For example, CEQ suggests that it would take five full-time employees familiar with EJScreen "four to five weeks" and over $150,000 to restore CEJST. D'Ambrosio Decl. ¶ 7. In another recent case, though, the agencies were able to restore webpages within one day. *See* Order, *Doctors for Am. v. Office of Personnel Mgmt*, No. 25-cv-00322-JDB, ECF 11 (Feb. 11, 2025) (requiring restoration of webpages "by not later than 11:59 pm on February 11, 2025"); Joint Status Report, *Doctors for*

*Am. v. Office of Personnel Mgmt.*, No. 25-cv-00322-JDB, ECF 13 (Feb. 13, 2025) (acknowledging that webpages were restored as ordered).

## CONCLUSION

This Court should grant Plaintiffs' motion for a preliminary injunction and order restoration of EJScreen, CEJST, the Community Benefits Map, the ETC Explorer, and the Future Risk Index and the webpages necessary for those pages to operate.

Dated: June 20, 2025

Respectfully submitted,

/s/ Zachary R. Shelley
Zachary R. Shelley (DC Bar No. 90021549)
Adina H. Rosenbaum (DC Bar No. 490928)
Allison M. Zieve (DC Bar No. 424786)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
zshelley@citizen.org

*Counsel for All Plaintiffs*

Andrea Issod (pro hac vice)
Joya Manjur (pro hac vice)
Sierra Club
2101 Webster Street, Suite 1300
Oakland, CA 94612
(415) 977-5544

*Counsel for Sierra Club*