# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| SIERRA CLUB, *et al.*, | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 25-1112 (RC) |
| | : | | |
| v. | : | Re Document No.: | 20 |
| | : | | |
| ENVIRONMENTAL PROTECTION | : | | |
| AGENCY, *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

## MEMORANDUM OPINION

### DENYING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

## I. INTRODUCTION

When President Trump came into office, some federal agencies removed certain pages from their public websites. Four non-profit advocacy organizations have sued the Environmental Protection Agency, the Council on Environmental Quality, the Department of Transportation, and the Federal Emergency Management Agency (collectively, "Defendants") for deleting webpages that provided important information concerning the environment. They allege that the deletions violate the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, and the Paperwork Reduction Act ("the Act"), 44 U.S.C. §3501 *et seq.* Plaintiffs have moved for a preliminary injunction requiring Defendants to restore the deleted webpages. For the reasons discussed below, the Court denies the motion.

## II. BACKGROUND

### A. Factual Background

This case concerns four government webpages that had, until January and February of this year, "provided information about the environment and public health" through interactive

data tools.  Mem. Law Supp. Pls.' Mot. Prelim. Inj. ("Mot. Prelim. Inj.") at 2, ECF No. 20-1.

The webpages were "authoritative, regularly updated resources that were centralized and

accessible."  *See* Proposed Amicus Curiae Br. Chesapeake Bay Found. Supp. Pls.' Mot. Prelim.

Inj. at 9 ("Chesapeake Bay Found. Amicus Br."), ECF No. 26-1.  According to one

environmental advocacy organization, "[t]he data was valuable not only for the trends it revealed

but also for its ability to democratize conversations about the intersection of environmental harm

and historical injustices."  *Id.*  Beginning in January, Defendants removed the webpages and the

"behind-the-scenes webpages and datasets necessary for the interactive pages to function."  Mot.

Prelim. Inj. at 2.  The Court describes each deleted tool in turn.

 **EJScreen.**  First released to the public in 2015, the Environmental Protection Agency's

("EPA") EJScreen was an online "interactive mapping tool" that provided data on local pollution

burdens, demographic indicators, and environmental justice indicators.  *Id.* (citing EPA, *How*

*was EJSCREEN Developed?* (Jan. 19, 2021), available at https://perma.cc/Q6DP-98SK).  It

constituted "a nationally consistent dataset and approach for combining environmental and

demographic indicators."  EPA, *What is EJSCREEN?* (Jan. 19, 2021), available at

https://perma.cc/7UPR-MURP).  EJScreen aggregated data from a variety of sources, including

the U.S. Census Bureau, National Aeronautics and Space Administration, the National

Association for Public Health Statistics and Information Systems, the Robert Wood Johnson

Foundation, the Centers for Disease Control and Prevention, National Oceanic and Atmospheric

Administration, the Department of Agriculture, and EPA.  Defs.' Opp'n to Pls.' Mot. Prelim. Inj.

("Defs.' Opp'n") at 2, ECF No. 29.

 EPA created EJScreen "to be more transparent about how we consider environmental

justice in our work, []to assist our stakeholders in making informed decisions about pursuing

environmental justice and []to create a common starting point between the agency and the public when looking at issues related to environmental justice."  EPA, *Purposes and Uses of EJSCREEN* (Jan. 19, 2021), available at https://perma.cc/J4RA-ESG9.  According to Plaintiffs, "EJScreen enabled users to analyze the demographic characteristics and environmental burdens of communities at a granular level."  Mot. Prelim. Inj. at 3.  As an illustrative example, one of the Plaintiff organizations had consistently used EJScreen to "conduct research and prepare public reports, interactive maps, legal filings, and other materials [to] educate the public and decision-makers about the impacts of industrial pollution on communities."  Decl. of Jennifer Duggan ("Duggan Decl.") ¶¶ 8, 11, ECF No. 20-5.

On February 5, 2025, EPA removed from its website EJScreen, webpages that supported its functionality, and the EJScreen Application Program Interface tool, which allowed the public to automatically collect EJScreen's data at scale.  Mot. Prelim. Inj. at 2; Decl. of Patrick Grenter ("Grenter Decl.") ¶ 7, ECF No. 20-3; Duggan Decl. ¶ 6.  EPA has since posted some of the EJScreen data to a public repository, but Plaintiffs claim "those datasets are not nearly as functional or useful" as EJScreen itself.  *See* Mot. Prelim. Inj. at 3; *see also* Defs.' Opp'n at 2 (noting that the EJScreen code is available online as a public archive).

**Climate and Economic Justice Screening Tool ("Screening Tool").**  Like EJScreen, the Council on Environmental Quality's ("CEQ") Screening Tool "was an interactive mapping tool that identified and highlighted communities that face disproportionate environmental burdens using a consistent nationwide methodology."[1]  Mot. Prelim. Inj. at 4.  It encompassed different environmental and demographic indicators than EJScreen, combining datasets on

---

[1] The CEQ is an advisory agency within the Executive Office of the President.  *See generally Marin Audubon Soc. v. Fed. Aviation Admin.*, 121 F.4th 902 (D.C. Cir. 2024).

climate change, energy, health, housing, pollution, transportation, water and wastewater, and workforce development. *Id.* It functioned to "identify geographically disadvantaged communities" that received funding priority under certain Biden administration programs. *See* M-23-09 Memorandum for the Heads of Executive Departments and Agencies, Addendum to the Interim Implementation Guidance for the Justice40 Initiative, M-21-28, on using the Climate and Economic Justice Screening Tool (CEJST) (Jan. 27, 2023), available at https://perma.cc/733J-Y5PL. The Screening Tool used data from the Federal Emergency Management Agency ("FEMA"), the First Street Foundation, the U.S. Census Bureau, and other sources, including the public. Defs.' Opp'n at 6–7. CEQ removed CEJST and its supporting webpages and datasets from its website on January 22, 2025. Grenter Decl. ¶ 7. The Screening Tool's underlying code remains available online. *See* Defs.' Opp'n at 7; Decl. of Jocelyn D'Ambrosio ("D'Ambrosio Decl.") Ex. 1 at 30, ECF No. 29-4.

  **Equitable Transportation Community Explorer ("ETC Explorer").** The ETC Explorer was an interactive mapping tool published by the Department of Transportation ("DOT") that "compiled location data based on transportation insecurity, climate and disaster risk burden, environmental burden, health vulnerability, and social vulnerability." Mot. Prelim. Inj. at 6; Decl. of Juli Huynh ("Huynh Decl.") ¶ 3, ECF No. 29-6. It was designed to allow "every community in the country to understand how it is experiencing burden that transportation investments can mitigate or reverse." Mot. Prelim. Inj. at 6. Between January 26 and February 1, 2025, DOT removed from its website the original ETC Explorer and the affiliated webpages and datasets. Grenter Decl. ¶ 7. The tool has since been updated with new methodology and data, and now contains slightly different indices. Huynh Decl. ¶¶ 3–5; Defs.' Opp'n at 13–14.

**Future Risk Index.**  FEMA published the Future Risk Index, an interactive mapping tool that "provided projected economic losses due to climate change at the county level, based on different climate scenarios and environmental hazards, including coastal flooding, extreme heat, wildfire, hurricanes, and drought."  Mot. Prelim. Inj. at 6.   It "provided one-of-a-kind information about how much climate change is likely to cost communities in the United States." *Id.* at 7.  FEMA deleted the Future Risk Index in February 2025.  Decl. of Pallavi Phartiyal ("Pharityal Decl.") ¶ 5, ECF No. 20-4.

## B.  Procedural Background

On April 14, Plaintiffs Sierra Club, Union of Concerned Scientists, Environmental Integrity Project, and California Communities Against Toxics initiated this action against EPA, CEQ, DOT, and FEMA.[2]  *See generally* Compl., ECF No. 1.  The Plaintiff organizations had used the deleted webpages "to investigate environmental harms and educate the public, to guide where they directed their technical expertise and funding, and to engage with public officials."  Mot. Prelim. Inj. at 7 (citing Grenter Decl. ¶¶ 9–33; Phartiyal Decl. ¶¶ 7–12; Duggan Decl. ¶¶ 7–27; Decl. of Jane Williams ("Williams Decl.") ¶¶ 5–16, ECF No. 20-6).  The complaint has four operative counts, one against each Defendant agency.  Compl. ¶¶ 66–95.  Each count states that the deleted webpages and tools are "significant information dissemination products" under the Paperwork Reduction Act, 44 U.S.C. § 3506(d)(3).  *Id.* ¶¶ 67, 73, 85, 91; *see also* 67 Fed. Reg. 8452, 8460 (Feb. 22, 2002) (defining the term "information dissemination product" to include "any electronic document . . . or web page" that an agency disseminates to the public).  Plaintiffs

---

[2] Originally Plaintiffs also challenged the removal of two online tools from the Department of Energy's ("DOE") website, *see* Compl. ¶¶ 13, 47–50, 78–83, but they have since voluntarily dismissed their claims against DOE.  *See* Notice of Voluntary Dismissal of Def. Dep't of Energy, ECF No. 33.

claim that because Defendants did not provide advance public notice before removing the webpages, they failed to comply with the Act's requirement that an agency must "provide adequate notice when initiating, substantially modifying, or terminating significant information dissemination products."  Compl. ¶¶ 68, 74, 86, 92 (citing 44 U.S.C. § 3506(d)(3)).  They also claim that in removing access to the interactive webpages, Defendants failed to comply with the Act's mandate that an agency "ensure that the public has timely and equitable access to the agency's public information,"; that Defendants' decisions to remove the webpages lacked reasonable explanations; and that Defendants failed to engage in reasoned decisionmaking as required by the APA.  *Id.* ¶¶ 69–71, 75–77, 87–89, 93–95.  Plaintiffs request that the Court declare that Defendants' removal of the webpages violates the Act and the APA; order Defendants to restore the removed webpages; and award them costs and attorneys' fees.  *Id.* at 22.

Over one month after filing their complaint, Plaintiffs moved for a preliminary injunction that would require Defendants to restore the deleted webpages.  Mot. Prelim. Inj.  Defendants filed an opposition and Plaintiffs filed a reply.  Defs.' Opp'n; Reply Mem. Law Supp. Pls.' Mot. Prelim. Inj. ("Pls.' Reply"), ECF No. 32.  Chesapeake Bay Foundation, a conservation organization, filed an amicus brief in support of Plaintiffs.  *See* Chesapeake Bay Found. Amicus Br.  The motion for preliminary injunction is now ripe for review.

## III.  LEGAL STANDARD

"A preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the [movant] is entitled to such relief.'"  *John Doe Co. v. Consumer Fin. Prot. Bureau*, 849 F.3d 1129, 1131 (D.C. Cir. 2017) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)).  "A plaintiff seeking a preliminary injunction must establish [1] that he is

likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter*, 555 U.S. at 20. "The last two factors 'merge when the Government is the opposing party.'" *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 10 (D.C. Cir. 2019) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). "Of course, the movant carries the burden of persua[ding]" the Court that these factors merit preliminary relief, *Fla. EB5 Invs., LLC v. Wolf*, 443 F. Supp. 3d 7, 11 (D.D.C. 2020) (citing *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004)), and must do so by making a "clear showing," *Cobell*, 391 F.3d at 258. If a movant does not show irreparable harm, the Court can deny the motion for injunctive relief without reaching the other preliminary injunction factors. *CityFed Fin. Corp. v. Off. of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995); *Wis. Gas Co. v. Fed. Energy Regul. Comm'n*, 758 F.2d 669, 674, 676 (D.C. Cir. 1985) (per curiam).

## IV.  ANALYSIS

A preliminary injunction is "never awarded as of right" and can only issue upon "a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22, 24. The Court agrees with Defendants that Plaintiffs have not made such a showing.

First, to the extent Plaintiffs used the deleted webpages to "assess where to allocate their limited resources," the resulting harm—greater resource-allocation costs—is essentially economic. Mot. Prelim. Inj. at 17. It is "well settled that economic loss does not, in and of itself, constitute irreparable harm." *Wis. Gas Co.*, 758 F.2d at 674. The costs Plaintiffs have expended and will expend in seeking out alternative data and tools also do not qualify as irreparable harm. *See* Mot. Prelim. Inj. at 20 (describing how, without the eliminated webpages, Plaintiffs may have to "spend time disputing the reliability of [other] data sources" and that some of Plaintiffs'

work "will either be halted or will require additional time and resources"); Pls.' Reply at 2 ("Since their removal, Plaintiffs have expended substantial effort seeking alternative resources, but they have been unable to find satisfactory alternatives."); *see also* Grenter Decl. ¶ 37 (describing how the deletion of the tools will require expending additional resources); Phartiyal Decl. ¶ 15 (same); Duggan Decl. ¶¶ 16, 35 (same); Williams Decl. ¶ 21 (same).  The Court credits Plaintiffs' position that the tools at issue in this case were "uniquely useful," and that without them Plaintiffs will need to "'invest considerably more of [their] limited time, money, and effort' to obtain the same information."  Pls.' Reply at 5; Mot. Prelim. Inj. at 22 (quoting Grenter Decl. ¶ 35); *see also* Pls.' Reply at 5–6 (explaining that Plaintiffs would have to invest more resources to rebuild the tools based on the limited source code currently available and that third party attempts to recreate the tools are incomplete).  But "[m]ere injuries, however substantial, in terms of money, time, and energy necessarily expended in the absence of a stay are not enough."  *Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958).  At most, Defendants' actions have made it marginally more difficult for Plaintiffs to advance certain initiatives, including providing information and resources to the public.  That is not the type of harm that courts typically recognize as irreparable.[3]  *Cf. Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 394–95 (2024) (holding that organizations do not suffer a cognizable injury when they "divert[] resources in response to a defendant's actions").

---

[3] The Court also agrees with Defendants that any downstream effects that may be borne by unnamed third parties, including the public, do not constitute irreparable harm.  *See* Defs.' Opp'n at 26–27; *see also, e.g.*, *Church v. Biden*, 573 F. Supp. 3d 118, 146 (D.D.C. 2021) ("Abstract harm that might befall unnamed third parties does not satisfy the irreparable harm requirement in the context of emergency injunctive relief, which must instead be connected specifically to the parties before the Court.").

The Court's conclusion is "bolstered" by the fact that Plaintiffs waited until long after the subject webpages were removed to seek injunctive relief.  *See* Defs.' Opp'n at 20–21.  Other courts have found that "[a]n unexcused delay in seeking extraordinary injunctive relief . . . implies a lack of urgency and irreparable harm."  *Open Top Sightseeing USA v. Mr. Sightseeing, LLC*, 48 F. Supp. 3d 87, 90 (D.D.C. 2014) (quoting *Newdow v. Bush*, 355 F. Supp. 2d 265, 292 (D.D.C. 2005)); *see also Gordon v. Holder*, 632 F.3d 722, 724–25 (D.C. Cir. 2011) (holding that while a delay in filing cannot be the sole basis for denial of a preliminary injunction, delay can "support a conclusion that the plaintiff cannot satisfy the irreparable harm prong").  That principle applies here.

Most of the webpages at issue in this case were removed from Defendants' public websites in late January and early February.[4]  *See* Compl. ¶¶ 22, 36, 53 (noting that EJScreen was removed on February 5, 2025; that the Screening Tool was removed on January 22, 2025; and that the ETC Explorer tool was removed by February 1, 2025).  Plaintiffs filed their complaint on April 14—over two months after most of the tools were deleted, and at least one and a half months after the last tool was deleted.  *See* Compl.  And they moved for preliminary injunctive relief over one month after that.  *See* Mot. Prelim. Inj. (filed on May 16, 2025).

Plaintiffs' intentional delay is in tension with the high bar they must clear to establish irreparable harm.  *E.g.*, *Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 44 (D.D.C. 2000) (noting that delay of two months in seeking injunctive relief "militates against a finding of irreparable harm")*; cf. Washington Post v. Dep't Homeland Sec.*, 459 F. Supp. 2d 61, 74–75 (D.D.C. 2006) (emphasizing the urgency of a plaintiff's request while granting preliminary

---

[4] Plaintiffs do not know when in the month of February FEMA removed the Future Risk Index.  *See* Compl. ¶ 57.

injunctive relief).  The D.C. Circuit has held that a party's "inexcusable" forty-four day delay in seeking a preliminary injunction "bolstered" the conclusion that "an injunction should not issue." *Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975).  Plaintiffs' delay of around 100 days is similarly inexcusable.

Plaintiffs' arguments otherwise are unavailing.  *See* Pls.' Reply at 7–8.  First they point out that they took time to search for alternative data sources before concluding that "[t]here are no adequate substitutes available for the eliminated federal tools." *Id.* (citing Grenter Decl. ¶ 36; Williams Decl. ¶ 36; Duggan Decl. ¶ 30).  Fair enough.  But Plaintiffs do not claim to have initiated this lawsuit immediately upon reaching that conclusion.  And even so, they waited over one month after filing the complaint to move for a preliminary injunction.  Their "failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary injunctive relief and suggests that there is, in fact, no irreparable injury." *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 277 (2d Cir. 1985) (citation omitted).

Next Plaintiffs claim that their delay was reasonable because (1) in some instances, when agencies had revoked access to public information, they self-corrected "shortly thereafter"; and (2) in other instances, agencies "changed course after a lawsuit was filed but before a court ruled." Pls.' Reply at 8.  Plaintiffs made a tactical decision to wait to see if the government would "moot[] this case in its entirety," one way or another. *Id.*  That choice is inconsistent with their position that they are now suffering irreparable harm.  For a harm to be irreparable, it must be "'certain and great,' 'actual and not theoretical,' and so 'imminent that there is a clear and present need for equitable relief to prevent [it].'" *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 7–8 (D.C. Cir. 2016) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)).  For around 100 days Plaintiffs apparently concluded that there

10

was no "clear and present need" for court-ordered relief.  That position contradicts their argument that now, suddenly, there is such a need.

Plaintiffs also state in a conclusory fashion that "none of the fact-specific findings in the other [inexcusable delay] cases cited by Defendants resemble the facts here."  Pls.' Reply at 9 (citing Defs.' Opp'n at 21).  That does nothing to justify their delay.

Plaintiffs attempt to distinguish the facts of this case from a leading case that Defendants cite, *Newdow v. Bush*, 355 F. Supp. 2d 265 (D.D.C. 2005), in support of their position that Plaintiffs have not shown irreparable harm.  Pls.' Reply at 9.  In *Newdow*, the preliminary relief the plaintiff sought would have also constituted the ultimate relief in the case, which is generally disfavored.  *Id.* (citing *Newdow*, 355 F. Supp. 2d at 292); *see also Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) ("[I]t is generally inappropriate for a federal court at the preliminary injunction stage to give a final judgment on the merits.").  And in *Newdow* the court found that the plaintiff's delay in "in seeking a preliminary injunction has placed defendants and the federal courts in a difficult position."  *Newdow*, 355 F. Supp. 2d at 292.  Defendants have not argued that the preliminary relief Plaintiffs seek would be tantamount to the final relief, or that the timing of Plaintiffs' motion caused them prejudice.  *Id.*  But that is immaterial because it is Plaintiffs' burden to establish irreparable harm.  *See Cobell*, 391 F.3d at 258.

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter*, 555 U.S. at 22.  Because Plaintiffs have not clearly established irreparable harm, the Court will deny their motion without considering the other preliminary injunction factors.  *See CityFed Fin. Corp.*, 58 F.3d at 747.

## V.  CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction is **DENIED**.

An order consistent with this Memorandum Opinion is separately and contemporaneously issued.


Dated:  July 9, 2025                                          RUDOLPH CONTRERAS
                                                              United States District Judge