**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| SIERRA CLUB, et al., | |
| Plaintiffs, | |
| v. | Civil Action No. 25-cv-1112-RC |
| ENVIRONMENTAL PROTECTION AGENCY, et al., | |
| Defendants. | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS**

Andrea Issod (pro hac vice)
Joya Manjur (pro hac vice)
Sierra Club
2101 Webster Street, Suite 1300
Oakland, CA 94612
(415) 977-5544

*Counsel for Sierra Club*

Zachary R. Shelley (DC Bar No. 90021549)
Adina H. Rosenbaum (DC Bar No. 490928)
Allison M. Zieve (DC Bar No. 424786)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
zshelley@citizen.org

*Counsel for All Plaintiffs*

# CONTENTS

Introduction .................................................................................................................... 1

Background .................................................................................................................... 1

    Removal of data and webpages ................................................................................ 1

    This lawsuit ............................................................................................................. 5

Legal Standard .............................................................................................................. 6

Argument ...................................................................................................................... 7

I.      Plaintiffs have standing. ........................................................................................ 7

    A.  Plaintiffs are suffering concrete harms. ........................................................ 7

    B.  Plaintiffs' injuries will be redressed by an order setting aside the webpage removals.
        .................................................................................................................. 24

II.     Plaintiffs have stated claims on which relief can be granted. .......................... 26

    A.  Defendants' removal of the webpages is final agency action. ...................... 27

    B.  Defendants violated the Paperwork Reduction Act's timely and equitable access
        requirement. .......................................................................................... 29

    C.  Defendants failed to follow procedures required by the Paperwork Reduction Act. . 38

Conclusion ................................................................................................................. 41

## TABLE OF AUTHORITIES

**Cases**

*American National Insurance Co. v. FDIC*,
    642 F.3d 1137 (D.C. Cir. 2011) ................................................................. 6

*Anderson Group, LLC v. City of Saratoga Springs*,
    805 F.3d 34 (2d Cir. 2015) ...................................................................... 23

*Bennett v. Spear*,
    520 U.S. 154 (1997) ............................................................................. 27

*Biden v. IRS*, 752 F. Supp. 3d 97 (D.D.C. 2024) ....................................... 6, 7

*California v. EPA*,
    72 F.4th 308 (D.C. Cir. 2023) ................................................................. 26

*Campaign Legal Center & Democracy 21 v. FEC*,
    952 F.3d 352 (D.C. Cir. 2020) .................................................................. 8

*Campaign Legal Center v. FEC*,
    31 F.4th 781 (D.C. Cir. 2022) ................................................................... 7

*Citizens for Responsibility & Ethics in Washington v. FEC*,
    No. 22-cv-3281-CRC, 2023 WL 6141887 (D.D.C. Sept. 20, 2023) ................... 8

\* *Citizens for Responsibility & Ethics in Washington v. OMB*,
    No. 25-cv-1051-EGS, 2025 WL 2025114 (D.D.C. July 21, 2025)............ 9, 10, 23, 30

*Delaware Riverkeeper Network v. FERC*,
    243 F. Supp. 3d 141 (D.D.C. 2017) .......................................................... 10

*Department of Education v. Brown*,
    600 U.S. 551 (2023) ............................................................................. 7

\* *Doctors for America v. OPM*,
    No. 25-cv-322-JDB, 2025 WL 1836009 (D.D.C. July 3, 2025) ................. passim

*Environmental Defense Fund v. EPA*,
    922 F.3d 446 (D.C. Cir. 2019) .................................................................. 8

*Environmental Defense Fund v. Regan*,
    No. 20-cv-762-LLA, 2024 WL 3887383 (D.D.C. Aug. 20, 2024)..................... 28

*FDA v. Alliance for Hippocratic Medicine*,
    602 U.S. 367 (2024) ............................................................................ 19

*Food & Water Watch, Inc. v. Vilsack*,
    808 F.3d 905 (D.C. Cir. 2015) ................................................................. 13, 20, 21

*Friends of Animals v. Jewell*,
    828 F.3d 989 (D.C. Cir. 2016) ......................................................................... 8

*Fund for Animals, Inc. v. BLM*,
    460 F.3d 13 (D.C. Cir. 2006) ......................................................................... 27

*Garnett v. Zeilinger*,
    485 F. Supp. 3d 206 (D.D.C. 2020) ............................................................. 20

*Hawaii v. Trump*,
    871 F.3d 646 (9th Cir. 2017) ......................................................................... 23

*Humane Society of the United States v. Vilsack*,
    797 F.3d 4 (D.C. Cir. 2015) ........................................................................... 22

*Judicial Watch, Inc. v. National Energy Policy Development Group*,
    219 F. Supp. 2d 20 (D.D.C. 2002) ......................................................... 27, 28

\* *League of Women Voters of the United States v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ..................................................................... 19, 20

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ......................................................................................... 6

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
    567 U.S. 209 (2012) ....................................................................................... 26

*Morales v. Trans World Airlines, Inc.*,
    504 U.S. 374 (1992) ....................................................................................... 39

*Nader v. FEC*,
    725 F.3d 226 (D.C. Cir. 2013) ....................................................................... 10

*National Taxpayers Union, Inc. v. United States*,
    68 F.3d 1428 (D.C. Cir. 1995) ................................................................. 20, 21

*New York Stock Exchange LLC v. SEC*,
    2 F.4th 989 (D.C. Cir. 2021) ......................................................................... 27

*New York v. Meta Platforms, Inc.*,
    66 F.4th 288 (D.C. Cir. 2023) ......................................................................... 4

\* *People for the Ethical Treatment of Animals v. USDA*,
    797 F.3d 1087 (D.C. Cir. 2015) .............................................................. 13, 19, 20

iii

*Pharmaceutical Research & Manufacturers of America v. DHS,*
  43 F. Supp. 3d 28 (D.D.C. 2014) ............................................................................ 2

*RFE/RL, Inc. v. Lake,*
  No. 1:25-cv-799-RCL, 2025 WL 900481 (D.D.C. Mar. 25, 2025) ......................... 26

*Schiff v. OPM,*
  No. 25-cv-10595-LTS, 2025 WL 1481997 (D. Mass. May 23, 2025) ..................... 28

*Sherley v. Sebelius,*
  610 F.3d 69 (D.C. Cir. 2010) ................................................................................ 19

*Spann v. Colonial Village, Inc.,*
  899 F.2d 24 (D.C. Cir. 1990) ................................................................................ 20

*Steel Co. v. Citizens for a Better Environment,*
  523 U.S. 83 (1998) ................................................................................................ 24

*Tanner-Brown v. Haaland,*
  105 F.4th 437 (D.C. Cir. 2024) ............................................................................ 10

*Turlock Irrigation District v. FERC,*
  786 F.3d 18 (D.C. Cir. 2015) ................................................................................ 20

*United Steel, Paper & Forestry, Rubber, Manufacturing, Energy, Allied Industrial &*
  *Service Workers International Union v. Federal Highway Administration,*
  151 F. Supp. 3d 76 (D.D.C. 2015) ........................................................................ 38

*United to Protect Democracy v. Presidential Advisory Commission on Election Integrity,*
  288 F. Supp. 3d 99 (D.D.C. 2017) .......................................................................... 8

*Uzuegbunam v. Preczewski,*
  592 U.S. 279 (2021) .............................................................................................. 24

*Village of Arlington Heights v. Metropolitan Housing Development Corp.,*
  429 U.S. 252 (1977) .............................................................................................. 23

*Wertheimer v. FEC,*
  268 F.3d 1070 (D.C. Cir. 2001) ............................................................................ 11

*Youngstown Sheet & Tube Co. v. Sawyer,*
  343 U.S. 579 (1952) .............................................................................................. 26

**Statutes**

5 U.S.C. § 551(6) ...................................................................................................... 27

5 U.S.C. § 551(13) .................................................................................................... 27

44 U.S.C. § 3501 ...................................................................................................... 9, 29

44 U.S.C. § 3501(7) ...................................................................................................... 29

44 U.S.C. § 3502(12) ............................................................................... 9, 30, 33, 37

44 U.S.C. § 3506(d)(1) .......................................................................................... 9, 28, 30

44 U.S.C. § 3506(d)(2) ................................................................................................ 39

Consolidated Appropriations Act, 2021,
    Pub. L. 116-260, 134 Stat. 1182 (Dec. 27, 2020) .......................................... 25

Consolidated Appropriations Act, 2022,
    Pub. L. 117-103, 136 Stat. 49 (Mar. 15, 2022) .......................................... 25

Consolidated Appropriations Act, 2024,
    Pub. L. 118-42, 138 Stat. 25 (Mar. 9, 2024) .......................................... 25

Full-Year Continuing Appropriations and Extensions Act, 2025,
    Pub. L. 119-4, 139 Stat. 9 (Mar. 15, 2025) .......................................... 25

Inflation Reduction Act of 2022,
    Pub. L. No. 117-169, 136 Stat. 1818 (Aug. 16, 2022) .......................... 24

One Big Beautiful Bill Act,
    Pub. L. 119-21, 139 Stat. 72 (July 4, 2025) .......................................... 25

**Other Authorities**

Antonin Scalia & Bryan Garner, Reading Law: The Interpretation of Legal Texts (2012) ......... 40

Climate and Economic Justice Screening Tool Beta Version,
    87 Fed. Reg. 10176 (Feb. 23, 2022) .......................................... 24

Executive Order 14008,
    86 Fed. Reg. 7619 (Jan. 27, 2021) .......................................... 24, 25

Executive Order 14148,
    90 Fed. Reg. 8237 (Jan. 28, 2025) .......................................... 26

Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and
    Integrity of Information Disseminated by Federal Agencies; Republication,
    67 Fed. Reg. 8452 (Feb. 22, 2002) .......................................... 9, 37, 38, 40

H.R. Rep. No. 104-37 .......................................................................................... 39

OMB Circular A-130,
  1993 WL 357572 (June 28, 1993) .......................................................................................... 39

Websters Dictionary 1828 (2025) ("fact"),
  https://webstersdictionary1828.com/Dictionary/fact ................................................................ 37

## INTRODUCTION

Plaintiffs Sierra Club, Union of Concerned Scientists (UCS), Environmental Integrity Project (EIP), and California Communities Against Toxics (CCAT) brought this action to remedy the harm that they are currently suffering due to Defendants' unlawful removal from public view of webpages containing important information about environmental harms, climate change, and socioeconomic stressors.

Defendants have moved to dismiss, arguing that Plaintiffs lack standing, that their webpage removals do not qualify as final agency action reviewable under the Administrative Procedure Act (APA), and that the Paperwork Reduction Act of 1995 (PRA) does not apply to their webpages. Nothing in Defendants' motion, however, calls into question that Defendants' actions have caused significant, concrete harm to Plaintiffs. And because their removal of webpages was the final disposition of the public's right of access to information that the PRA requires Defendants to disseminate, the Court should deny Defendants' motion.

## BACKGROUND

### Removal of data and webpages

For years, Defendants ensured public access to interactive webpages that provided information about the environment and public health, including the Environmental Protection Agency's (EPA's) EJScreen, Council on Environmental Quality's (CEQ's) Climate and Economic Justice Screening Tool (CEJST), Department of Transportation's (DOT's) Equitable Transportation Community (ETC) Explorer, and Federal Emergency Management Agency's (FEMA's) Future Risk Index. Beginning in January 2025, Defendants removed each of these

interactive webpages, as well as the behind-the-scenes webpages and datasets necessary for the interactive pages to function.

**EPA – EJScreen**

On February 5, 2025, EPA removed from its website EJScreen, webpages that supported EJScreen's functionality, and the EJScreen Application Program Interface (API) tool, which allowed the public to automatically collect data from EJScreen using computer code. Compl. ¶¶ 22, 29, ECF 1. Developed over the course of several years and first released to the public in 2015, EJScreen was an interactive mapping tool that provided critical data on local pollution burdens, demographic indicators, and environmental justice indicators. *See* EPA, How was EJSCREEN Developed? (Jan. 19, 2021), https://19january2021snapshot.epa.gov/ejscreen/how-was-ejscreen-developed_.html.[1] EJScreen presented over a dozen environmental and demographic indicators by standardizing and compiling information from other public datasets and also generated EPA's own indices. This solved the technical problems of developing a "nationally consistent dataset and approach for combining environmental and demographic indicators." EPA, What is EJSCREEN? (Jan. 19, 2021), https://19january2021snapshot.epa.gov/ejscreen/what-ejscreen_.html. It also presented that data in an interactive format and used the underlying data to create environmental justice indicators that identified communities that face unique burdens from pollution. *Id.*

By providing all this data in one place, EJScreen enabled users to analyze the demographic characteristics and environmental burdens of communities at a granular level. As part of that analysis, EJScreen provided users with color-coded mapping, the ability to generate a report for a selected area, and comparisons showing differences between a selected area and the surrounding

---

[1] The Court may take "judicial notice of information posted on official public websites of government agencies." *Pharm. Rsch. & Manufacturers of Am. v. DHS*, 43 F. Supp. 3d 28, 33 (D.D.C. 2014).

state, EPA region, or the nation. *See* EPA, Learn to Use EJSCREEN (Jan. 19, 2021), https://19january2021snapshot.epa.gov/ejscreen/learn-use-ejscreen_.html.

EPA promoted public use of EJScreen, recognizing that it "may be of interest to community residents or other stakeholders as they search for environmental or demographic information" and "can also support a wide range of research and policy goals." EPA, Purposes and Uses of EJSCREEN (Jan. 19, 2021), https://19january2021snapshot.epa.gov/ejscreen/purposes-and-uses-ejscreen_.html. EPA also recognized that because EJScreen provided a consistent nationwide methodology for understanding environmental burdens, it "create[d] a common starting point between the agency and the public when looking at issues related to environmental justice." *Id.* After removing EJScreen, EPA posted at least some of the data from EJScreen to a public repository. *See* USEPA/EJAMM-open, https://github.com/USEPA/EJAM-open. However, those datasets are not nearly as functional or useful as the EJScreen webpage, and using that data has proved time-intensive and costly because it requires overcoming steep technical challenges the agencies had solved when they originally created the interactive tools. *See* Compl. ¶¶ 60–65.

**CEQ – CEJST**

On January 22, 2025, CEQ removed CJEST and its supporting webpages and datasets. Compl. ¶ 36. Like EJScreen, CEJST was an interactive mapping tool that identified and highlighted communities that face disproportionate environmental burdens using a consistent nationwide methodology. *See* CEQ, Methodology (Jan. 17, 2025), https://web.archive.org/web/20250117221651/https://screeningtool.geoplatform.gov/en/methodology#3/33.47/-97.5.[2]

---

[2] "The Internet Archive Wayback Machine is a service that allows people to visit archived versions of Web sites. Visitors to the Wayback Machine can type in a URL, select a date range, and then begin surfing on an archived version of the Web." Wayback Machine General Information, Internet Archive, https://help.archive.org/help/wayback-machine-general-

The tool included different environmental and demographic indicators than did EJScreen, combining dozens of datasets on climate change, energy, health, housing, pollution, transportation, water and wastewater, and workforce development. *Id.* Before it removed CEJST, CEQ encouraged public use of and feedback on the tool. *See* CEQ, About (Jan. 17, 2025), https://web.archive.org/web/20250117222055/https://screeningtool.geoplatform.gov/en/about#3/33.47/-97.5.

**DOT – ETC Explorer**

At some point between January 26, 2025, and February 1, 2025, DOT removed from its website the ETC Explorer and its supporting webpages and datasets. Compl. ¶ 53. The ETC Explorer was an interactive mapping tool that compiled location data based on transportation insecurity, climate and disaster risk burden, environmental burden, health vulnerability, and social vulnerability. *See* DOT, ETC Explorer (Jan. 26, 2025), https://web.archive.org/web/20250126215618/https://www.transportation.gov/priorities/equity/justice40/etc-explorer. The ETC Explorer was "designed to complement [CEJST] by providing users deeper insight into the Transportation disadvantage component of CEJST, and the ETC Explorer's Transportation Insecurity component, which will help ensure the benefits of DOT's investments are addressing the transportation related causes of disadvantage." *Id.* DOT encouraged the public's use of the ETC Explorer, explaining that the tool would allow "every community in the country to understand how it is experiencing burden that transportation investments can mitigate or reverse." *Id.*

---

information. As the D.C. Circuit has recognized, "[t]he contents of webpages available through the Wayback Machine constitute facts that can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *New York v. Meta Platforms, Inc.*, 66 F.4th 288, 303 (D.C. Cir. 2023) (internal quotation marks omitted). Although the Wayback Machine preserves some of Defendants' descriptions of the removed webpages, the contents of the interactive mapping tools are not functional on the archived Wayback Machine pages.

**FEMA – Future Risk Index**

In February 2025, FEMA removed from its website the Future Risk Index and its supporting webpages and datasets. Compl. ¶ 57. The Future Risk Index was an interactive mapping tool that provided projected economic losses due to climate change at the county level, based on different climate scenarios and environmental hazards, including coastal flooding, extreme heat, wildfire, hurricanes, and drought. *See* FEMA, Frequently Asked Questions (Jan. 19, 2025), https://web.archive.org/web/20250119104326/https://hazards.fema.gov/nri/frequently-asked-questions#is-future-risk-incorporated-into-the-national-risk-index. The Future Risk Index provided one-of-a-kind information about how much climate change is likely to cost communities in the United States. *See id.*

**This lawsuit**

Plaintiffs Sierra Club, UCS, EIP, and CCAT are nonprofit organizations that regularly relied on the removed webpages. *See* Compl. ¶¶ 23–32, 37–40, 54–55, 58. Plaintiffs used the webpages to investigate environmental harms and educate the public, to guide where they directed their technical expertise and funding, and to engage with public officials. *See id.* For example, the webpages allowed EIP to draft a report exposing that petroleum refineries that release pollution in waterways are disproportionately located in communities where the majority of residents are people of color or are considered low-income. Compl. ¶ 28. Defendants' removal of these tools has disrupted Plaintiffs' work and forced them to expend additional resources in search of replacement data. *See* Compl. ¶¶ 60–65.

Plaintiffs moved for a preliminary injunction. ECF 20. While the Court "credit[ed] Plaintiffs' position that the tools at issue in this case were 'uniquely useful,' and that without them Plaintiffs will need to 'invest considerably more of [their] limited time, money, and effort' to

obtain the same information," Mem. Op., ECF 35, at 8 (citation omitted), it denied Plaintiffs'
motion on the basis that they had not established that the removals imposed irreparable harm that
justified a preliminary injunction and in light of their delay in seeking preliminary injunctive relief.

Defendants subsequently filed the present motion to dismiss. ECF 37.

## LEGAL STANDARD

To establish standing at the motion to dismiss stage, "a complaint must state a plausible
claim that the plaintiff has suffered an injury in fact fairly traceable to the actions of the defendant
that is likely to be redressed by a favorable decision on the merits." *Humane Soc'y of the U.S. v.
Vilsack*, 797 F.3d 4, 8 (D.C. Cir. 2015). For each claim, the Court need only determine that one
plaintiff has standing. *Id.* at 10 ("Where the [court] finds that one plaintiff has standing, it need not
and does not reach the arguments of the other plaintiffs regarding their standing."). In assessing a
plaintiff's standing, the evaluating court must "assume the truth of all material factual allegations
in the complaint and 'construe the complaint liberally, granting plaintiff the benefit of all
inferences that can be derived from the facts alleged.'" *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137,
1139 (D.C. Cir. 2011) (quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005)); *see Lujan
v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) ("At the pleading stage, general factual allegations
of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [courts]
presume that general allegations embrace those specific facts that are necessary to support the
claim." (cleaned up)).

"A motion to dismiss under Rule 12(b)(6) 'tests the legal sufficiency of a complaint' by
asking whether the plaintiff has properly stated a claim on which relief can be granted.'" *Biden v.
IRS*, 752 F. Supp. 3d 97, 103 (D.D.C. 2024) (quoting *Browning v. Clinton*, 292 F.3d 235, 242
(D.C. Cir. 2002)). "In deciding a motion to dismiss under Rule 12(b)(6), a court must consider the

whole complaint, accepting all factual allegations as true and drawing all reasonable inferences in favor of the plaintiff." *Id.* at 103–04.

## ARGUMENT

### I.    Plaintiffs have standing.

To establish standing, a plaintiff must show injury in fact, causation, and redressability. *Campaign Legal Ctr. v. FEC*, 31 F.4th 781, 788–89 (D.C. Cir. 2022). All three requirements are met here: Defendants have inflicted concrete injuries on Plaintiffs by depriving them of the information from the removed webpages, disrupting their everyday operations, and undermining their investment in their own websites and operations. Those injuries derive directly from, and are therefore traceable to, Defendants' unlawful removal of access to EJScreen, CEJST, the ETC Explorer, and the Future Risk Index. And a decision holding the removals unlawful and imposing an injunction that requires Defendants to restore the webpages would redress Plaintiffs' injuries.

#### A.  Plaintiffs are suffering concrete harms.

"[A]n injury in fact" must be "concrete and particularized and actual or imminent, not conjectural or hypothetical." *Dep't of Educ. v. Brown*, 600 U.S. 551, 561 (2023) (cleaned up). Plaintiffs satisfy that requirement because they are suffering informational injuries, are experiencing ongoing disruptions to their organizational interests and activities, and have suffered economic harm.

##### 1.  Plaintiffs are suffering informational injuries.

Defendants' actions have caused Plaintiffs to suffer an informational injury. A plaintiff suffers an informational injury when it has (1) "been deprived of information that, on its interpretation, a statute requires the government . . . to disclose to it" and (2) "suffer[ed], by being denied access to that information, the type of harm Congress sought to prevent by requiring

disclosure." *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016). In assessing the second prong, "[t]he existence and scope of an injury for informational standing purposes is defined by Congress: a plaintiff seeking to demonstrate that it has informational standing generally 'need not allege any additional harm beyond the one Congress has identified.'" *Id.* (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 342 (2016); citing *FEC v. Akins*, 524 U.S. 11 (1998), and *Public Citizen v. DOJ*, 491 U.S. 440 (1989)); *see Env't Def. Fund v. EPA*, 922 F.3d 446, 452 (D.C. Cir. 2019) (recognizing the second prong is satisfied where "there is no reason to doubt the[] claim that the information would help [the plaintiff]" (internal quotation marks and citation omitted)).

For example, in *Campaign Legal Center & Democracy 21 v. FEC*, the D.C. Circuit found that the plaintiffs were injured by the Federal Election Commission's failure to disclose campaign spending information as mandated by statute, where disclosure "would further [the nonprofit organizations'] efforts to defend and implement campaign finance reform." *Campaign Legal Ctr. & Democracy 21 v. FEC*, 952 F.3d 352, 356 (D.C. Cir. 2020) (per curiam). Similarly, in *Environmental Defense Fund v. EPA*, the court held that an environmental group had raised a "quintessential claim of informational standing" where the statutorily mandated public disclosure of chemical information would "promote [the group's] environmental interests, research, and educational activities." 922 F.3d at 452. And "courts in this district … have conferred standing to 'groups who … engage[] in a number of … activities—including public education, litigation, administrative proceedings, and legislative reform efforts—where the sought-after information would likely prove useful.'" *Citizens for Resp. & Ethics in Washington v. FEC*, No. 22-cv-3281-CRC, 2023 WL 6141887, at *5 (D.D.C. Sept. 20, 2023) (alteration in original); *see also United to Protect Democracy v. Presidential Advisory Comm'n on Election Integrity*, 288 F. Supp. 3d 99,

107–08 (D.D.C. 2017) (finding standing to challenge non-disclosure of data that would have facilitated nonprofits' advocacy, research, and public education efforts on democracy issues).

Here, Defendants have deprived Plaintiffs of access to information the disclosure of which is required by the PRA. The PRA requires that every agency "ensure that the public has timely and equitable access to the agency's public information,"[3] 44 U.S.C. § 3506(d)(1), and that agencies "provide adequate notice when initiating, substantially modifying, or terminating significant information dissemination products,"[4] 44 U.S.C. § 3506(d)(3). Those provisions require Defendants to provide Plaintiffs access to the removed webpages and the information contained therein both because the removed webpages are Defendants' public information and because Defendants failed to provide notice before removing access to the webpages. *See Citizens for Resp. & Ethics in Washington v. OMB* (*CREW v. OMB*), No. 25-cv-1051-EGS, 2025 WL 2025114, at *9 (D.D.C. July 21, 2025) (holding that the PRA's timely-and-equitable access provision supports informational standing because it "plainly requires the public dissemination of an 'agency's public information'" (citation omitted)); *infra* II.B–C.

When Congress enacted the PRA's information dissemination requirements, it set out to "ensure the greatest possible public benefit from and maximize the utility of information created, collected, maintained, used, shared and disseminated by or for the Federal Government." 44 U.S.C. § 3501(2). Plaintiffs used the webpages to investigate environmental harms and educate the public, to guide where they directed their technical expertise and funding, and to engage with public

---

[3] The "agency's public information" includes all information an agency has disclosed to the public. 44 U.S.C. § 3502(12); *see infra* II.B.

[4] "Information dissemination product" includes all "map[s]" and "web page[s]" that the agencies disseminated to the public, including the webpages at issue in this case. 67 Fed. Reg. 8452, 8460; *see infra* II.C.

officials. *See, e.g.*, Compl. ¶¶ 23–32, 37–40, 54–55, 58; Grenter Decl. ¶¶ 9–33, ECF 20-3; Phartiyal Decl. ¶¶ 7–12, ECF 20-4; Duggan Decl. ¶¶ 7–27, ECF 20-5; Williams Decl. ¶¶ 5–16, ECF 20-6.[5] Plaintiffs' widespread use of the removed webpages aligns with the PRA's goal of maximizing public access to and benefit from agency information and reflects that Plaintiffs would continue to benefit from access to the webpages. Indeed, information from the removed webpages is essential to Plaintiffs' "informed participation in the political process." *Nader v. FEC*, 725 F.3d 226, 230 (D.C. Cir. 2013); *see, e.g.*, Williams Decl. ¶ 26 (describing how removal of EJScreen and CEJST hindered CCAT's ability "to provide public comment on measures the Oregon legislature was considering to reduce landfill pollution"). Because the PRA requires Defendants to provide Plaintiffs access to the removed webpages and because Plaintiffs would undoubtedly benefit from access to those webpages, the removals inflict informational injuries.

Defendants argue that Plaintiffs lack informational standing because, in their view, the PRA does not require disclosure of the webpages. *See* Defs. Motion to Dismiss (MTD) 21, ECF 37. That argument conflates standing and the merits. *Tanner-Brown v. Haaland*, 105 F.4th 437, 445 (D.C. Cir. 2024) ("[Courts] must consider standing separately from the merits by assuming that the plaintiff will ultimately prevail on her legal theory."). And, to boot, Defendants are wrong on the merits of that argument. *See CREW v. OMB*, 2025 WL 2025114, at *9 ("The PRA plainly requires the public dissemination of an 'agency's public information.'" (citation omitted)); *infra* II.B–C.

Defendants also contend that Plaintiffs lack informational standing because EPA and CEQ have made some of the source code and data behind EJScreen and CEJST publicly available, and

---

[5] When evaluating standing, "the court 'is not limited to the allegations of the complaint,'" and "'may consider such materials outside the pleadings as it deems appropriate.'" *Delaware Riverkeeper Network v. FERC*, 243 F. Supp. 3d 141, 147 (D.D.C. 2017) (citations omitted).

because third parties have attempted to reconstruct three of the four removed tools. *See* MTD 23–24. To be sure, a plaintiff lacks informational standing if the government has provided information from one source and the plaintiff "only seek[s] the same information from a different source." *Wertheimer v. FEC*, 268 F.3d 1070, 1075 (D.C. Cir. 2001). But no currently available data source provides the same "standardization, reliability, precision, and functionality," Duggan Decl. ¶ 30, or "one-of-a-kind information," as the removed webpages, Phartiyal Decl. ¶ 12; *see* Grenter Decl. ¶ 36 ("There are no adequate substitutes available for the eliminated federal tools."). The limited set of code and data that Defendants have posted online is not an adequate replacement for CEJST and EJScreen. Reconstructing the tools from the source code and data EPA and CEQ have posted "present[s] time-consuming technical challenges," Duggan Decl. ¶ 30, that prevent Plaintiffs from reliably replicating the information in the removed tools. *See* Compl. ¶¶ 62–63; MTD 44 (recognizing the possibility that "the underlying data is not available"). Because existing government data does not offer access to the same information as did the removed tools, that available data does not undermine Plaintiffs' informational standing.

As for the third-party attempted replicas of CEJST, EJScreen, and the Future Risk Index, Defendants tellingly do not state that alternative websites reliably replicate the removed tools, nor could they. The alternatives are a patchwork consisting of the limited data and code that Defendants have posted, the third parties' own code, and any substitute data the third parties obtained to replace necessary inputs that are not included in Defendants' data repositories. *See* CEJST Tool, EDGI (Aug. 21, 2025), https://github.com/edgi-govdata-archiving/j40-cejst-2/blob/main/README.md (stating that "instructions in [part of the code repository] are not appropriate at the current stage of development" and that the host "hope[s] to gradually improve [the tool]"); j40-cejst-2/data, EDGI (Aug. 21, 2025), https://github.com/edgi-govdata-

archiving/j40-cejst-2/tree/main/data/data-pipeline (changes to "Last commit date" indicating that numerous files relating to data were modified in the third-party tool); MTD 44 (recognizing the possibility that "the underlying data is not available"); Williams Decl. ¶¶ 20, 23 (explaining that CCAT has contacted "other data analysts and map-making experts to discern the viability of fixing the bugs in the older versions of EJScreen data" but that those efforts have not produced a "sufficient substitute[]"); *id.* at 22 (explaining that "previously downloaded EJScreen data" is not as useful "due to the poor quality and limited functionality of these backup sources"). Indeed, an article that Defendants cite in support of their argument that the removed tools are available through third parties makes clear that the third-party alternatives are *not* equivalent to the versions the agencies removed. *See* Victoria Heath, *The online climate tool that Trump removed, but data scientists have now rebuilt*, Geographical (Mar. 13, 2025), https://geographical.co.uk/news/the-online-climate-tool-that-trump-removed-but-data-scientists-have-now-rebuilt ("Despite their work, [the individuals that attempted to recreate the Future Risk Index] say that a lot of data has still been lost, including details on methodology."); *id.* ("[S]ome information was even censored as they tried to access it."). Because the alternatives do not in fact replace EJScreen, CEJST, and the Future Risk Index, they do not negate Plaintiffs' informational injury.

## 2. Plaintiffs are suffering ongoing disruptions to their organizational interests and daily operations.

In addition to inflicting informational injuries, Defendants' failure to provide public access to information also inflicted injuries to Plaintiffs' organizational interests and activities. "To determine whether an organization's injury is concrete and demonstrable or merely a setback to its abstract social interests, [courts in this circuit] ask, first, whether the agency's action or omission to act injured the organization's interest and, second, whether the organization used its resources to counteract that harm." *People for the Ethical Treatment of Animals v. USDA* (*PETA*), 797 F.3d

1087, 1094 (D.C. Cir. 2015) (cleaned up). To satisfy the first prong, "an organization must allege that the defendant's conduct perceptibly impaired the organization's ability to provide services." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015) (internal quotation marks and citation omitted). "An organization's ability to provide services has been perceptibly impaired when the defendant's conduct causes an inhibition of the organization's daily operations." *Id.* (cleaned up). For the second prong, a plaintiff has used its organizational resources to counteract a harm when its response to the harm incurs "operational costs beyond those normally expended." *Id.* at 920 (quoting *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995)). Defendants' webpage removals have hindered, and in some instances completely halted, several of Plaintiffs' core activities and services, including their work investigating environmental harms, educating the public, providing technical expertise and funding, and engaging with public officials. In response, Plaintiffs have used resources to counteract these harms, and they will need to continue doing so unless the webpages are restored.

Plaintiffs frequently used the removed webpages to understand environmental harms, educate the public about those harms, and engage with government officials whose actions would mitigate or exacerbate those harms. Plaintiffs relied on the removed webpages to assess where to allocate their limited resources to alleviate the greatest environmental burdens. EIP, for instance, provides funding to "ensure that local communities and environmental advocates have access to high-quality science and engineering expertise." Duggan Decl. ¶ 22; *see* Compl. ¶ 30. EIP took information from EJScreen and CEJST into account as a factor in making its funding decisions, since a goal of the funding is to "support[] communities most affected by pollution and historically left out of environmental decision-making." Duggan Decl. ¶ 23; *see id.* 24–25 (describing

13

additional ways in which EIP uses EJScreen and CEJST to evaluate candidate communities for technical assistance).

Once Plaintiffs had decided where to focus their limited resources, they relied on the removed webpages to educate the public, provide technical assistance to communities experiencing environmental burdens, and engage with government officials. Sierra Club, UCS, and EIP each expend substantial resources developing reports to understand and explain environmental harms and had relied on EJScreen as a key part of those reports. *See* Grenter Decl. ¶¶ 11, 13, 32; Phartiyal Decl. ¶¶ 7, 9; Duggan Decl. ¶¶ 11–14; *see* Compl. ¶¶ 23–25, 27–28, 32, 58. For example, UCS's report "Invisible Threat, Inequitable Impact" relied on EJScreen to explain how ethylene oxide emissions disproportionately burden disadvantaged communities across the country. Phartiyal Decl. ¶ 7. UCS, EIP, and Sierra Club also frequently relied on CEJST and the Future Risk Index to produce novel reports that provided them and the public with a better understanding of how environmental harms impact issues ranging from public health to affordable housing to energy costs. *See* Phartiyal Decl. ¶ 7 (UCS reports using CEJST); *id.* ¶ 12 (UCS reports using the Future Risk Index); Grenter Decl. ¶ 32 (Sierra Club reports using CEJST); Duggan Decl. ¶ 17 (EIP reports using CEJST).

Plaintiffs also relied on EJScreen and CEJST to develop interactive webpages of their own. For example, EIP relied on EJScreen's Application Program Interface (API) tool to automatically collect information for routine updates to its Oil & Gas Watch website, which monitors the expansion of petrochemical facilities and informs the public about opportunities to submit public comments on federal and state permits issued to those facilities. *See* Duggan Decl. ¶¶ 17–20; *see also* Grenter Decl. ¶¶ 12, 16 (discussing Sierra Club's use of EJScreen for its interactive Liquefied Natural Gas Export Tracker and interactive maps of large warehouses); Compl. ¶ 29. EIP likewise

14

incorporated information from CEJST into its interactive maps, including its interactive map of existing and proposed $CO_2$ pipelines. *See* Duggan Decl. ¶ 17.

The reports and interactive webpages that Plaintiffs created using the removed pages were essential to their work educating the public about environmental harms. *See, e.g.*, Grenter Decl. ¶¶ 14–15, 25; Duggan Decl. ¶ 8. Plaintiffs also relied on the removed webpages to conduct public education without formal reports, and to provide training services to community partners that were seeking to understand and address environmental burdens where they live. For example, UCS used EJScreen and CEJST as training tools so its local partners could "understand environmental and health stressors in their communities." Phartiyal Decl. ¶ 10; *see id.* ¶ 13 (explaining that UCS used the removed webpages "to provide technical assistance to communities that seek to understand and advocate about the environmental burdens they face"); Duggan Decl. ¶¶ 24–25 (describing how EIP "relies on EJScreen and CEJST for quick, reliable identification of certain risk levels" when providing technical assistance to communities); Williams Decl. ¶ 5 (explaining that CCAT relied on EJScreen and CEJST "to create maps and analyses for education … to protect public health and communities"); *see* Compl. ¶ 26.

Finally, Plaintiffs relied on the removed webpages when engaging with public officials. Plaintiffs used the removed webpages to educate public officials just as they used the webpages to educate other members of the public. *E.g.*, Grenter Decl. ¶ 11. And Plaintiffs relied on the removed webpages particularly heavily when submitting comments on proposed rulemakings or permits. *See, e.g.*, Grenter Decl. ¶¶ 32–33; Duggan Decl. ¶ 27; Williams Decl. ¶¶ 5–13; Compl. ¶¶ 24, 62. For example, "CCAT, in cooperation with other organizations, used EJScreen and CEJST data to support comments on the EPA's Major-Minor Source Reclassification Rule." Williams Decl. ¶ 6. "As a result of CCAT's efforts, the EPA strengthened the proposed rule," ensuring that "large

15

polluters maintain the pollution controls that limit emissions of toxic air pollution." *Id.* ¶ 9. The removed webpages were particularly valuable in that setting because they provided a "common starting point between the agency and the public," EPA, Purposes and Uses of EJSCREEN, *supra*, which eliminated the need to spend time disputing the reliability of data sources, *see id.* ¶ 21, 24 (explaining that EJScreen and CEJST are uniquely "recognized and accepted by … federal agencies" and "eliminated the need for expert testimony in litigation and regulatory proceedings to validate … data collection"); Duggan Decl. ¶ 29 (recognizing that EJScreen and CEJST are "authoritative"). The interactive webpages were also particularly valuable because they decreased the time needed to put together comments on permitting and regulatory processes. *See* Williams Decl. ¶¶ 21, 26; Grenter Decl. ¶ 38; Duggan Decl. ¶ 27; Compl. ¶ 62. Because most regulatory processes provide only a short window in which members of the public may make their voices heard, the time-savings the removed webpages provided compared to other sources of information were essential for ensuring the public could "meaningfully participat[e]" in the regulatory process. Williams Decl. ¶ 26. Indeed, the removed webpages allowed the public, including Plaintiffs, to undertake analysis quickly enough that they could engage with public officials to improve responses to ongoing emergencies: after the Maui wildfires in 2023, Sierra Club successfully used EJScreen and CEJST in conjunction with other research to advocate to local health officials to prioritize the evacuation of vulnerable populations. Grenter Decl. ¶ 33; *see* Compl. 37.

This work is all central to Plaintiffs' missions. *See* Grenter Decl.¶ 3; Phartiyal Decl. ¶ 2; Duggan Decl. ¶ 2; Williams Decl. ¶ 2; Compl. ¶ 7–10. And Plaintiffs have already experienced disruptions due to the removals. Plaintiffs have halted or delayed work on their analysis of environmental burdens. *See* Phartiyal Decl. ¶ 14 (observing that "UCS has already had to halt work on some of its projects," including those on housing affordability, the health impacts of nuclear

materials exposure, and energy affordability); Williams Decl. ¶ 22 ("CCAT has already felt these impacts, including when it had to stop work on its project to inventory landfill pollution impacts across several states[.]"); Phartiyal Decl. ¶ 12 (explaining that "UCS had been considering integrating the [Future Risk Index] into a forthcoming analysis on affordable housing and climate change" but can no longer do so because of FEMA's decision to remove the tool); *id.* ¶ 6 ("But for the agencies' recent removals, UCS would continue to rely on these tools in the same manner in which it has in the past."); Compl. ¶ 60. They have lost some of the functionality of their own interactive webpages. *See* Duggan Decl. ¶ 33 ("Without access to EPA's EJScreen and the API tool, EIP is not capable of manually collecting, disseminating and evaluating the information [required by its Oil & Gas Watch] at the same pace and scale."); Compl. ¶ 29. They have had to stop education and organizing efforts with their community partners. *See* Williams Decl. ¶ 14 (discussing halt to efforts with partners in Colorado targeted at "address[ing] asthma-related issues near landfills"). They have been unable to consider information from the removed websites when deciding where to allocate their scarce resources. *See* Duggan Decl. ¶ 34; Compl. ¶ 59. And they have been hindered in their ability to engage with public officials. *See* Williams Decl. ¶ 26 (describing an instance in which removal of EJScreen and CEJST hindered CCAT's ability "to provide public comment on measures the Oregon legislature was considering to reduce landfill pollution"); Grenter Decl. ¶¶ 19, 40 (explaining that EJScreen and the ETC Explorer were "instrumental" to Sierra Club's Transit to Trails program and that their removal means "Sierra Club's work to continue building the Transit to Trails campaign will be much more difficult and time-consuming").

In response, Plaintiffs have invested resources searching for alternative sources of data. *See, e.g.*, Duggan Decl. ¶ 36 (stating that "EIP has already had to invest additional resources to

gather and analyze data without access to EJScreen," including "develop[ing] and run[ning] a new computer code" and "spend[ing] additional time reconciling inconsistencies in [the replacement data]"); Compl. ¶¶ 64–65. But ameliorating the disruptions by obtaining satisfactory replacement data from other existing sources requires "[a] significant investment of time and resources" and "would present technical and data management challenges." Duggan Decl. ¶ 31; *see* Grenter Decl. ¶ 37 ("It is extremely time-consuming to try to recreate the same analyses and reports that are available by using the federal tools."); Compl. ¶ 62–63. Moreover, when they cannot find or create those alternative resources, they have had to cut back or entirely cease some of their activities altogether. *See supra*.

These harms will persist going forward. Without access to the removed webpages, Plaintiffs will need to "[p]ursue other means to individually gather demographic and environmental burden information and establish a standardized and authoritative method to analyze, calculate, and evaluate demographic data at scale." Duggan Decl. ¶ 35. That will require them to "invest considerably more of [their] limited time, money, and effort" to obtain the same information. *Id.*; *see* Phartiyal Decl. ¶ 15; Grenter Decl. ¶¶ 35, 37; Williams Decl. ¶ 25. Even when Plaintiffs have the time and resources necessary to obtain the same information that they readily could have obtained from the removed webpages, that added expense means they will "be forced to abandon some of [their] other work." Grenter Decl. ¶ 37; *see* Phartiyal Decl. ¶ 15 ("UCS will be forced to abandon some projects due to resource limitations."). Further, because finding alternative sources of information is time-intensive, "the removals may deny [them] the ability to timely participate in the rulemaking process" even when they would otherwise invest the time and resources to seek out alternative data sources. Williams Decl. ¶ 26.

Altogether, these injuries meet and exceed the bar courts in this circuit have set for establishing concrete harm. *See League of Women Voters of the United States v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016) ("An organization is harmed if the actions taken by the defendant have perceptibly impaired the organization's programs." (cleaned up)); *Drs. for Am. v. OPM*, No. 25-cv-322-JDB, 2025 WL 1836009, at *10 (D.D.C. July 3, 2025) (explaining that where "time and effort are valuable, scarce resources," a defendant imposes concrete harm by taking actions that cause the plaintiff to expend additional time or resources); *see PETA*, 797 F.3d at 1091 (holding that the plaintiff established standing where the defendant's actions forced it to "expend resources to seek relief through other, less efficient and effective means"); *cf. Sherley v. Sebelius*, 610 F.3d 69, 72 (D.C. Cir. 2010) (recognizing a concrete harm arises when an agency's actions force a plaintiff "to expend more resources to achieve the same sales").

Defendants' counterarguments are unavailing. First, Defendants contend that standing does not exist when an organization diverts its resources in response to a defendant's unlawful conduct. That argument, however, relies on a misunderstanding of the Supreme Court's decision in *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024). *See* MTD 20. *Alliance for Hippocratic Medicine* does not hold that a diversion of resources never supports standing. Rather, it explains that diversion of resources to advocate against the challenged action does not support standing, because every plaintiff would otherwise establish standing merely by expending resources to sue over the challenged conduct. *All. for Hippocratic Med.*, 602 U.S. at 394–95 ("[A]n organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action."). That understanding is in line with the longstanding requirements for standing applied by courts in this circuit, which recognize that a diversion of resources supports standing when the

19

diversion is not intended to manufacture standing and instead constitutes "operational costs beyond those normally expended." *Food & Water Watch*, 808 F.3d at 920 (internal quotation marks and citation omitted); *see Drs. for Am.*, 2025 WL 1836009, at *10 n.6 (recognizing that in *Alliance for Hippocratic Medicine*, "the Court suggested the doctors' injuries would *not* have been too speculative had the plaintiffs alleged that the challenged action had 'caused a resulting diversion of the [plaintiffs'] time and resources'" (quoting *All. For Hippocratic Med.*, 602 U.S. at 390)). Here, Plaintiffs have alleged and attested that they have experienced harms beyond the costs of pursuing this litigation.

In a similar vein, Defendants argue that diversion of Plaintiffs' resources does not support standing because their resources are used "for litigation, investigation in anticipation of litigation, or advocacy." MTD 19. Again, their argument misapprehends the relevant rule. "An organization cannot, of course, manufacture the injury necessary to maintain a suit from its expenditure of resources on that very suit." *Spann v. Colonial Vill., Inc.*, 899 F.2d 24, 27 (D.C. Cir. 1990). "But that principle does not apply where the 'purportedly illegal action increases the resources the group must devote to programs *independent of its suit challenging the action*.'" *Garnett v. Zeilinger*, 485 F. Supp. 3d 206, 217 (D.D.C. 2020) (quoting *Spann*, 899 F.2d at 27); *see, e.g.*, *League of Women Voters*, 838 F.3d at 9; *PETA*, 797 F.3d at 1094; *Drs. for Am.*, 2025 WL 1836009, at *8–11. And the cases that Defendants cite are not to the contrary. *See Nat'l Taxpayers Union*, 68 F.3d at 1434 (holding that a plaintiff does not establish standing by "expend[ing] resources to educate its members and others regarding" the very statute that it seeks to challenge); *Turlock Irr. Dist. v. FERC*, 786 F.3d 18, 24 (D.C. Cir. 2015) (holding that increased costs of participating in the specific administrative proceeding that the petitioner was challenging could not support standing).

Here, Plaintiffs do not allege harm based on diverting resources to engage in advocacy work targeted at ensuring access to the information tools or to inform the public about the actions the government is taking to suppress access to that information. Instead, Defendants' actions have required Plaintiffs to divert resources to mitigate disruptions to their independent activities of researching environmental harms and climate change, educating the public about those subjects, providing technical assistance and funding, and engaging with policymakers on subjects far afield from access to public information. *See supra* pp. 13–18.

Defendants nonetheless complain that "[n]o Plaintiff has alleged that it is unable to continue providing services or that it must divert so many resources to make up for the lack of the agencies' web tools that the organization will no longer be able to operate." MTD 19. Such allegations are not required to establish standing. *See Food & Water Watch*, 808 F.3d at 919 (recognizing that a plaintiff establishes standing if it shows "inhibition of the organization's daily operations" (cleaned up)); *Nat'l Taxpayers Union*, 68 F.3d at 1433 (recognizing that an organization has standing when its "discrete programmatic concerns are being directly and adversely affected by the challenged action" (internal quotation marks and citation omitted)). Because Defendants' unlawful actions have disrupted Plaintiffs' ordinary operations and activities, Plaintiffs have suffered concrete harm.

Finally, Defendants argue that third-party webpages and other datasets, *see supra* I.A.1, fully ameliorate the harm to Plaintiffs. That argument is wrong for the reason discussed above: the "alternatives" are not equivalent to the removed tools. In addition, as Plaintiffs have explained, one of the most important functions of the tools was that, because they came from the government and provided a gold-standard for reliability and standardization, they "eliminated the need for expert testimony in litigation and regulatory proceedings to validate the data collection." Williams

Decl. ¶ 24; *see also* Duggan Decl. ¶ 30; Purposes and Uses of EJSCREEN, EPA (Jan. 19, 2021), https://19january2021snapshot.epa.gov/ejscreen/purposes-and-usesejscreen_.html (recognizing that EJScreen "create[d] a common starting point between the agency and the public when looking at issues related to environmental justice."). Reconstructing the tools from the subset of source code and data EPA and CEQ have posted "present[s] time-consuming technical challenges," Duggan Decl. ¶ 30, and does not allow Plaintiffs to reliably replicate the removed tools. Plaintiffs will therefore "be forced to dedicate additional resources just to establish data reliability" if they use the alternatives and will "likely face challenges to the data [they] use[] in litigation and regulatory proceedings." Williams Decl. ¶ 24.

Moreover, the alternatives do not have the same functionality as the removed tools. For example, one of the key features of EJScreen was its ability "to automatically generate a PDF report" that Plaintiffs could submit alongside their statements to public officials. *Id.* ¶ 26. Because the alternatives appear to lack that functionality, they would not provide an adequate substitute for the removed tools.

### 3. EIP is suffering economic harm from the removal of EJScreen.

By removing access to EJScreen, Defendants inflicted economic injury on EIP by diminishing the value of the significant investments they have made in developing their own interactive websites that rely on EJScreen. "[E]conomic loss" is "a classic form of concrete and particularized harm." *Humane Soc'y of the U.S.*, 797 F.3d at 9. In furtherance of its mission, EIP invested substantial time, money, and resources into building and maintaining "the website oilandgaswatch.org, which tracks the expansion of oil, gas, and petrochemical infrastructure around the country and alerts the public about opportunities to submit public comments." Compl. ¶ 29; *see* Duggan Decl. ¶¶ 18–21, 33, 35. That website "relie[d] on EJScreen to collect and display

22

facility-specific demographic and environmental burden data for over 1,000 facilities." Duggan Decl. ¶ 20. EIP developed the website to automatically collect information about facilities from EJScreen as new facilities were added to Oil & Gas Watch. *Id.* ¶ 19. But because EJScreen is no longer accessible, "EIP is not able to provide demographic indicator information for numerous facilities added to Oil & Gas Watch." *Id.* ¶ 33. Oil & Gas Watch is therefore considerably less valuable because it can no longer effectively "enable community organizers and engaged residents to identify and better understand disproportionate impacts of industrial pollution in their own neighborhoods and provide them with information about proposed environmental permits and opportunities for public participation." *Id.* ¶ 21.

That diminution of value is precisely the type of economic harm that the Supreme Court has held creates a cognizable economic injury. In *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), a nonprofit suffered cognizable "economic injury" where it had "expended thousands of dollars" on plans and studies in support of a rezoning request that the defendant denied. *Id*. at 262. The Court found the nonprofit had standing because the "plans and studies" on which it had spent money would be "worthless" unless the request were granted. *Id.* In numerous other cases, courts have likewise found injury-in-fact where the plaintiff invested time, money, or resources on a project that was rendered of little value because of the defendant's subsequent action. *See, e.g.*, *CREW v. OMB*, 2025 WL 2025114, at *12 (holding that the agency's removal of a webpage inflicted economic injury by diminishing the value of a nonprofit's investments in its own interactive website that relied on the agency's website); *Hawaii v. Trump*, 871 F.3d 646, 661 (9th Cir. 2017); *Anderson Grp., LLC v. City of Saratoga Springs*, 805 F.3d 34, 46 (2d Cir. 2015).

**B. Plaintiffs' injuries will be redressed by an order setting aside the webpage removals.**

An injury is redressable if there is "a likelihood that the requested relief will redress the alleged injury." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998); *see Uzuegbunam v. Preczewski*, 592 U.S. 279, 291 (2021) (recognizing that even "the ability 'to effectuate a partial remedy' satisfies the redressability requirement" (quoting *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 13 (1992))). The requested relief—restoration of the webpages (i.e., setting aside the unlawful removals)—would remedy the injuries Defendants caused by removing the pages.

Defendants do not contest that Plaintiffs' injuries are redressable with respect to EJScreen, ETC Explorer, and the Future Risk Index. They contend, however, that Plaintiffs injuries from the removal of CEJST are not redressable because a recent reconciliation bill cut some funding that was earmarked for CEJST. *See* MTD 25–27. That contention misunderstands both the relationship between that funding and CEJST and the impact that funding has on the statutory obligations that Congress has imposed on CEQ.

Congress's recent rescission of some funding available for CEJST does not render it impossible for CEQ to maintain CEJST. In January 2021, the President issued Executive Order 14008, which directed that "[t]he Chair of the Council on Environmental Quality shall, within 6 months of the date of this order, create a geospatial Climate and Economic Justice Screening Tool and shall annually publish interactive maps highlighting disadvantaged communities." E.O. 14008, § 222(a), 86 Fed. Reg. 7619, 7631 (Jan. 27, 2021). CEQ released a version of CEJST in February 2022. 87 Fed. Reg. 10176 (Feb. 23, 2022). Over eighteen months after the President first directed CEQ to begin work on CEJST and more than five months after CEQ had published CEJST, the Inflation Reduction Act of 2022 (IRA), Pub. L. No. 117-169, 136 Stat. 1818 (Aug. 16, 2022), was

24

enacted into law. The IRA provided CEQ with $32.5 million earmarked for (1) data collection related to disproportionate environmental harms and the cumulative impact of climate change, (2) tracking disproportionate environmental burdens, and (3) "support[ing] efforts to ensure that any mapping or screening tool is accessible to community-based organizations and community members." *Id.*, § 60401, 136 Stat. 2079–80. In July 2025, Congress rescinded funds that had not yet been obligated. *See* One Big Beautiful Bill Act, Pub. L. 119-21, § 60018, 139 Stat. 72, 156 (July 4, 2025). But that rescission did not eliminate all the funding available for CEJST. Instead, it returned the funding available for CEJST to its pre-IRA level. Because CEQ first released CEJST in February 2022, it necessarily developed and maintained CEJST through the funds Congress provided CEQ in its ordinary annual appropriation. *See* Consolidated Appropriations Act, 2022, Pub. L. 117-103, 136 Stat. 49, 402 (Mar. 15, 2022) (allocating CEQ $4.2 million for fiscal year 2022); Consolidated Appropriations Act, 2021, Pub. L. 116-260, 134 Stat. 1182, 1528 (Dec. 27, 2020) (allocating CEQ $3.5 million for fiscal year 2021). And rescission of the IRA funding does not prevent CEQ from continuing to fund CEJST. *See* Consolidated Appropriations Act, 2024, Pub. L. 118-42, 138 Stat. 25, 277–78 (Mar. 9, 2024) (allocating CEQ $4.6 million for fiscal year 2024); Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. 119-4, § 1101(a)(7), 139 Stat. 9, 11 (Mar. 15, 2025) (maintaining the funding set in the Consolidated Appropriations Act, 2024). Furthermore, rescission of the IRA funding does not excuse CEQ from its statutory duties. CEQ remains bound by its duty to comply with the PRA and the APA, and the appropriate remedy for its unlawful removal of CEJST is to set aside the removals and order CEJST to be restored.

Defendants also briefly suggest that CEJST cannot be restored because CEJST was originally created following Executive Order 14008, which was later revoked by Executive Order

14148. *See* MTD 25–26 (discussing E.O. 14008, 86 Fed. Reg. 7631, and E.O. 14148, § 2(s), 90

Fed. Reg. 8237, 8238 (Jan. 28, 2025)). "An executive order can do a lot, but it does not absolve

agencies of their obligations to follow the law." *Drs. for Am.,* 2025 WL 1836009, at *24. Because

"an executive order is not 'law' within the meaning of the Constitution or the APA," *California v.

EPA*, 72 F.4th 308, 318 (D.C. Cir. 2023), executive orders do not provide a basis on which to

ignore applicable statutes. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 588 (1952)

(holding that the President may not usurp Congress's lawmaking power by issuing an order that

"directs that a presidential policy be executed in a manner prescribed by the President" rather than

"direct[ing] that a congressional policy be executed in a manner prescribed by Congress");

*RFE/RL, Inc. v. Lake*, No. 1:25-cv-799-RCL, 2025 WL 900481, at *5 (D.D.C. Mar. 25, 2025)

(stating that an agency may not ignore statutory obligations "even if the President has told them to

do so"). Executive Order 14148, therefore, cannot excuse statutory violations and does not bar this

Court from requiring Defendants to restore CEJST to comply with their statutory duties.

## II.    Plaintiffs have stated claims on which relief can be granted.

The APA provides that a reviewing court "shall" hold unlawful and set aside agency

actions "not in accordance with law." 5 U.S.C. § 706(2)(A); *see Match-E-Be-Nash-She-Wish Band

of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 220 (2012) (referring to a claim that an agency

has "violate[d] a federal statute" as "a garden-variety APA claim"). Defendants' removals of the

interactive tools were undertaken in violation of multiple provisions of the PRA and, in addition,

were arbitrary and capricious.[6] Defendants, however, assert that their actions are not subject to

review under the APA and that the PRA does not constrain removal of EJScreen, CEJST, the ETC

---

[6] Defendants' motion to dismiss does not address Plaintiffs' claim that Defendants' actions
were arbitrary and capricious.

Explorer, and the Future Risk Index. Those arguments run contrary to foundational principles of administrative law and the plain text of the relevant statutes.

### A. Defendants' removal of the webpages was final agency action.

Defendants' removals of EJScreen, CEJST, the ETC Explorer, and the Future Risk Index were final agency actions. "'[A]gency action' includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). Congress broadly crafted the APA's definition of agency action to "assure the complete coverage of every form of agency power, proceeding, action, or inaction." *Jud. Watch, Inc. v. Nat'l Energy Pol'y Dev. Grp.*, 219 F. Supp. 2d 20, 38 (D.D.C. 2002) (quoting S. Doc. No. 248, 79 Cong., 2d Sess., 255 (1946)); *see Fund for Animals, Inc. v. BLM*, 460 F.3d 13, 20 (D.C. Cir. 2006) (recognizing that the definition of agency action "is expansive . . . [and] is meant to cover comprehensively every manner in which an agency may exercise its power" (internal quotation marks and citation omitted)). That broad definition of agency action includes a similar broad definition of "order," which the APA defines as "the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing." 5 U.S.C. § 551(6). "In other words, an order is virtually any authoritative agency action other than a rule." *New York Stock Exch. LLC v. SEC*, 2 F.4th 989, 992 (D.C. Cir. 2021).

EPA's removal of EJScreen, CEQ's removal of CEJST, DOT's removal of the ETC Explorer, and FEMA's removal of the Future Risk Index each easily qualifies as an "order." The removals were the consummation of whatever process Defendants undertook when deciding the scope of public access to the interactive tools. *See Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). And the removals determined—and denied—the right of public access to the tools. *See Env't Def.*

*Fund v. Regan*, No. 20-cv-762-LLA, 2024 WL 3887383, at *12 (D.D.C. Aug. 20, 2024) (recognizing that an agency "determine[s] rights and obligations" when it "provides or fails to provide … access to" information to which the plaintiff is entitled); *Jud. Watch*, 219 F. Supp. 2d at 40 ("The decisions to hold meetings without public access to the meetings or the records created indeed had a legal consequence—the denial of the public's right of access to that information."); *cf.* 44 U.S.C. § 3506(d)(1) (guaranteeing the public "timely and equitable access to the agency's public information"); *Schiff v. OPM*, No. 25-cv-10595-LTS, 2025 WL 1481997, at *9 (D. Mass. May 23, 2025) (concluding that removal of webpages is final agency action).

Defendants argue that removal of an individual webpage does not qualify as agency action unless the removal has a "sufficient nexus" with some overarching agency policy. The cases that Defendants cite, however, do not support that conclusion. Defendants principally rely on language from the recent district court decision in *Doctors for America v. OPM*. There, the plaintiffs challenged the removal by the Department of Health and Human Services (HHS) of health-related webpages, the HHS policy that led to the removals, and the Office of Personnel Management (OPM) memorandum that prompted the HHS policy. *See Drs. for Am.*, 2025 WL 1836009, at *6, *16–17. The plaintiffs "identified numerous webpages" that had been removed and, in addition, requested that the court order restoration of a broader set of unidentified webpages removed "in response to the OPM memorandum *or* without reasoned justification." *Id.* at *4. The court recognized that "a webpage removal seems to fit within the APA's definition of agency action" because "[t]here is little doubt that the decision to remove a webpage is circumscribed, discrete, and an exercise of agency power." *Drs. for Am.*, 2025 WL 1836009, at *16. However, it expressed concern that the plaintiffs, in addition to seeking a "targeted group of removals linked to the [challenged] OPM Memo," also sought an undefined list of "hundreds or thousands of individual

webpages removed for an unknown number of different reasons." *Id.* at *17. The court therefore indicated that, while a clearly circumscribed set of webpage removals (such as all removals undertaken pursuant to a specific memorandum) could qualify as a final agency action, the plaintiffs' broader challenge to removal of numerous unidentified webpages constituted an impermissible challenge to "[g]eneral deficiencies" in the defendants' compliance with the law. *Id.* (alteration in original). In that context, the court stated that "an individual webpage removal challenged alone and distinct from the auspices of an overarching agency removal directive is not an agency action within the meaning of the APA." *Id.* That statement, however, does not carry the sweeping scope that Defendants suggest. Instead, when read in context, it reflects the court's fact-bound determination that some of the allegations the plaintiffs in that case made regarding "hundreds or thousands of webpages," *id.*, was more akin to a programmatic challenge than a challenge to a discrete agency action.

No such concern is present here, where Plaintiffs challenge the removal of four specified interactive tools. *See* Compl. ¶¶ 66–77, 84–95. Because Plaintiffs have described the complete universe of challenged agency action, they have sufficiently alleged "the kinds of 'discrete' and 'circumscribed' actions" that *Doctors for America* indicates is "subject to judicial review." *Id.* (quoting *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004)).

### B. Defendants violated the Paperwork Reduction Act's timely and equitable access requirement.

Congress enacted the PRA to "ensure the greatest possible public benefit from and maximize the utility of information created, collected, maintained, used, shared and disseminated by or for the Federal Government" and to "provide for the dissemination of public information on a timely basis, on equitable terms, and in a manner that promotes the utility of the information to the public and makes effective use of information technology." 44 U.S.C. §§ 3501(2), (7). To

accomplish these goals, Congress mandated that every agency "ensure that the public has timely and equitable access to the agency's public information." *Id.* § 3506(d)(1); *see CREW v. OMB*, 2025 WL 2025114, at *9.

The PRA defines "public information" as "*any* information, regardless of form or format, that an agency discloses, disseminates, or makes available to the public." *Id.* § 3502(12) (emphasis added). When an agency first "discloses, disseminates, or makes [information] available to the public," that information becomes "public information." *Id.* § 3502(12); *see* H.R. Rep. No. 104-37, at 109 (contrasting the PRA with the Freedom of Information Act and explaining that "'[p]ublic information' is information that an agency has in fact made public"). Because Defendants disseminated the removed webpages through their publicly accessible websites, the contents of those webpages are Defendants' public information, and the requirement to provide timely and equitable access attaches to them.

Defendants' removal of the interactive webpages denies "timely" access to their "public information" for two reasons. First, some of the information on the pages was available only through those webpages. For example, the Future Risk Index provided a novel assessment of the costs of climate change that is not available elsewhere, Compl. ¶ 56, and EJScreen included unique environmental burden indices and percentiles. *See* EPA, Environmental Justice Indexes in EJSCREEN, (Jan. 19, 2021), https://19january2021snapshot.epa.gov/ejscreen/environmental-justice-indexes-ejscreen_.html. By removing access to the webpages, Defendants effectively revoked access to that information. And, to state the obvious, access to information cannot be timely if there is no access at all.

Second, by removing access to the interactive tools, Defendants have denied access to information on the timeline on which it is most useful. When Defendants created the webpages,

30

they consolidated information from numerous other data sources and solved the difficult technical problems inherent in creating a consistent and user-friendly nationwide approach for combining that data. *Id.* By presenting that information in an interactive format, Defendants ensured that the public had easy access to the information whenever they needed it. *See, e.g.*, Compl. ¶¶ 60–65 (discussing disruptions from removal of the webpages). Attempting to collect the information from the disparate sources that Defendants consolidated with their interactive tools and to display it in a comprehensible format would require a significant investment of time and resources and "would present technical and data management challenges." *Id.* ¶ 64; *see id.* ¶ 65. By denying access to the interactive webpages, Defendants have therefore effectively denied access to all the information for a substantial portion of the public. *Id.* ¶¶ 69, 75, 87, 93.

Moreover, even well-resourced and technically-savvy members of the public now lack timely access to the information because, in situations with limited timeframes, such as public comment periods, they are now required to engage in a time- and labor-intensive process to retrieve the data that was previously accessible through the interactive webpages. "[M]any public comment periods are only open for 30 days," so the delays in accessing public information that Defendants have imposed by removing the interactive webpages will frequently prevent Plaintiffs from meaningfully engaging with policymakers. *See id.* ¶ 62; *see, e.g.*, U.S. Army Corp of Engineers, Public Notice of Application for Permit (Apr. 28, 2025) (seven-day comment period);[7] U.S. Army Corp of Engineers, Public Notice (Apr. 21, 2025) (thirteen-day comment period);[8] Compl. ¶ 24

---

[7]    https://www.nws.usace.army.mil/Portals/27/docs/regulatory2/Public%20Notices/2025/NWS-2024-23-PN.pdf?ver=WLa0grFTKFw6z-ltO_jT8g%3d%3d.

[8]    https://www.swg.usace.army.mil/Portals/26/docs/regulatory/PN%20APRIL/SWG-2025-00115%20TXCPL%20PN%20(Energy%20EO).pdf?ver=x-583fPypUiD0pJ6EvCq3g%3d%3d.

(describing use of EJScreen for public comments). Defendants' actions have thus undermined a key use of the data and denied timely access to Plaintiffs.

Defendants' removal of webpages is also not "equitable." In enacting the PRA's information dissemination requirements, Congress "require[d] agencies not only to refrain from enhancing the position of some members of the public over that of others, but to refrain from enhancing the Federal Government's position over that of others as well." H.R. Rep. No. 104-37, at 45. Removing access to the interactive tools, however, disadvantages the public, which now must spend substantial resources to attempt to access other, insufficient sources of information that the government possesses and previously made readily available. And, again, only well-resourced members of the public with technical expertise can even attempt to do so. *See* Compl. ¶¶ 62–64. Those barriers violate the duty to provide equitable access to public information.

Defendants do not seriously contest that the public now lacks "timely" and "equitable" access to this information.[9] Instead, they contend that the timely-and-equitable access provision does not even apply to the removed webpages. Their argument proceeds in two steps, both of which are flawed. First, Defendants argue that most of the information disseminated in each tool is not the Defendant agency's information but rather other agencies' information. Second, they argue that some of the information created by the Defendant agencies constituted "the subjective judgments (i.e. opinions) of the agencies rather than unadulterated facts and data," and thus that the removed tools did not display any of the Defendants' "public information." MTD 41; *see id.*

---

[9] In a single sentence each, Defendants assert that "the public still has timely and equitable access to the source code and many of the underlying data sources" for EJScreen and CEJST. MTD 44; *see id.* 42. But they do not argue that the public has timely access to the information that CEJST and EJScreen displayed as their end product, and their assertions are otherwise flawed for the same reasons as their claims about Plaintiffs' standing. *See supra* pp. 9–22. Defendants do not contest that their actions denied timely and equitable access to the information in the Future Risk Index and the ETC Explorer.

42–44. The first argument rests on a misunderstanding of what information the tools display, and the second relies on an absurd reading of the PRA and Defendants' blatantly misleading quotation of Office of Management and Budget (OMB) guidance.

The PRA defines "public information" as "any information, regardless of form or format, that an agency discloses, disseminates, or makes available to the public." 44 U.S.C. § 3502(12). Defendants seem to recognize that some of the information disseminated through the removed tools qualifies as "information" under the PRA. For example, CEJST both displayed information from the Centers for Disease Control and Prevention (CDC) about the prevalence of asthma and also used the prevalence of asthma to determine whether a community is disadvantaged. *See* CEQ, Methodology (Jan. 17, 2025), https://web.archive.org/web/20250117221651/https://screeningtool.geoplatform.gov/en/methodology#3/33.47/-97.5. And Defendants do not appear to contest that the data CEJST displayed regarding the prevalence of asthma is "information." *See* MTD 35 (recognizing that CEJST "aggregated information in data sets originating with and disseminated by entities such as the Census Bureau, the EPA, Transportation, the Department of Housing and Urban Development, the CDC, Energy, and FEMA").

Defendants contend, however, that because most of the "data inputs" used in the removed tools—that is, data that the tools both displayed on their own and used to calculate empirical measures of environmental burden, disadvantage, or costs of climate change—originated with other agencies, the tools do not disseminate each Defendant "agency's public information." MTD 38; *see id.* 41–44 (asserting that the PRA only applies to "raw data sets" for which the agency "generated" "all of the data"). Whether information is an "agency's public information," however, does not depend on whether the agency originally collected the information. Rather, it depends on whether the agency "discloses" or "disseminates" the information. 44 U.S.C. § 3502(12). The PRA

is clear that the "agency's public information" includes "any" information that the agency discloses or disseminates. *Id.* Here, that means that all information distributed to the public through the removed tools is Defendants' public information.

In addition, Defendants' argument ignores the ways in which Defendants combined information from other sources into their own unique datasets. One of the important features of the removed tools is that they provided a "nationally consistent dataset and approach for combining environmental and demographic indicators." EPA, What is EJSCREEN? (Jan. 19, 2021), https://19january2021snapshot.epa.gov/ejscreen/whatejscreen_.html; *see* Compl. ¶¶ 61, 63. When Defendants solved the technical challenges necessary to combine disparate data sources into a single, useful data source, they created a new set of "information" that they—not the agencies from which the underlying raw data derived—possessed and disseminated to the public. So, even if the removed tools did nothing more than combine and display data from other agencies, the information in the tools would still be the Defendant "agenc[ies'] public information," and the timely and equitable access requirement would apply.

Moreover, the removed tools did not merely combine and parrot data from other agencies. Instead, they both displayed that aggregated data and used the aggregated data to calculate their own objective empirical metrics. For example, CEJST used the input data to calculate and display a community's relative prevalence of health problems and other measures of environmental burden (e.g., that a community was in the 92nd percentile for asthma rates) and the relative prevalence of the community's population that was low-income. CEQ, Methodology (Jan. 17, 2025), https://web.archive.org/web/20250117221651/https://screeningtool.geoplatform.gov/en/methodo logy#3/33.47/-97.5. CEQ also incorporated into CEJST numerous other measures of burden, including those related to climate change, energy, housing, legacy pollution, transportation, water

and wastewater, and workforce development. *See id.* CEQ, Methodology (Jan. 17, 2025), https://web.archive.org/web/20250117221651/https://screeningtool.geoplatform.gov/en/ methodology#3/33.47/-97.5. For each of those categories, CEQ used the underlying data to determine a community's relative prevalence of the concerned burden indicator and flagged a community as disadvantaged if it was at or above the 90th percentile for the burden indicator and at or above the 65th percentile for low-income population. *See id.* If a community was both at or above the 90th percentile for a burden measure, such as the prevalence of asthma, and was at or above the 65th percentile for low income, CEJST identified the community as disadvantaged. Defendants calculated similar objective empirical metrics for use in EJScreen, the ETC Explorer, and the Future Risk Index. *See* Equitable Transportation Community Explorer (ETCE), ETCE Technical Documentation, DOT (Feb. 2023), https://www.transportation.gov/sites/dot.gov/ files/2023-02/ETCE-Technical-Documentation.pdf ("The index computes cumulative disadvantage by normalizing indicators associated with disadvantage, summing the percentile ranks of these indicators into components, and then summing the percentile ranks of the sums of each component to determine an overall score."); Environmental Justice Indexes in EJSCREEN: What the EJ Index Means, EPA (Jan. 19, 2021), https://19january2021snapshot.epa.gov/ ejscreen/environmental-justice-indexes-ejscreen_.html (describing how EJScreen indicators were calculated); Compl. ¶ 56 (explaining that the Future Risk Index used data about climate change and related risk factors to "project[] economic losses due to climate change at the county level, based on different greenhouse gas emission scenarios and environmental hazards"). Because the removed tools disseminated the information they contained and contained variables that Defendants themselves calculated, they contained Defendants' public information twice over.

In addition, even under Defendants' approach, the timely and equitable access requirement would apply to EJScreen, the ETC Explorer, and the Future Risk Index. Defendants acknowledge that EJScreen relied on EPA data that was not originally collected for the purposes of developing EJScreen, that the ETC Explorer relied on data originally collected by the Department of Transportation, and that the Future Risk Index relied on data originally collected by the Federal Emergency Management Agency (FEMA). *See* Overview of Environmental Indicators in EJSCREEN, EPA (Jan. 19, 2021), https://19january2021snapshot.epa.gov/ejscreen/overview-environmental-indicators-ejscreen_.html (listing eight data fields from other EPA datasets); MTD 40 ("EJScreen similarly aggregated data from a variety of different sources, including … the EPA[.]"); *id.* 13 ("The data that FEMA utilized to create the [Future Risk Index] included publicly available information from … FEMA."); *id.* 11 ("Data sources used included … various data sets developed and managed by [DOT's] Bureau of Transportation Statistics (BTS)."). Ignoring those facts, however, Defendants assert that the timely and equitable access requirement does not apply to EJScreen, the ETC Explorer, and the Future Risk Index on the grounds that those tools did not disseminate those agencies' information. *See* MTD 43–44. Because each tool did in fact incorporate preexisting underlying data sources from the disseminating agency, the timely and equitable access requirement applies even under Defendants' theory.

Defendants' second argument—that the tools contained subjective judgments rather than "facts" or "data"—fares no better. Defendants seek to characterize the empirical variables that they calculated for and disseminated through the removed tools as "subjective calculations" that amount to nothing more than "opinions" that fall outside the PRA's definition of "information" altogether. MTD 43; *see id.* 41–42, 44. Even setting aside that the phrase "subjective calculations" is an oxymoron, Defendants' reasoning conflicts with any sensical definition of "information" and

misunderstands the relevant text. As mentioned above, the PRA defines "public information" as "any information, regardless of form or format, that an agency discloses, disseminates, or makes available to the public." 44 U.S.C. § 3502(12). And OMB's government-wide guidance states:

> "Information" means any communication or representation of knowledge such as facts or data, in any medium or form, including textual, numerical, graphic, cartographic, narrative, or audiovisual forms. This definition includes information that an agency disseminates from a web page…. This definition does not include opinions, where the agency's presentation makes it clear that what is being offered is someone's opinion rather than fact or the agency's views.

67 Fed. Reg. 8452, 8460 (Feb. 22, 2002). The variables that Defendants calculated and included in the removed tools are "data" and "fact[s]" under the PRA and OMB's guidance because they are objective, empirical measures of the state of the world. Whether a community is, for example, at or above the 65th percentile for the share of its population that is low-income and is at or above the 90th percentile for the share of its population that suffers from asthma is not Defendants' "opinion." *Cf.* Websters Dictionary 1828 (2025) ("fact"), https://webstersdictionary1828.com/Dictionary/fact ("Reality; truth").

Moreover, even accepting Defendants' characterization of empirical measures as "subjective" would not remove the measures from the definition of "information," because they would represent "the agency's views." OMB's guidance distinguishes "the agency's views," which qualify as "information," from "opinions[] where the agency's presentation makes it clear that what is being offered is someone's opinion," which do not qualify as "information." 67 Fed. Reg. at 8460. Here, Defendants calculated and disseminated the relevant empirical data. Regardless of what label Defendants now seek to attach to that data, that process shows the data at least amounts to the agencies' views. Notably, Defendants quote only part of OMB's definition of "information"—omitting that the agency's views fall within the definition. *See* MTD 41 ("[OMB] guidance defines 'information' as 'any communication or representation of knowledge such as

facts or data, and does not include opinions.'" (quoting 67 Fed. Reg. at 8460)). Defendants'
obfuscation cannot change the underlying nature of the information they created and disseminated.

### C. Defendants failed to follow procedures required by the Paperwork Reduction Act.

Through the PRA, Congress also required agencies to "provide adequate notice when
initiating, substantially modifying, or terminating significant information dissemination products."
44 U.S.C. § 3506(d)(3). When Congress has set out a procedural requirement, such as a
requirement to provide notice or an opportunity to comment prior to agency action, and the agency
fails to satisfy that requirement, this Court has found the action to be both "not in accordance with
law and without observance of procedure required by law, in violation of Section 706 of the APA."
*United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union
v. Fed. Highway Admin.*, 151 F. Supp. 3d 76, 93–94 (D.D.C. 2015) (internal quotation marks
omitted). Defendants failed to observe the PRA's notice requirement before removing the
webpages at issue.

OMB's guidance explains that the term "information dissemination product" includes "any
books, paper, map, machine-readable material, audiovisual production, or other documentary
material, regardless of physical form or characteristic, an agency disseminates to the public,"
"includ[ing] any electronic document, CD-ROM, or web page." 67 Fed. Reg. at 8460. Here, the
webpages that Defendants removed are all "map[s]" or "web page[s]" that the agencies
disseminated to the public and therefore fit neatly within the definition of information
dissemination products.

Defendants do not contest that the removed webpages are "significant," and for good
reason. The information they provided was key to the public's understanding of how pollution,
climate change, and policy choices about energy and transportation impact public health and the

environment. *See, e.g.*, Compl. ¶¶ 23–32, 37–40, 54–55, 58–65. And Defendants themselves have recognized the singular usefulness of the information that the removed webpages provided and have invested substantial resources and years of time to develop the tools. *See supra* pp. 2–5; *cf.* OMB Circular A-130, 1993 WL 357572, at *40 (June 28, 1993) (including as examples of "significant" information dissemination products those that "by reason of the nature of the information, are matters of continuing public interest," "by reason of the time value of the information, command public interest," or "involve expenditure of substantial funds").

Because the removed webpages were significant information dissemination products, Defendants were required to provide "adequate notice" before removing them. 44 U.S.C. § 3506(d)(3). Yet Defendants failed to provide *any* notice at all. Without notice, Plaintiffs' work was thrown into disarray. *See* Compl. ¶¶ 27, 29, 38, 60–62. Further, Defendants' failure to provide notice undermined "[t]he purpose of the notice," which "is to maximize the ability of the public to influence agency information plans at an early stage." H.R. Rep. No. 104-37, at 46; *c.f.* 44 U.S.C. § 3506(d)(2) (requiring agencies to "solicit and consider public input on the agency's information dissemination activities").

Defendants seek to evade the consequences of their statutory violation by offering confused definitions of the terms "information" and "dissemination." MTD 34–40. Their arguments lack merit. First, although OMB's guidance provides a definition for "information dissemination product," Defendants' discussion of the PRA's notice requirement does not account for that definition. Instead, Defendants focus on the separate definitions of "information" and "dissemination." Because the guidance specifically defines "information dissemination product," Defendants' discussion of the separate definitions is unnecessary. *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992) ("[I]t is a commonplace [principle] of … construction that

the specific governs the general."); Antonin Scalia & Bryan Garner, Reading Law: The Interpretation of Legal Texts 183 (2012) ("[T]he specific provision comes closer to addressing the very problem posed by the case at hand and is thus more deserving of credence."). And the more specific definition of "information dissemination product readily covers the removed tools: OMB's definition of "information dissemination product" includes "any" map or webpage that an agency disseminates to the public, 67 Fed. Reg. at 8460, and the removed tools are maps and webpages.

Moreover, Defendants reading of "information" and "dissemination" is flawed. Defendants contend that each of the removed interactive tools is not an information dissemination product because they each disseminate "opinions" rather than "information" or because they disseminate information collected by other agencies. *See* MTD 34–40. Defendants made the same arguments with respect to the timely and equitable access requirement, and they are wrong for the same reasons. *See supra* pp. 32–37. And the argument that the PRA does not apply because other agencies collected some of the information that Defendants' interactive tools disseminated is also wrong with regard to the notice requirement for an additional reason. OMB's guidance defines "dissemination" as "agency initiated or sponsored distribution of information to the public." 67 Fed. Reg. at 8460. Thus, whether another agency *collected* the information is irrelevant. What matters is whether Defendants "initiated or sponsored *distribution*" of the information. 67 Fed. Reg. at 8460 (emphasis added). Here, Defendants each created and hosted their own tools. *See* Compl. ¶¶ 20–22 (alleging that "EPA encouraged public use of EJScreen," citing EPA's own description of EJScreen, and describing EPA's control of EJScreen), 35–36 (alleging that "CEQ regulations recognized the importance of CEJST and EJScreen and encouraged reliance on those tools" and describing CEQ's control of CEJST), 51–52 (alleging DOT's purpose for and control over the ETC Explorer), 56–57 (alleging DOT's purpose for and control over the ETC Explorer).

40

Defendants' websites confirm their use of and control over the removed webpages. *See, e.g.*, EPA, Purposes and Uses of EJSCREEN (Jan. 19, 2021), https://19january2021snapshot.epa.gov/ ejscreen/purposes-and-uses-ejscreen_.html (promoting use of EJScreen); CEQ, About (Jan. 17, 2025), https://web.archive.org/web/20250117222055/https://screeningtool.geoplatform.gov/ en/about#3/33.47/-97.5 (encouraging public use of CEJST); DOT, ETC Explorer (Jan. 26, 2025), https://web.archive.org/web/20250126215618/https://www.transportation.gov/priorities/equity/ justice40/etc-explorer (encouraging public use of the ETC Explorer). They therefore undeniably initiated and hosted the distribution of the information contained in the tools, and the notice requirement therefore applies.

In short, because Plaintiffs alleged that Defendants developed the interactive tools as "web pages" and "maps," shared those webpages with the public, and promoted significant reliance on the webpages, they have sufficiently alleged that the removed webpages were all significant information dissemination products. Because Defendants failed to provide notice before removing public access to the webpages, the removals therefore violated the PRA.

## CONCLUSION

For the foregoing reasons, this Court should deny Defendants' motion to dismiss.

Dated: August 25, 2025                    Respectfully submitted,

                                          /s/ Zachary R. Shelley
                                          Zachary R. Shelley (DC Bar No. 90021549)
                                          Adina H. Rosenbaum (DC Bar No. 490928)
                                          Allison M. Zieve (DC Bar No. 424786)
                                          Public Citizen Litigation Group
                                          1600 20th Street NW
                                          Washington, DC 20009
                                          (202) 588-1000
                                          zshelley@citizen.org

                                          *Counsel for All Plaintiffs*

41

Andrea Issod (pro hac vice)
Joya Manjur (pro hac vice)
Sierra Club
2101 Webster Street, Suite 1300
Oakland, CA 94612
(415) 977-5544

*Counsel for Sierra Club*