**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| SIERRA CLUB, *et al.*, | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 25-1112 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 37, 38, 47 |
| | : | | |
| ENVIRONMENTAL PROTECTION | : | | |
| AGENCY, *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

### MEMORANDUM OPINION

**GRANTING DEFENDANTS' MOTION TO DISMISS; GRANTING DEFENDANTS' MOTION FOR
RELIEF FROM LOCAL RULE 7(N)(1); DENYING PLAINTIFFS' MOTION FOR LEAVE TO FILE SUR-
REPLY**

## I. INTRODUCTION

Four non-profit advocacy organizations—Sierra Club, Union of Concerned Scientists
(UCS), Environmental Integrity Project (EIP), and California Communities Against Toxics
(CCAT) (collectively, "Plaintiffs")—filed suit against several federal agencies for removing web
tools on the agencies' public websites that compiled and presented information concerning the
environment. The organizations had utilized the web tools to gather data for use in their
advocacy and public education initiatives. The organizations allege that the removal of the web
tools violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq*., and the
Paperwork Reduction Act ("PRA"), 44 U.S.C. §3501 *et seq*.  The federal agencies have moved
to dismiss the Complaint, contending that, among other things, the organizations lack standing to
bring their claims. For the reasons discussed below, the Court agrees. Accordingly, the Court
grants Defendants' motion to dismiss.

## II.  BACKGROUND

### A.  Factual Background

#### 1.  The Removed Web Tools

Four federal agency webpages had, until early last year, "provided important information concerning the environment" through interactive data tools ("web tools"). Compl. ¶ 19, ECF No. 1. Several federal agencies, including the Environmental Protection Agency (EPA), the Council on Environmental Quality (CEQ)[1], the Department of Transportation (DOT), and the Federal Emergency Management Agency (FEMA) (collectively, "Defendants"), allegedly removed public access to these web tools between January 2025 and February 2025, without notice or explanation. *Id.* ¶¶ 4, 19, 68, 86, 92. The Court describes each removed tool below.

**EJScreen**. First released to the public in 2015, the EPA's EJScreen was an "interactive mapping tool" that provided data on local pollution burdens, demographic indicators, and environmental justice indicators. *Id.* ¶ 20; *see also* Pls.' Mot. Prelim. Inj. at 2, ECF No. 20 (citing EPA, *How was EJSCREEN Developed?* (Jan. 19, 2021), https://perma.cc/Q6DP-98SK). The tool "enabled users to conduct analysis for different pollutants and populations at the federal, state, and city levels" by providing users with "color-coded map[s], the ability to generate . . . report[s] for selected areas, and compar[ative] [analyses] showing differences between a selected area and the surrounding state, EPA region, or the nation."  Compl. ¶ 20. EPA created EJScreen "to be more transparent about how [it] consider[s] environmental justice in [its] work, []to assist [its] stakeholders in making informed decisions about pursuing environmental justice and []to create a common starting point between the agency and the public when looking at issues related to environmental justice." Mem. Op. Denying Pls.' Mot. Prelim. Inj. at 2–3, ECF No. 35 (quoting

---

[1] The CEQ is an advisory agency within the Executive Office of the President. *See generally Marin Audubon Soc. v. Fed. Aviation Admin.*, 121 F.4th 902 (D.C. Cir. 2024).

EPA, *Purposes and Uses of EJSCREEN* (Jan. 19, 2021), https://perma.cc/J4RA-ESG9)). EPA

recognized that EJScreen "may be of interest to community residents or other stakeholders as

they search for environmental or demographic information" and "can also support a wide range

of research and policy goals." Compl. ¶ 21 (citing EPA, *Purposes and Uses of EJSCREEN* (Jan.

19, 2021), https://perma.cc/J4RA-ESG9).

Plaintiffs used EJScreen in their public education and advocacy activities. For instance,

Sierra Club incorporated EJScreen data into reports, interactive maps, and testimony before

federal agencies and elected officials to highlight community impacts from proposed projects,

including environmental and public health burdens. Compl. ¶¶ 23–24. UCS used EJScreen in

public reports and community guides to explain environmental justice burdens. *Id*. ¶¶ 25–27.

CCAT utilized EJScreen to demonstrate environmental harms and advocate for stronger

regulation in disadvantaged communities. *Id*. ¶ 32. EIP relied on EJScreen to create reports,

maps, and legal filings to inform the public and policymakers. *Id*. ¶¶ 28–31. It also utilized

EJScreen for its interactive website—oilandgaswatch.org (Oil & Gas Watch)—to track oil, gas,

and petrochemical infrastructure and to inform the public about opportunities to submit public

comments. *Id*. ¶ 29. The website incorporated EJScreen data through EJScreen's Application

Program Interface (API), which allowed EIP to automatically retrieve demographic and

environmental burden data. *Id*.

**Climate and Economic Justice Screening Tool (CEJST)**. Created by CEQ, CEJST was

an "interactive mapping tool" that "identified and highlighted communities that face

disproportionate environmental burdens." *Id*. ¶ 34. CEJST "expanded on EJScreen and

considered burden indicators, including energy burdens, air quality, higher education enrollment,

formerly redlined census tracts, expected agricultural loss, and traffic proximity." *Id*.

Plaintiffs relied on CEJST to support its advocacy efforts and inform the public. Sierra Club, for example, "regularly relied on CEJST to provide targeted advocacy to address the disproportionate impact of environmental crises." *Id.* ¶ 37. UCS used CEJST to produce public reports on vulnerable communities and gaps in government infrastructure investment. *Id.* ¶ 38. EIP relied on CEJST for public reports, interactive maps, and materials informing the public and policymakers about industrial pollution. *Id.* ¶39. CCAT relied on CEJST to determine the impact of pollution on disadvantaged communities and to assist those communities in advocating against the environmental and health harms they are suffering. *Id.* ¶ 40.

**Equitable Transportation Community Explorer ("ETC Explorer").** DOT's ETC Explorer "was an interactive mapping tool" that aggregated location-based data on transportation insecurity, climate and disaster risks, environmental burdens, health vulnerabilities, and social vulnerabilities. *Id.* ¶ 51. It complemented CEJST by illustrating the cumulative burdens communities face as a result of transportation underinvestment. *Id.*

Sierra Club used ETC Explorer, alongside EJScreen, to identify transit routes connecting underserved communities to parks, trails, and other recreational areas; to urge municipalities to promote those routes; and to advocate for legislation creating or improving transportation connections between underserved communities and public lands. *Id.* ¶ 54. Sierra Club also relied on ETC Explorer, in conjunction with EJScreen, to identify gaps in public transit availability, guide its advocacy priorities, and inform the organization's allocation of resources for public transportation projects. *Id.* ¶ 55.

**Future Risk Index**. FEMA's Future Risk Index was an "interactive mapping tool" that presented "projected economic losses due to climate change at the county level, based on different greenhouse gas emission scenarios and environmental hazards (coastal flooding,

extreme heat, wildfire, hurricanes, and drought)." *Id*. ¶ 56. The Future Risk Index provided

information on how much climate change is likely to cost communities in the United States. *Id*.

"UCS used the Future Risk Index webpages for scoping technical analyses." *Id*. ¶ 58. It

also "had been considering integrating the tool into a forthcoming analysis on affordable

housing." *Id*.

### 2. Plaintiffs' Alleged Injuries

Plaintiffs allege that Defendants' removal of the web tools has impaired their public

education and advocacy efforts. According to Plaintiffs, the web tools were "essential for

explaining how communities around the country are harmed or benefited by policy choices

regarding the environment, transportation, and energy." *Id*. ¶ 2; *see also id*. ¶¶ 59–60. Plaintiffs

further allege that the removals make it harder to disseminate accurate information about the

impacts of industrial air and water pollution, forcing them to rely on less convenient alternative

sources or publish less detailed reports. *Id*. ¶¶ 60–61. Moreover, "[w]ithout the information

provided by the removed [web tools], Plaintiffs have had to halt work on reports intended for

public dissemination" in order to obtain the information elsewhere. *Id*. ¶ 60

Plaintiffs further allege that they lack access to alternative sources providing the same

level of "standardization, reliability, precision, and functionality," or a "consistent, reliable

methodology." *Id*. ¶ 63. EIP's Oil & Gas Watch website, for instance, incorporated EJScreen

data through EJScreen's API, which allowed EIP to automatically retrieve demographic and

environmental burden data. *Id*. ¶ 29. Without EJScreen, EIP alleges that it can no longer

automatically update the website and lacks the resources to perform those updates manually. *Id*.

In addition to affecting public education, Plaintiffs allege that the removals burden their

advocacy and participation in regulatory processes by eliminating tools needed to quickly assess

environmental and community impacts, thereby requiring Plaintiffs to expend additional resources to participate and advocate effectively. *Id.* ¶ 62*; see also* Pls.' Mot. for Prelim. Inj. at 1 ("Plaintiffs . . . cannot engage with policymakers as efficiently or effectively" without the web tools.). As a result of these alleged harms, Plaintiffs contend that they must either expend additional resources to determine how to serve their target populations or face a greater risk that their investments of time, money, and resources will "go to naught." Compl. ¶ 65.

## B.  Procedural Background

After the web tools' removals, Plaintiffs filed suit against the federal agencies, alleging that the failure to notify or explain the removal of the web tools violated the PRA, as well as the APA.[2] *See generally* Compl. Specifically, Plaintiffs claim that because Defendants provided no advance public notice before removing the web tools, Defendants failed to comply with the PRA's requirement that agencies "provide adequate notice when initiating, substantially modifying, or terminating significant information dissemination products."[3] *See*, e.g., *id.* ¶ 68 (quoting 44 U.S.C. § 3506(d)(3)). Plaintiffs further assert that because Defendants removed access to the web tools, Defendants also failed to provide "timely and equitable access to the agency's public information," as required by the PRA. *See, e.g.*, *id.* ¶ 69 (quoting 44 U.S.C. § 3506(d)(1)). Finally, Plaintiffs claim that Defendants' decisions to remove the web tools lacked reasonable explanations and that Defendants failed to engage in reasoned decision-making, in violation of the APA. *See, e.g.*, *id.* ¶¶ 69–71; ¶ 66 (quoting 5 U.S.C. §§ 706(2)(A), (D)). Plaintiffs request that the Court declare that Defendants' removal of the webpages violates the

---

[2] Originally Plaintiffs also challenged the removal of two online tools from the Department of Energy's ("DOE") website, *see* Compl. ¶¶ 13, 47–50, 78–83, but voluntarily dismissed their claims against DOE, *see* Notice of Voluntary Dismissal of Def. Dep't of Energy, ECF No. 33.

[3] Plaintiffs contend that the web tools are "information dissemination products" under the PRA. *See, e.g.*, Compl. ¶ 67 (citing 44 U.S.C. § 3506(d)(3)).

PRA and the APA, order Defendants to restore the removed webpages, and award them costs and attorneys' fees. *Id.* at 22.

After Plaintiffs filed their complaint, they moved for a preliminary injunction, seeking to have the web tools reinstated. *See* Pls.' Mot. Prelim. Inj. Chesapeake Bay Foundation, a conservation organization, filed an amicus brief in support of Plaintiffs. *See* Chesapeake Bay Found. Amicus Br., ECF No. 26. This Court denied the motion, citing Plaintiffs' failure to show irreparable harm. Mem. Op. Denying Pls.' Mot. Prelim. Inj. at 7–11. Thereafter, Defendants moved to dismiss the Complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). *See generally* Defs.' Mot. to Dismiss, ECF No. 37.

As relevant here, Defendants' motion argues that Plaintiffs lack standing because Plaintiffs have not suffered an informational injury, nor have they suffered a perceptible impairment to their services to establish organizational standing. *Id*. at 18–26. Defendants also seek relief from Local Rule 7(n)(1), which would have required Defendants to file a certified list of the administrative record and serve an administrative record simultaneously with their motion to dismiss. *See* LCvR 7(n)(1); Defs.' Mot. for Relief from Local R. 7(n), ECF No. 38. Plaintiffs oppose both motions.[4] Pls.' Opp'n Mot. Dismiss ("Pls.' Opp'n"), ECF No. 39; Pls.' Opp'n Mot. for Relief from Local R. 7(n), ECF No. 40. Plaintiffs also seek leave to file a sur-reply opposing

---

[4] Defendants contend that they should be excused from complying with Local Rule 7(n)(1) because their motion to dismiss does not rely on the administrative record. Defs.' Mot. for Relief from Local R. 7(n) at 1. Plaintiffs oppose Defendants' motion because "Plaintiffs seek to prepare a motion for summary judgment." Pls.' Opp'n Mot. for Relief from Local R. 7(n) at 2. Because the Court grants Defendants' motion to dismiss for lack of standing, as explained below, the Court grants Defendants' motion for relief; the record is unnecessary for resolving Defendants' dispositive motion. *See Connecticut v. U.S. Dep't of Interior*, 344 F. Supp. 3d 279, 294 (D.D.C. 2018).

Defendants' motion to dismiss, contending that Defendants' reply raises new arguments. [5] Pls.

Mot. for Leave to File Sur-reply at 1, ECF No. 47.

## III.  LEGAL STANDARD

Under Federal Rule of Civil Procedure Rule 12(b)(1), a claim must be dismissed if a

district court lacks subject-matter jurisdiction to entertain the claim. Fed. R. Civ. P. 12(b)(1).

Rule 12(b)(6), on the other hand, requires a court to dismiss "a claim upon which relief can[not]

be granted." Fed. R. Civ. P. 12(b)(6). When a defendant files a motion to dismiss under Rule

12(b)(1) and Rule 12(b)(6), a court must first examine the Rule 12(b)(1) challenges, *U.S. ex rel.*

*Settlemire v. District of Columbia*, 198 F.3d 913, 920–21(D.C. Cir. 1999), because "if it must

dismiss the complaint for lack of subject matter jurisdiction, the accompanying defenses and

objections become moot and do not need to be determined," *Epps v. U.S. Capitol Police Bd*., 719

F. Supp. 2d 7, 12 (D.D.C. 2010); *see also Bell v. Hood*, 327 U.S. 678, 682 (1946) (holding that a

motion to dismiss for failure to state a claim may be decided only after finding subject-matter

jurisdiction).

Because Rule 12(b)(1) concerns a court's ability to hear a particular claim, the court must

scrutinize the plaintiff's allegations more closely when considering a motion to dismiss pursuant

to Rule 12(b)(1) than it would under Rule 12(b)(6). *Macharia v. United States*, 334 F.3d 61, 64,

69 (D.C. Cir. 2003); *Epps*, 719 F.Supp.2d at 11–12; *Grand Lodge of Fraternal Ord. of Police v.*

*Ashcroft*, 185 F. Supp. 2d 9, 13 (D.D.C. 2001). In deciding a motion to dismiss under Rule

12(b)(1), a court must "accept as true all of the factual allegations contained in the complaint"

---

[5] Defendants have not taken a position on whether leave should be granted. Pls. Mot. for
Leave to File Sur-reply at 1. Because the Court does not rely upon any of Defendants' arguments
to which Plaintiffs wish to respond by filing a sur-reply, Plaintiffs' motion for leave to file a sur-
reply is denied. *See United States v. All Assets Held at Bank Julius Baer & Co.*, 772 F. Supp. 2d
191, 205 (D.D.C. 2011).

and draw all reasonable inferences in favor of the plaintiff, *Brown v. District of Columbia*, 514 F.3d 1279, 1283 (D.C. Cir. 2008), but courts are "not required . . . to accept inferences unsupported by the facts alleged or legal conclusions that are cast as factual allegations," *Rann v. Chao*, 154 F.Supp.2d 61, 64 (D.D.C. 2001). Further, the "court may consider such materials outside the pleadings as it deems appropriate to resolve the question whether it has jurisdiction to hear the case." *Scolaro v. D.C. Bd. of Elections & Ethics*, 104 F. Supp. 2d 18, 22 (D.D.C. 2000). Ultimately, the plaintiff bears the burden of establishing the court's jurisdiction, *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 182–83 (1936), and where subject-matter jurisdiction does not exist, "the court cannot proceed at all in any cause," *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998).

## IV.  ANALYSIS

Plaintiffs contend that they relied on the four web tools described above to advance their advocacy and public education initiatives. Now, without the web tools, Plaintiffs must expend additional time and resources to access the information upon which the web tools relied and recreate the functionality the tools provided. Plaintiffs also contend that the removal of the web tools devalued EIP's investment in its Oil & Gas Watch website, which utilized EJScreen. Defendants, on the other hand, assert that Plaintiffs have not established that they suffered an injury in fact and therefore lack standing.

The Court agrees with Defendants. Plaintiffs have failed to establish standing to pursue their claims. As discussed below, Plaintiffs have not shown that they suffered an injury in fact, as they have not demonstrated a cognizable legal right to the information they seek. Even assuming such a right exists, any alleged impairment to Plaintiffs' advocacy or public education activities is insufficient to establish organizational standing. Plaintiffs also fail to plausibly allege an

economic injury related to EIP's Oil & Gas Watch website. Accordingly, Defendant's motion to dismiss must be granted.

## A.  Informational Standing

Defendants argue that Plaintiffs have failed to establish informational standing because Plaintiffs have not identified a statute that entitles them to the web tools. Defs.' Mot. Dismiss at 21–22. Defendants also contend that Plaintiffs have not shown they suffered an informational injury, as Plaintiffs have access through other public sources to the underlying data upon which the web tools relied. *Id.* Defendants' arguments are indeed persuasive.

Informational standing "arises only in very specific statutory contexts where a statutory provision has explicitly created a right to information." *Ass'n of Am. Physicians & Surgeons, Inc. v. FDA*, 539 F. Supp. 2d 4, 15 (D.D.C. 2008) (citation modified), *aff'd*, 358 F. App'x 179 (D.C. Cir. 2009). It therefore does not extend to "situation[s] where . . . the plaintiff's view of the statute would not directly entitle it to the information it seeks." *ASPCA v. Feld Entm't, Inc.*, 659 F.3d 13, 24 (D.C. Cir. 2011). Thus, to establish informational standing, a plaintiff must "(1) identify a statute that, on plaintiff's reading, directly requires the defendant to disclose information that the plaintiff has a right to obtain, (2) show that it has been denied the information to which it is entitled, and (3) provide a credible claim that the information would be helpful to it." *WildEarth Guardians v. Salazar*, 859 F. Supp. 2d 83, 92–93 (D.D.C. 2012) (citing *FEC v. Akins*, 524 U.S. 11, 21 (1998); *ASPCA*, 659 F.3d at 22–23 (D.C. Cir. 2011); and *Ethyl Corp. v. EPA*, 306 F.3d 1144, 1148 (D.C. Cir. 2002)); *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016).

Plaintiffs contend that the PRA requires Defendants to provide Plaintiffs access to the web tools. Specifically, Plaintiffs note that Section 3506(d)(1) of the PRA states that agencies

must "ensure that the public has timely and equitable access to the agency's public information." Pls.' Opp'n at 9 (quoting 44 U.S.C. § 3506(d)(1)). But there is a difference in kind between: a statute requiring an agency to disseminate information to the public; and a statute requiring an agency to provide timely and equitable access to that information once it has been made public.[6] And a plaintiff suffers an informational injury only "when the plaintiff fails to obtain information which must be publicly disclosed pursuant to a statute." *Akins*, 524 U.S. at 21 (explaining that the plaintiffs' injury consisted of their inability to obtain information that "the statute requires that AIPAC make public"); *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395–96 (2024) (finding no informational injury alleged where plaintiffs did not assert that "federal law requires FDA to disseminate such information upon request by members of the public").

Section 3506 of the PRA, however, is not a public-disclosure law. The Eleventh Circuit, for instance, rejected the same argument Plaintiffs advance here concerning the same section of the PRA and a closely related subsection. In *Van Cleve*, the plaintiff claimed to have suffered an informational injury because it had been deprived of statistical data it claimed was required to be disclosed pursuant to Section 3506(e) of the PRA, a provision that requires that agencies make statistical data "readily accessible to the public." *Van Cleve v. U.S. Sec'y of Com.*, No. 21-13699, 2022 WL 1640669, at *4 (11th Cir. May 24, 2022) (per curiam). The Eleventh Circuit found that the "alleged informational injury was not concrete" because Section 3506(e) "is [not] a public-disclosure law that entitles all members of the public to certain information." *Id*. Rather, that

---

[6] Plaintiffs assert that whether the PRA requires the disclosure of the web tools goes to the merits. But "plaintiffs cannot assume away the entire informational-standing inquiry merely by erroneously asserting that the statute creates a cognizable interest in information." *Lawyers' Comm. for 9/11 Inquiry, Inc. v. Wray*, 848 F. App'x 428, 430 (D.C. Cir. 2021); *see also id.* (finding no informational injury where "[t]he plaintiffs' argument that [an] appropriations provision, which says nothing about disclosure, nonetheless mandates disclosure is not plausible").

provision of the PRA "only refer[s] to the responsibilities of statistical agencies" and does not "provide[] a mechanism for members of the public to seek disclosure of certain information." *Id.* (citing 44 U.S.C. § 3506(e)). In so holding, the court noted, "Section 3506 is titled 'Federal agency responsibilities'" and is contained within a subchapter titled "Federal Information Policy," which outlines its purposes as including "improving government efficiency, organization, and decision-making." *Id.* at *3 (citing 44 U.S.C. § 3501). Because Section 3506(e) does not entitle members of the public to certain information, the plaintiff there failed to establish informational standing. *Id.* at 4*.

The same is true here. Section 3506(d) directs agencies to disseminate information equitably and efficiently, seek and respond to public input about dissemination practices, not charge user fees for public information that exceed the cost of dissemination, and engage the public in using and adding value to agency data, among other things. *See generally* 44 U.S.C. § 3506(d). This is consistent with the PRA's purpose of "ensur[ing] the greatest possible public benefit from and maximiz[ing] the utility of information created, collected, maintained, used, shared and disseminated by or for the Federal Government" and "provid[ing] for the dissemination of public information on a timely basis, on equitable terms, and in a manner that promotes the utility of the information to the public and makes effective use of information technology." 44 U.S.C. §§ 3501(2), (7). Nothing in the statute, however, explicitly *requires* an agency to make certain information public. Instead, it requires only that an agency provide timely and equitable access to information once it has been distributed to the public. *See Info. Handling Servs., Inc. v. Def. Automated Printing Servs.*, 338 F.3d 1024, 1034 (D.C. Cir. 2003) (construing the PRA's mandate under § 3506(d)(1)(B), that agencies provide "timely and equitable access to the [data] underlying" public information "maintained in electronic format,"

as a requirement that an agency make available over the internet documents the agency had distributed to the public).

Plaintiffs have thus not identified any statute that requires Defendants to disclose the web tools to the public. To the contrary, the Complaint, for example, acknowledges that Defendants published the tools voluntarily, not because any law required them to do so. *See, e.g.*, Compl. ¶ 21 ("EPA recognized that EJScreen 'may be of interest to community residents or other stakeholders as they search for environmental or demographic information' and 'can also support a wide range of research and policy goals.'"). Plaintiffs therefore have not alleged that they were deprived of information to which they had a statutory right. Consequently, they have not established an informational injury necessary to establish standing.

Even if Plaintiffs could identify a statute requiring public disclosure of the web tools, Plaintiffs have not shown that they lack access to the underlying information upon which the tools relied. To establish informational injury, "plaintiffs must lack access to the information sought; a plaintiff cannot establish injury based on information that is already available from a different source, disclosure of which would only result in duplicative reporting." *Wertheimer v. FEC*, 268 F.3d 1070, 1075 (D.C. Cir. 2001) (citation modified). Similarly, a plaintiff lacks standing where the information sought "would add only a trifle to the store of information . . . already publicly available." *Campaign Legal Ctr. v. FEC*, 31 F.4th 781, 790 (D.C. Cir. 2022) (quoting *Citizens for Responsibility & Ethics in Wash. v. FEC*, 475 F.3d 337, 340 (D.C. Cir. 2007)).

At the heart of Plaintiffs' claims is that the web tools functioned as a centralized, standardized, and user-friendly platform, enabling Plaintiffs to efficiently analyze public data. According to Plaintiffs, the tools allowed them to manipulate data drawn from numerous public

datasets to create maps, reports, and analyses, without needing to access the underlying datasets directly. *See, e.g.*, Phartiyal Decl. ¶ 13, ECF No. 20-4 ("EJScreen, CEJST, the LEAD Tool, and the Future Risk Index were incredibly useful because they provided data in a user-friendly, interactive format and are based on datasets . . . from numerous government sources."); Pls.' Prelim. Inj. Mot. at 2–3 (explaining that EJScreen "standardiz[ed] and compil[ed] information from other public datasets" and presented it "in a more useful interactive format"); Pls. Opp'n at 2–3. Now, without the web tools, Plaintiffs must "locate all the underlying data sets from the tools, reformat and 'clean' the data, and develop programs to recreate the analyses, maps, and reports," a process they describe as "cumbersome and time-consuming." Grenter Decl. ¶¶ 13, 37, ECF No. 20-3; Duggan Decl. ¶ 31, ECF No. 20-5; Phartiyal Decl. ¶¶ 7, 13. And in some instances, as Plaintiffs acknowledge, Defendants have made the source code and underlying data available. *See* Pls.' Opp'n at 3 ("After removing EJScreen, EPA posted at least some of the data from EJScreen to a public repository."); *see also* Defs.' Opp'n Pls.' Prelim. Inj. Mot., Ex. 1 to D'Ambrosio Decl. at 30, ECF No. 29-4 (stating that CEQ's underlying code remains available online).

Plaintiffs also contend that the web tools provided a standardized and authoritative method for analyzing the underlying data. Duggan Decl. ¶ 31 (without EJScreen and CEJST, "demographic data must be directly estimated from U.S. Census data," lacking "the authoritative, standardized methodology that underlies [the web tools]"). The tools also "eliminated the need for expert testimony in litigation and regulatory proceedings to validate the data collection," and without the tools, Plaintiffs "will be forced to dedicate additional resources just to establish data reliability" and "will likely face challenges to the data it uses in litigation and regulatory proceedings." Williams Decl. ¶ 24, ECF No. 20-6; *see also* Chesapeake Bay Found. Amicus Br.

at 6, 9–10 (acknowledging that "the raw data was available" but expressing a preference for the web tools because the analyses generated from the tools are deemed more authoritative than those conducted independently by the organization's scientists and experts). Therefore, Plaintiffs' chief complaint is not that the underlying data is unavailable, but that they have lost the "standardization, reliability, precision, and functionality" the web tools provided. Duggan Decl. ¶ 30.

Plaintiffs cite no case—and the Court has found none—in which an informational injury was recognized where a plaintiff retains access to the underlying information but objects to the manner in which it is presented insofar that it is not in their preferred format—here, a web based tool.[7] Because the information Plaintiffs seek remains publicly available through other sources, as Plaintiffs acknowledge, they have not shown that they lack access to the underlying information upon which the web tools relied. Accordingly, Plaintiffs have failed to establish informational standing.

## B. Organizational Standing

In addition to informational standing, Plaintiffs invoke organizational standing as an alternative theory for standing. In particular, they claim that they have suffered an organizational injury based on the deprivation of information, the web tools, the very same injury they assert in an attempt to establish informational standing. To establish organizational standing, an organization "must make the same showing required of individuals: an actual or threatened

---

[7] Of course, certain laws may require that information be publicly disclosed in a particular format, but Plaintiffs have made no such allegations here. In other words, Plaintiffs do not claim that any law requires Defendants to publicly disclose the data through an interactive web-based tool. *Cf. Citizens for Resp. & Ethics in Washington v. Off. of Mgmt. & Budget*, 791 F. Supp. 3d 29, 40, 50 (D.D.C. 2025) (rejecting defendants' argument that plaintiffs had alternative sources for obtaining apportionment information; none of defendants' proposed alternatives provided plaintiffs with the information in the "Open Government Data asset format" required by the Consolidated Appropriations Act).

injury in fact that is fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by a favorable court decision." *Am. Anti-Vivisection Soc'y v. Dep't of Agric.*, 946 F.3d 615, 618 (D.C. Cir. 2020). Organizational standing, however, "is best conceived not as an entirely separate injury, but rather as a means for groups to vindicate their legal rights and interests, just as any individual person can." *Campaign Legal Ctr. v. Fed. Election Comm'n*, No. 22-CV-3319 (CRC), 2024 WL 4263853, at *7 (D.D.C. Sept. 23, 2024). Therefore, when the asserted injury stems entirely from the deprivation of certain information, an organizational injury based on that deprivation should rise and fall with Plaintiffs' informational injury. *Id.*; *see also Lawyers' Comm. for 9/11 Inquiry, Inc. v. Wray*, 848 F. App'x 428, 431 (D.C. Cir. 2021) (explaining that the organizational plaintiffs' claims predicated on the deprivation of information are "part and parcel of the alleged informational injury" and must fail with it). Because Plaintiffs here have not established that they suffered an informational injury, as explained above, Plaintiffs' assertion, that they have organizational standing based on that same injury, must fail.[8]

---

[8] As another court in this district has recognized, however, there appears to be competing lines of precedent in this Circuit on this point. *See Campaign Legal Ctr.*, 2024 WL 4263853, at *7. On the one hand, the D.C. Circuit has held that where plaintiffs lacked an informational injury because they had no cognizable legal interest in the information sought, plaintiffs also lacked organizational standing because the alleged organizational injuries were not "analytically separate" and could not be grounded on a non-existent interest. *See Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 377 (D.C. Cir. 2017) ("*EPIC*"). And on the other, it has found standing where organizations adequately alleged an organizational injury based on the deprivation of government reports, notwithstanding the absence of any statutory right to the reports that would support an informational injury. *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1097 (D.C. Cir. 2015) (explaining that "if an organization expends resources in response to, and to counteract, the effects of the defendants' alleged unlawful conduct . . . that suffices for purposes of organizational standing" (citation modified)); *id.* at 1100–06 (Millett, J., dubitante) (stating that the majority opinion's determination "just walks the path that circuit precedent has trodden" but expressing doubt that standing can properly rely on an informational harm untethered to a legally protected interest).

Nevertheless, even if Plaintiffs could pull apart organizational and informational injuries for purposes of establishing standing, Plaintiffs' bases for organizational standing are nevertheless unavailing. Plaintiffs claim that the deprivation of information—the lack of access to the web tools—has impaired their advocacy and public education activities. Plaintiffs further allege that this lack of access has also caused economic harm because it has devalued EPI's investment in its Oil & Gas Watch website. The Court disagrees.

Below, the Court outlines the standard Plaintiffs must meet to establish organizational standing and explains why Plaintiffs have failed to meet this standard as to their advocacy and public education activities. The Court then explains that Plaintiffs have not sufficiently alleged that EPI suffered economic harm.

### 1.  Standard

As noted above, to establish organizational standing, an organization must "mak[e] the same showing required of individuals: an actual or threatened injury in fact that is fairly traceable to the [defendant's] allegedly unlawful conduct and likely to be redressed by a favorable court decision." *Indep. Mkt. Monitor for PJM v. FERC*, 162 F.4th 1167, 1172 (D.C. Cir. 2025) (quoting *Am. Anti-Vivisection Soc'y*, 946 F.3d at 618). And to demonstrate an injury in fact, "an organization must allege a 'concrete and demonstrable injury to the organization's activities' that is 'more than simply a setback to the organization's abstract social interests.'" *Am. Anti-Vivisection Soc'y*, 946 F.3d at 618. (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). When determining whether an organization has so alleged, the court's inquiry is twofold. *Indep. Mkt. Monitor for PJM*, 162 F.4th at 1172. First, the court asks "whether the [plaintiff organization] has shown an injury to its organizational interests." *Id*. Second, the court

"look[s] to whether the [plaintiff organization] has used its resources to counteract that harm." *Id*. (citation modified).

The Supreme Court first articulated the contours of organizational standing in *Havens Realty*, where it considered whether a nonprofit organization that provided counseling and referral services to home seekers had standing to challenge allegedly discriminatory housing practices. 455 U.S. at 379. The organization alleged that those practices had "perceptibly impaired" its ability to deliver its services. *Id*. The Supreme Court emphasized that this alleged impairment amounted to more than "a setback to the organization's abstract social interests." *Id*. Rather, it constituted a "concrete and demonstrable injury to the organization's activities" that resulted in a "drain on the organization's resources." *Id*. On that basis, the Supreme Court concluded that the organization had standing to challenge the alleged discriminatory housing practices. *Id*.

More recently, however, the Supreme Court has cautioned against reading *Havens Realty* broadly. In *Alliance for Hippocratic Medicine*, the Supreme Court described *Havens Realty* as an "unusual case" and reiterated that it has declined to extend that decision beyond its "specific context." *All. for Hippocratic Med.*, 602 U.S. at 396. The Supreme Court underscored that the plaintiff in *Havens Realty* was not merely an advocacy organization, but also a provider of direct services, namely, counseling and referral services. *Id*. at 395. The injury supporting standing therefore stemmed from interference with the organization's core operational activities, not from harm to its abstract policy interests. *Id*.

Applying that understanding, the Supreme Court in *Alliance for Hippocratic Medicine* held that several medical associations lacked organizational standing to challenge the Federal Drug Administration's (FDA) approval of mifepristone, an abortion-inducing drug. *Id*. at 396.

Although the associations alleged that the FDA's actions forced them to expend substantial resources on research, advocacy, and public education related to abortion, the Supreme Court concluded that such expenditures were insufficient. An organization "cannot spend its way into standing" by choosing to devote resources responding to the challenged action. *Id.* at 394–95 (explaining that *Havens Realty* does not stand for the expansive theory that "standing exists when an organization diverts its resources in response to a defendant's actions"). Organizations may, however, have standing where the challenged conduct "directly affected and interfered with" the organization's "core business activities." *Id.* at 394–96. The Supreme Court noted that the effect on the "core business activities" of the organizational plaintiff in *Havens Realty* was "not dissimilar to a retailer who sues a manufacturer for selling defective goods to the retailer." *Id.* at 395.

Since *Alliance for Hippocratic Medicine*, courts in this district evaluating organizational standing under *Havens Realty* appear to agree that "prior circuit precedent is consistent with the organizational-standing principles articulated in *Alliance for Hippocratic Medicine*." *League of United Latin Am. Citizens v. Exec. Off. of President*, No. CV 25-0946, 2025 WL 3042704, at *13 (D.D.C. Oct. 31, 2025); *see also, e.g.*, *Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, 793 F. Supp. 3d 19, 66–70 (D.D.C. 2025); *Travelers United, Inc. v. Hyatt Hotels Corp.*, 761 F. Supp. 3d 97, 115 (D.D.C. 2025). That is, for an organization to have standing, it must allege that "the defendant's conduct 'perceptibly impaired' the organization's ability to provide services," *Turlock Irrigation Dist. v. FERC*, 786 F.3d 18, 24 (D.C. Cir. 2015), or as the Supreme Court phrased it, "directly affected and interfered with the organization's core business activities," *All. for Hippocratic Med.*, 602 U.S. at 396. *See* 4 Admin. L. & Prac. § 13:16 (3d ed.)

(explaining that the D.C. Circuit's organizational standing cases "reason[] along similar lines" as *Alliance for Hippocratic Medicine*).

### 2. Advocacy and Public Education Activities

In essence, Plaintiffs contend that Defendants' web tools offered a convenient and user-friendly "one-stop shop" of information that Plaintiffs could easily use and integrate into their public reports, website, and analyses, which Plaintiffs use to advance certain environmental and health initiatives. Now, without the web tools, Plaintiffs must seek other ways to obtain and present the same information, which they contend may take more time and resources to do than if Plaintiffs had access to the web tools. *See supra* pp. 13–15. As a result, Plaintiffs' advocacy and public education efforts, they argue, have been made "more difficult." Grenter Decl. ¶¶ 40–41; *see also* Phartiyal Decl. ¶ 13; Duggan Decl. ¶¶ 15–16; Williams Decl. ¶¶ 5, 17. These allegations, however, are insufficient to support organizational standing.

First, some of Plaintiffs' alleged injuries stem from the impact the web tool removals had on Plaintiffs' pure issue-advocacy or lobbying-related activities, which cannot support standing. Sierra Club explains, for instance, that it uses the web tools "to provide targeted advocacy to address the disproportionate impact of environmental crises" and the "[e]limination of [the web tools] makes Sierra Club's work more time-consuming and costly and less likely to succeed in its mission and goals." Grenter Decl. ¶¶ 32, 35; *see also* Compl. ¶ 54. The other organizations cite similar concerns. *See, e.g.*, Williams Decl. ¶¶ 14, 24; Phartiyal Decl. ¶ 12; Duggan Decl. ¶ 28.

When the alleged impairment of services consists of pure issue advocacy or lobbying-related activities, however, such impairment is insufficient to establish standing. *People for the Ethical Treatment of Animals*, 797 F.3d at 1093 ("[No] standing [is] found when the only injury arises from the effect of the regulations on the organizations' lobbying activities." (citation

modified)); *Turlock Irr. Dist.*, 786 F.3d at 24 (holding that an organization "does not allege impairment of its ability to provide services" when it alleges "impairment of its advocacy"); *Ctr. for Biological Diversity v. Dep't of the Interior*, 144 F.4th 296, 315 (D.C. Cir. 2025) (finding no organizational standing where organization alleged that "it must work harder to gather information and expend additional resources to lobby the federal government, file rulemaking petitions, request improved policies, and in other ways urge the government to better protect endangered and threatened species and habitats"); *Ctr. for L. & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1161 (D.C. Cir. 2005) (finding no organizational standing where organization alleged that defendant's actions "forced them to change their lobbying strategies" to "a more costly form of lobbying"). Moreover, allegations that an organization's ultimate goal has been made more difficult are not sufficient. *Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 11–12 (D.C. Cir. 2011); *Ctr. for L. & Educ.*, 396 F.3d at 1161–62 ("Frustration of an organization's objectives is the type of abstract concern that does not impart standing."). Thus, Plaintiffs assertions that the web tool removals affected its advocacy and lobby-related activities will not suffice to establish standing.

Second, Plaintiffs' allegations that its public education efforts are now harder because Defendants removed the web tools are likewise insufficient. Plaintiffs allege that "Defendants' removal of access to the webpages makes it harder for Plaintiffs to disseminate accurate information" about the environment because "they cannot publish reports with the same detailed data or must seek out alternative sources of information for their reports that are less convenient and less reliable." Compl. ¶ 61. To obtain such information, Plaintiffs allege that they must now "expend additional time and resources." Compl. ¶¶ 64–65; *see also* Grenter Decl. ¶ 37; Phartiyal Decl. ¶ 7; Duggan Decl. ¶¶ 8, 31; Williams Decl. ¶¶ 5, 17.

That Plaintiffs must now spend time and resources to obtain, compile, and analyze information from different data sets for use in their public education activities falls short of the required "perceptible impairment" to the organizations' ability to function, as is required for standing. *See Turlock Irrigation Dist.*, 786 F.3d at 24. Where, as here, an organizational plaintiff has no legal right to the information sought nor any entitlement to receive that information in a particular form and has access to such information through alternative means, the purported deprivation of information cannot be said to directly affect or interfere with the organization's core business activities. *See Indep. Mkt. Monitor for PJM*, 162 F.4th at 1172. Moreover, vague assertions that a plaintiff must "expend resources" to obtain the information from alternative sources is likewise insufficient to demonstrate a consequent drain on the organization's resources. *Id.* at 1174.

Recently, the D.C. Circuit in *Independent Market Monitor* declined to find organizational standing premised on an asserted lack of access to information, noting that the Supreme Court in *Alliance for Hippocratic Medicine* cautioned against extending the *Havens Realty* holding beyond its context.[9] *Id.* at 1173 (citing *Ctr. for Biological Diversity*, 144 F.4th at 315). The plaintiff—an organization retained by an electric-grid operator to monitor and report on regional market conditions—alleged that its exclusion from certain stakeholder meetings deprived it of

---

[9] In *Independent Market Monitor*, the D.C. Circuit observed that "in the past [it] [has] found organizational standing under *Havens Realty* based on informational harm even though the organization had no legal right to the information it sought." *Indep. Mkt. Monitor*, 162 F.4th at 1173. "But the Supreme Court," the court explained, "has since 'cautioned against' extending *Havens Realty* to such cases." *Id.* The court noted that *Havens Realty* "found informational injury . . . under a statute that . . . explicitly created a right to information" and in a particular form. *Id.* at 1172 (quoting *Animal Legal Def. Fund, Inc. v. Espy*, 23 F.3d 496, 502 (D.C. Cir. 1994) (citing *Jewell*, 828 F.3d at 994). The court therefore held that to establish standing under *Havens Realty*, a plaintiff without a legal right to the information sought must demonstrate how the lack of information "directly affect[s] and interfere[s] with [its] core business activities." *Id.* at 1173 (quoting *All. for Hippocratic Med.*, 602 U.S. at 395–96).

information necessary to perform its monitoring and reporting functions. The court rejected that theory, explaining that the legal provision the plaintiff sought to enforce—which would have permitted plaintiff to participate in those meetings— "d[id] not obligate anyone to disclose anything," nor did it confer upon the plaintiff "a right to receive information in a particular form," such as transcripts or recordings of the stakeholder meetings. *Id*. at 1172. Moreover, the court emphasized that the plaintiff was not foreclosed from obtaining the relevant market information altogether; the plaintiff already possessed, and could continue to access, market information through alternative channels outside the meetings. *Id*. at 1173. Because plaintiff could obtain, through alternative means, the market information needed to continue its core functions— "monitoring, advising, encouraging compliance, and informing others"—the plaintiff failed to demonstrate that the alleged deprivation of information "directly affected and interfered with [its] core business activities." *Id*.

So too here. As in *Independent Market Monitor*, Plaintiffs seek to enforce a statute—the PRA—that neither requires public disclosure of the web tools, or the information upon which the tools relied, nor entitles Plaintiffs to receive that information in any particular form. *See supra* pp. 10–13, 15. Here as well, Plaintiffs are not foreclosed from obtaining the information they seek through alternative, publicly available sources. *See supra* pp. 13–15. Accordingly, the alleged deprivation of information cannot be shown to have directly affected or interfered with Plaintiffs' public education activities, thus failing to give rise to an injury in fact for purposes of organizational standing under *Havens Realty*. *Indep. Mkt. Monitor*, 162 F.4th at 1172.

Furthermore, Plaintiffs' assertion that they must expend resources to obtain the information sought from alternative sources is insufficient to demonstrate the "drain on resources" necessary to establish standing. In addition to showing that the challenged conduct

perceptibly impaired the organization's core business activities, the organization must also show "how it has 'used its resources to counteract' the injury." *Id.* at 1174 (quoting *EPIC*, 878 F.3d at 378). As the D.C. Circuit in *Independent Market Monitor* explained, to establish a consequent drain on resources, a plaintiff must identify "programmatic expenditures it must make to fill the gap" resulting from the alleged deprivation of information. *Id.* (quoting *Ctr. for Biological Diversity*, 144 F.4th at 315); *see also id.* at 1177 (Edwards, J., concurring) ("To make this showing, it is not enough for an organization to merely state that it has expended resources in response to the alleged harm. Instead, an organization must offer specific representations to show a 'drain on resources.'" (quoting *Havens Realty*, 455 U.S. at 369)). Because the plaintiff there made only vague assertions that it had to "expend resources" to obtain the information it sought, *id.* at 1174, the D.C. Circuit was left to "speculate as what those costs might be," explaining that "[s]peculation is ordinarily fatal to standing," *id.* (quoting *EPIC*, 878 F.3d at 379). The court thus declined to find that plaintiff had met its burden to demonstrate that it used its resources to counteract the deprivation of information. *Id.*

Here, Plaintiffs have likewise made no specific representations to support their assertion that they have experienced a drain on their resources. Rather, they state in general terms that "[w]ithout these webpages . . . they must expend additional time, effort, and resources." Compl. ¶ 3; *id.* ¶ 64 (stating that collecting information from alternative sources "would require Plaintiffs to invest significant time and resources"). These "unadorned assertions," however, do not enable this Court "to fairly assess whether [Plaintiffs] ha[ve] satisfied the requirements for organizational standing under *Havens Realty*." *Viasat, Inc. v. FCC*, 47 F.4th 769, 781 (D.C. Cir. 2022) (citation modified). Plaintiffs have therefore also failed to allege that they have experienced the requisite "drain on resources" to establish organizational standing.

In sum, Plaintiffs' allegations that the removal of the web tools impaired their advocacy cannot establish organizational standing. Nor does the need to obtain the same information from alternative sources constitute a perceptible interference with its public education activities, particularly where, as here, Plaintiffs lack a legal right to the information sought, are not entitled to receive that information in a particular format, and retain access to the information through alternate means. Finally, Plaintiffs' vague assertions that they "expended resources," without identifying specific programmatic costs, are insufficient to show the necessary "drain on resources." Accordingly, Plaintiffs have not alleged an injury in fact sufficient to establish organizational standing.

### 3. Economic Injury

Finally, Plaintiffs contend that they have suffered an economic injury. According to Plaintiffs, the removal of EJScreen devalued EIP's investment in its Oil & Gas Watch website. *See* Pls.' Opp'n at 22–23. Specifically, in their opposition brief, Plaintiffs assert that "EIP invested substantial time, money, and resources into building and maintaining" the Oil & Gas Watch website and EJScreen's removal devalued "significant investments [EIP] made in developing their own interactive websites that rely on EJScreen." Pls.' Opp'n at 22. Certainly, economic harm constitutes an injury in fact for purposes of standing. *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 5 (D.C. Cir. 2017). But no such allegations appear in the Complaint nor in Plaintiffs' supporting declaration. *See* Compl. ¶ 19; Duggan Decl. ¶¶ 18–21, 33, 35. And "[a]n opposition brief cannot be used to put forth new allegations and legal theories, and as such, the Court must ignore those facts for the purposes of deciding [the defendant's] motion." *Briscoe v. Costco Wholesale Corp.*, 61 F. Supp. 3d 78, 83 n.2 (D.D.C. 2014) (citing *Sloan v. Urban Title Servs., Inc.*, 689 F. Supp. 2d 94, 114 (D.D.C. 2010).

At most, EIP has alleged that without EJScreen, "EIP can no longer automatically update the oilandgaswatch.org website," Compl. ¶ 29, "at the same pace and scale," Duggan Decl. ¶ 33. And Plaintiffs state only, and in general terms, that they "must now either expend additional time and resources to determine how to serve their target populations *or face a greater risk* that their investment of time, money, and resources will go to naught." Compl. ¶ 65 (emphasis added). Plaintiffs, however, cannot establish standing by "incurr[ing] certain costs as a reasonable reaction to a risk of harm." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013) (holding that plaintiffs cannot manufacture standing by inflicting harm on themselves based on their fears of hypothetical future harm). Thus, general allegations that Plaintiffs must expend resources to avoid a risk of uncertain future harm shall not do. *See id.* at 409; *see also EPIC*, 878 F.3d at 379 ("Speculation is ordinarily fatal to standing."). Plaintiffs have therefore failed to allege that they have suffered an economic injury to establish standing.[10]

## V. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss (ECF No. 37) is **GRANTED**; Defendants' Motion for Relief from Local Rule 7(n) (ECF No. 38) is **GRANTED**; and Plaintiffs' Motion for Leave to File Sur-reply (ECF No. 47) is **DENIED**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  March 11, 2026                                           RUDOLPH CONTRERAS
                                                                United States District Judge

---

[10] Because the Court finds that Plaintiffs lack standing, "the accompanying defenses and objections become moot and do not need to be determined." *Epps v. U.S. Capitol Police Bd.*, 719 F. Supp. 2d 7, 12 (D.D.C. 2010); *see also Bell v. Hood*, 327 U.S. 678, 682 (1946) (holding that a motion to dismiss for failure to state a claim may be decided only after finding subject-matter jurisdiction).